EXHIBIT G

# An Appraisal Report

*Concerning the Fair Market Value of the Fee Simple Interest of the*

**Hickory Ridge Crossing**
Multi-Tenant Retail Center

*Located At*

**3685-3721 Hickory Hill Road**
Memphis, Tennessee 38115



*Prepared For*

**Mr. Ronald Underberg**
**Chief Manager**
**American Properties, Co., G.P.**
5720 Stage Road, Suite E
Bartlett, Tennessee 38134

*Prepared By*

**Andrew J. Bryant, MAI, ASA**
Bryant Asset Advisors LLC
11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
EIN: 45-3085574

*As Of*

**April 9, 2019, Effective Date of Value**
April 9, 2019, Inspection Date
April 12, 2019, Report Date

BRYANT ASSET ADVISORS
Real Estate Appraisal & Consulting Services

11715 Fox Road, Suite 400-127
Indianapolis, Indiana 46236
Office: (317) 730-2423
Fax: (317) 863-1017
info@bryantassetadvisors.com
www.bryantassetadvisors.com

Mr. Ronald Underberg
Chief Manager
American Properties, Co., G.P.
5720 Stage Road, Suite E
Bartlett, Tennessee 38134

April 12, 2019

Subject: The estimated fair market value of the real property located at: 3685-3721 Hickory Hill Road, Memphis, Tennessee 38115

Dear Mr. Underberg,

Pursuant to your request, I have conducted the required investigation, gathered the necessary data, and made certain analyses that have enabled me to form an opinion as to the estimated fair market value of the fee simple interest in the property at the address listed above.

The function of this appraisal is to provide an "as-is" market value estimate of the subject property in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will also be utilized to develop a deduction for the seller's (owner's) federal income tax. The appraiser is not responsible for unauthorized use of this report. Based upon the subsequent investigation and analyses undertaken, I have formed the opinion, that as of the effective date of April 9, 2019, the fair market value of the subject property "as-is" is:

**FOUR MILLION SEVEN HUNDRED FIFTY-FIVE THOUSAND DOLLARS**
**(*$4,755,000)**

*Refer to page 12 for any Extraordinary Assumptions & Limiting Conditions.

**Note:** *A bargain sale of the real property is currently under contract. According to the purchase agreement provided to the appraiser by the client (signed by the buyer on January 7, 2019, and executed by the seller on January 17, 2019), the purchase price (bargain sale price) was listed as $2,000,000. The difference between the "purchase price", and fair market value estimate relates to charitable donation of the subject, and the negotiated price is not judged to be reflective of its fair market value.*

The analyses, opinions and conclusions herein were developed and this appraisal report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) and the Appraisal Institute's ethical requirements.

It is understood that this is an Appraisal Report and will be used financial decision making purposes relating to a bargain sale to a charitable organization and subsequent charitable donation. The Appraisal Report that follows presents only succinct discussions of the data, reasoning, and analyses undertaken to arrive at the valuation conclusion. This report is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report and IRS Publication 561. Documentation supporting the data, reasoning, and analyses is retained in the appraiser's file. This report is specific to the needs of the client. This letter is cogent only when presented conjointly with the appraisal report.

*Continued…*

*Mr. Ronald Underberg*
*Chief Manager*
*American Properties, Co., G.P.*
*Page Two*

American Properties, Co., G.P., in addition to affiliates and-or assigns, including Food Assistance, Inc. (the buyer), and the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's market value for financial decision-making purposes relating to a potential bargain sale and charitable donation of the subject.

**Extraordinary Assumptions**

- See page 12

**Hypothetical Conditions**

- None

Our firm appreciates the opportunity to have performed this appraisal assignment on your behalf. If we may be of further service, please contact us.

Respectfully submitted,
**Bryant Asset Advisors, LLC**

Andrew J. Bryant, MAI, ASA
Indiana Certified General Appraiser
Certification Number: CG41100046
Tennessee CG Temporary Practice Permit, Certification Number: 58857

**Bryant Asset Advisors LLC**
11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
EIN: 45-3085574

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... 4
APPRAISER'S CERTIFICATION ..... 5
SUMMARY OF SALIENT FACTS & CONCLUSIONS ..... 6
GENERAL ASSUMPTIONS AND LIMITING CONDITIONS ..... 8
EXTRAORDINARY ASSUMPTIONS AND/OR ATYPICAL LIMITING CONDITIONS ..... 12
REPORT FUNDAMENTALS ..... 13
- Definition of the Problem ..... 13
- Scope of Appraisal ..... 13
- Intended Use of Appraisal ..... 13
- Client Identification - Intended User of Appraisal ..... 14
- Real Property Interest Appraised ..... 14
- Effective Date of the Appraisal ..... 14
- Competency of Appraiser ..... 14
- History of the Property ..... 15
- "Typical Buyer" Defined ..... 15
- Definition of Market Value ..... 15
- Marketing Period & Exposure Time ..... 16
- Appraisal Process Summary ..... 17

MARKET AREA ANALYSIS ..... 18
- National Market Area Analysis ..... 18
- Regional Market Area Analysis ..... 26
- Local Market Analysis ..... 28

SITE DESCRIPTION ..... 33
IMPROVEMENT DESCRIPTION ..... 37
- Subject Photographs ..... 39

HIGHEST AND BEST USE ANALYSIS ..... 41
VALUATION PROCESS SUMMARY ..... 44
THE COST APPROACH ..... 45
- Land Value, "As-Vacant" ..... 45
- Improved Value ..... 47

SALES COMPARISON APPROACH ..... 51
- Comparable Sales Grid ..... 57

INCOME APPROACH ..... 60
- Direct Capitalization Calculation ..... 66

RECONCILIATION AND VALUE ESTIMATE ..... 67
ADDENDUM ..... 68
- *Subject Exhibits ..... 69*
- *Qualifications of the Appraiser ..... 70*
- *Engagement Letter ..... 73*

# APPRAISER'S CERTIFICATION

I hereby certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analysis, opinions and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. My analyses, opinions, and conclusions have been developed, and this appraisal report has been prepared in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice; Financial Institutions Reform, Recovery, and Enforcement Act of 1989, IRS Publication 561, and the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

8. Andrew J. Bryant, MAI, ASA, made an exterior only inspection of the subject on April 9, 2019.

9. Andrew J. Bryant, MAI, ASA, is professionally competent to perform this appraisal assignment by virtue of previous experience with similar assignments and/or research and education regarding the specific property type being appraised.

10. I have performed no other services, as an appraiser, or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

11. No one provided significant real property appraisal assistance to the person signing this certification.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, Andrew J. Bryant, MAI, ASA, have completed the continuing education program of the Appraisal Institute, and the American Society of Appraisers.

As of the effective date of this report, being: April 9, 2019.

April 12, 2019

Date

Andrew J. Bryant, MAI, ASA
Indiana Certified General Appraiser
License # CG41100046 (Expires 6/30/2020)
Tennessee CG Temporary Practice Permit, Certification Number: 58857

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

**PROPERTY NAME:** Hickory Ridge Crossing

**PROPERTY USE TYPE:** Multi-Tenant Retail Center

**REAL PROPERTY:** The subject property consists of a ±68,029 gross square foot multi-tenant retail center, originally developed in 1981, situated on a ±6.58 gross acre site, under a single parcel. The subject improvements are divided between twelve (12) suites total, of various sizes and configurations. Net rentable area (NRA) is also estimated to be ±68,029, as no significant common area exists. The site improvements consist of adequate asphalt and concrete paved parking (±84,670 SF), with ±680 striped spaces (parking ratio of 10/1,000), lighting, signage and landscaping for the trade area. The subject is in overall average condition for its age and market location.

**GENERAL LOCATION:** The subject is located along the west side of Hickory Hill Road, within the SWQ of its intersection with Winchester Road, within the City of Memphis, Shelby County, Tennessee. This location is within the southwest portion of Shelby County, approximately ±12.25 miles southeast of the Memphis CBD, within the central portion of the Memphis Metropolitan Statistical Area (MSA), in the southwestern portion of the State of Tennessee.

**LOCATION:**

Mailing Address: 3685-3721 Hickory Hill Road
County: Shelby County
City, State & Zip Code: Memphis, Tennessee 38115

**PARCEL NUMBER:** 09-3400-0-0383

**OWNER OF RECORD:** American Properties, Co., G.P.
5720 Stage Road, Suite E
Bartlett, Tennessee 38134

**PROPERTY HISTORY:** The subject property consists of a single parcel, currently under the ownership of American Properties, LP. The subject is identified on public records as 3695 Hickory Hill Road, Memphis, Tennessee 38115 (commonly known as 3685 or 3685-3721 Hickory Hill Road). County records indicate that no transfers of the subject parcels have occurred within the three years preceding the effective date of this appraisal.

A bargain sale of the real property is currently under contract. According to the purchase agreement provided to the appraiser by the client (signed by the buyer on January 7, 2019, and executed by the seller on January 17, 2019), the purchase price (bargain sale price) was listed as $2,000,000.

**Note:** The difference between the "purchase price", and fair market value estimate relates to charitable donation of the subject, and the negotiated price is not judged to be reflective of its fair market value.

**VALUE INDICATIONS:**

| | |
|---|---|
| Cost Approach: | $4,605,000 |
| Sales Comparison Approach: | $4,420,000 |
| Income Capitalization Approach: | $5,050,000 |

**FAIR MARKET VALUE "AS-IS":** **$4,755,000 – Final Weighted Value Conclusion**

| | |
|---|---|
| *As of the effective date being:* | April 9, 2019 |
| *As of the date of report being:* | April 12, 2019 |

**MARKETING & EXPOSURE TIME:** 24 to 36 months in current market conditions

## *General Assumptions and Limiting Conditions*

This appraisal report has been made with the following general assumptions:

1. Any legal description or plats reported herein are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. We have made no survey of the property and assume no responsibility in connection with such matters.

2. The appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the appraiser or the appraiser's staff or was obtained or taken from referenced sources and is considered reliable. No responsibility is assumed for the costs of preparation or for arranging geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

3. No responsibility is assumed for matters legal in nature. Title is assumed to be good and marketable and in Fee Simple unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated.

4. Unless otherwise stated herein, it is assumed there are no encroachments or violations of any zoning or other regulations affecting the subject property and the utilization of the land and improvements is within the boundaries or property lines of the property described and that there are no trespasses or encroachments.

5. Bryant Asset Advisors, LLC assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

6. It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein.

7. It is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

8. Unless otherwise stated within the report, the depiction of the physical condition of the improvements described herein is based on visual inspection. No liability is assumed for the soundness of structural members since no engineering tests were conducted. No liability is assumed for the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made. No responsibility is assumed for hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during our inspection.

9. If building improvements are present on the site, no significant evidence of termite damage or infestation was observed during our physical inspection, unless so stated in the report. No termite inspection report was available, unless so stated in the report. No responsibility is assumed for hidden damages or infestation.

10. Any proposed or incomplete improvements included in this report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

11. No responsibility is assumed for hidden defects or for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

12. Responsible ownership and competent property management are assumed.

13. The appraisers assume no responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

14. The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report.

15. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

16. Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment.

17. Unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered; unless otherwise stated. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

18. Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are our best estimate of current market thinking of what future trends will be. No warranty or representation is made that these projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

19. Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

20. Bryant Asset Advisors, LLC representatives are not experts in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraisers are not qualified to detect such substances. The client is urged to retain an expert in this field.

21. We are not experts in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent endangered species impact studies, research, and investigation that may be provided.

22. No environmental impact studies were either requested or made in conjunction with this analysis. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, and investigation that may be provided.

23. The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

24. Neither all nor any part of the contents of this report or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media, without the prior written consent and approval of the appraisers. This limitation pertains to any valuation conclusions, the identity of the analyst or the firm and any reference to the professional organization of which the appraiser is affiliated or to the designations thereof.

25. Although the appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

26. If this report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

27. The American Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

28. This appraisal report has been prepared for the exclusive benefit of the client. It may not be used or relied upon by any other party. Any other party who is not the identified client within this report who uses or relies upon any information in this report does so at their own risk.

29. The dollar amount of any value opinion herein rendered is based upon the purchasing power and price of the United States Dollar as of the effective date of value. This appraisal is based on market conditions existing as of the date of this appraisal.

30. The right is reserved by the appraiser to make adjustments to the analyses, opinions, and conclusions set forth in this report as may be required by consideration of additional or more reliable data that may become available. No change of this report shall be made by anyone other than the appraiser or appraisers. The appraiser(s) shall have no responsibility for any unauthorized change(s) to the report.

31. If the client instructions to the appraiser were to inspect only the exterior of the improvements in the appraisal process, the physical attributes of the property were observed from the street(s) as of the inspection date of the appraisal. Physical characteristics of the property were obtained from tax assessment records, available plans, if any, descriptive information, and interviewing the client and other knowledgeable persons. It is assumed the interior of the subject property is consistent with the exterior conditions as observed and that other information relied upon is accurate.

32. The submission of this report constitutes completion of the services authorized. It is submitted on the condition the client will provide reasonable notice and customary compensation, including expert witness fees, relating to any subsequent required attendance at conferences, depositions, and judicial or administrative proceedings. In the event the appraiser is subpoenaed for either an appearance or a request to produce documents, a best effort will be made to notify the client immediately. The client has the sole responsibility for obtaining a protective order, providing legal instruction not to appear with the appraisal report and related work files and will answer all questions pertaining to the assignment, the preparation of the report, and the reasoning used to formulate the estimate of value. Unless paid in whole or in part by the party issuing the subpoena or by another party of interest in the matter, the client is responsible for all unpaid fees resulting from the appearance or production of documents regardless of who orders the work.

33. Use of this appraisal report constitutes acknowledgement and acceptance of the general assumptions and limiting conditions, special assumptions (if any), extraordinary assumptions (if any), and hypothetical conditions (if any) on which this estimate of market value is based.

34. If provided, the estimated insurable value is included at the request of the client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The appraisers are not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The appraisers are not cost experts in cost estimating for insurance purposes.

## *Extraordinary Assumptions and/or Atypical Limiting Conditions of this Appraisal Report:*

1. General Assumption: The value conclusions described herein are predicated on several extraordinary assumptions being met or realized, based on the Internal Revenue Service (IRS), IRC §170, and Publication 561 guidelines. These include, but are not limited to, the aggressive and creative marketing of the asset be handled by an independent professional, globally dominant, commercial investment & leasing brokerage team (Cushman & Wakefield, CBRE, NKF, HHF or similar) specializing in industrial real estate; marketing time of the asset be nearly open ended (24-36+ months) and void of any undue pressure or motivation on the part of the seller; exposure time is assumed to have been (24-36+ months) preceding the effective date of value; necessary capital investment be made to repair all items of deferred maintenance (as described herein); property being professionally maintained throughout the prescribed marketing period to exhibit pride of ownership; outreach be made to the local city, municipality, or county, to explore any public-private partnership opportunities that might benefit the marketing efforts or serve to enhance the appeal of the subject property; historically low interest rates remain stable; national economic conditions remain stable and continue on a positive trend; local market conditions remain stable to upwardly trending; development/redevelopment trends continue to take root and benefit more properties within the subject's regional trade area. Finally, given the current upward economic trends seen in the real estate sector, it is the opinion of the appraiser that the subject property will be an attractive investment for an investor or group of investors, seeking a well located commercial property in the near future. The appraiser assumes the property to be in overall average physical condition (interior & exterior) and free and clear of any environmental contamination or similar hazard. If the subject is later determined to be impacted by environmental contamination, the appraisers reserve the exclusive right to review and amend/alter any and all opinions expressed herein.

2. The appraiser has not considered/included any FF&E in this valuation report.

3. The final reconciled value opinion associated with the subject's real property recognizes minimal deferred maintenance costs. However, any interested party is encouraged to engage a local licensed general contractor or structural engineering firm to further evaluate the subject property.

4. The appraiser was provided with, or has relied upon information on the subject property which may, at times, have been inconsistent with information available in the public domain regarding building size, dates of construction/renovation, precise acreage, lease terms, etc. It was therefore necessary for the appraiser to make certain assumptions throughout this report and will rely on these as being accurate until provided with information to the contrary.

5. The appraiser has relied upon information and documents provided by the owner/donor/seller/client/brokers/third parties/their advisors/local municipalities/county, state and federal agencies, etc. and assume these to accurately depict the condition of the subject property on the effective date of this appraisal report. If it is later determined that any of the information provided by the sources mentioned above, or other related parties, are determined to be false, information is omitted, or if the appraiser was provided with any inaccurate information, regardless of source, the appraiser reserves the exclusive right to alter any and all opinions expressed herein.

6. This appraisal assumes the physical and economic conditions related to the subject property as presented by public records and the client, prevail as of the anticipated date of donation/bargain sale (no later than 60 days from the effective date of this appraisal report). If the subject property of this appraisal report was not in comparable physical condition to similar competing properties in the market, or, any economic conditions have markedly changed since that time, the appraisers reserve the exclusive right to amend, alter or modify the details and conclusions presented herein.

7. The final value conclusions and exposure/marketing time periods presented herein, explicitly assume the subject property to have been marketed at or near the price point of the final correlated value presented within this report. Any previous marketing, asset pricing or pricing representations for the subject have not been given considerable weight due to the fact they were likely established by a highly motivated owner/seller with differing motivations than those of a typical Seller under the definition of "Fair Market Value" as defined by the Internal Revenue Service (IRS), IRC §170, and Publication 561.

8. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved nor have I, or our firm, completed any assignments related to the subject property within the past 3 year period. The appraiser assumes, and the value is predicated on, the property being in a similar overall condition to that observed during inspection.

## *Hypothetical Conditions:*

1. None.

# REPORT FUNDAMENTALS

The following sections provide basic information about the subject property and this appraisal report.

## *Definition of the Appraisal Problem*

This analysis has been ordered by the client to estimate the fair market value of the fee simple interest in the subject property, identified as the multi-tenant retail center, located at 3685-3721 Hickory Hill Road, Memphis, Tennessee 38115. It is understood that this is an Appraisal Report, and will be used for financial decision-making purposes in support of a bargain sale to a charitable organization, based on IRS Publication 561. It is acknowledged that, ultimately, this appraisal will also be utilized to develop a deduction for the seller's (owner's) federal income tax. This appraisal is undertaken on an "as-is" basis. Refer to page 12 for Extraordinary Assumptions and/or Atypical Limiting Conditions.

## *Scope of Appraisal*

The scope of this appraisal concerns the valuation of the subject property - as identified within the *Problem* and *Identification of the Subject Property* sections of this report - on an "as-is" basis.

Having performed an investigation of the subject site and local market area, as well as having gained an understanding of various locational and supply and demand forces active within the subject's market, an analysis is performed concerning the subject property's highest and best use. Based upon the conclusions ascertained via the highest and best use analysis, relevant comparable sales information has been sought, collected, and verified. The data included in this report represents information collected from several sources, not limited to, grantors and grantees of properties, real estate brokers, real estate appraisers, developers of real estate, and real estate management companies. Sources are quoted where applicable.

In most appraisals, once all relevant information is collected and analyzed, it is systematically developed into three approaches to value; the Cost Approach, Sales Comparison Approach, and the Income Approach. Finally, these three value estimates are then reconciled into a final market value determination for the subject property. Additional value determinations may be indicated as deemed necessary by the appraisers, or as requested by the client.

Note that all of the data obtained and employed within this analysis is not necessarily presented within this report. Data collected during our office's research-phase of the valuation analysis but not considered relevant is maintained within our office's work-file.

## *Intended Use of Appraisal*

The intended use of the appraisal analysis undertaken is to determine the highest and best use and estimate the market value of the fee simple interest in the subject on an "as-is" basis for financial decision making purposes in support of a bargain sale to a charitable organization. No attempt is made to determine "sentimental," "book," or "investment" value. This report is for the sole and private use of the client. Acceptance and use of this report shall constitute contractual agreement with an implied consent to all of the definitions, functions, purposes, and limiting conditions contained in this report.

## Client Identification - Intended User of Appraisal

American Properties, Co., G.P., in addition to affiliates and-or assigns, including Food Assistance, Inc., and the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's market value ("Fair Market Value") for financial decision making purposes in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will be utilized to develop a deduction for the seller's (owner's) federal income tax. No other user is intended or permitted.

## Real Property Interest Appraised

The real property interest appraised is the fee simple estate interest. It is defined as:

> "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."[1]

Fee simple estate is recognized as the highest state of ownership, an absolute fee, a fee unencumbered by restrictions; a fee without limitations of use or dispositions to any particular class of heirs; subject only to the aforementioned limitations.

## Effective Date of the Appraisal

Andrew J. Bryant, MAI, ASA, made an exterior only inspection of the subject on April 9, 2019. The effective date of value is April 9, 2019, or the date of inspection. The report was prepared in the interim and signed on April 12, 2019, representing the approximate completion date of the report.

## Competency of Appraiser

Our office certifies that Andrew J. Bryant, MAI, ASA, is currently a Certified General Appraiser (CG41100046) by the State of Indiana, working under a temporary permit to practice within the State Of Tennessee (#58857). He is designated as a commercial (MAI) appraiser by the Appraisal Institute, and an Accredited Senior Appraiser (ASA – Real Property) by the American Society of Appraisers.

During the previous several years, Andrew J. Bryant, MAI, ASA, has performed and adequately completed appraisal assignments concerning various improved commercial and industrial properties, as well as vacant tracts of land contemplated for development of various types of office-use, retail, commercial, industrial and residential development. He has previously appraised properties similar to the subject of this report.

---

1 Appraisal Institute, The Dictionary of Real Estate Appraisal, Fifth Edition, (Chicago, Appraisal Institute, 2010), p. 57.

## *"Typical Buyer" Defined*

The "typical buyer", as the term is used in this appraisal context, is defined to identify the characteristics of a potential purchaser of this real estate and improvements. Such characteristics are used to develop the mind-set of those individuals or entities most likely to comprise the theoretical market for the subject. The "typical buyer" is considered as an investor, group of investors, or possibly an owner-user, whose purpose is achieve a fair return on a reasonably safe real estate investment.

## *History of the Property*

The subject property consists of a single parcel, currently under the ownership of American Properties, LP. The subject is identified on public records as 3695 Hickory Hill Road, Memphis, Tennessee 38115 (commonly known as 3685 or 3685-3721 Hickory Hill Road). County records indicate that no transfers of the subject parcels have occurred within the three years preceding the effective date of this appraisal.

A bargain sale of the real property is currently under contract. According to the purchase agreement provided to the appraiser by the client (signed by the buyer on January 7, 2019, and executed by the seller on January 17, 2019), the purchase price (bargain sale price) was listed as $2,000,000.

<u>Note: The difference between the "purchase price", and fair market value estimate relates to charitable donation of the subject, and the negotiated price is not judged to be reflective of its fair market value.</u>

## *Definition of Fair Market Value*

Fair market value is specifically identified to differentiate the conclusion of this analysis from other forms of value. According to U.S. treasury Department regulations, Fair market value is defined in this report as:

*"Fair market value (FMV) is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. If you put a restriction on the use of property you donate, the FMV must reflect that restriction."*[2]

As stated, this intended use of this appraisal report is to support the due diligence of a bargain sale for charitable donations under IRS Publication 561 guidelines.

## *IRS 561 Appraisal Guidelines*

Regardless of a property's location, condition or adverse environmental hazards, the IRS allows the Seller to obtain an IRS 561 appraisal for the purpose of a Bargain Sale transaction. The appraisal method is not like a typical bank quick-sale appraisal, nor an insurance appraisal. It's specifically for the purposes of estimating the value of donated property.

**<u>Not Under Compulsion to Sell</u>**

In IRS Publication 561 and IRC §170 the regulations state in various forms that the value for charitable contributions and bargain sales are determined with the following components:

*"The fair market value is the price at which the property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, <u>with neither being required to act</u>, and both having reasonable knowledge of the relevant facts."*

---

[2] IRS Publication 561

In real estate transactions, one of the biggest reasons that a 561 Appraisal may be higher than list price for large and hard to move properties with significant carrying costs is because the list price is often determined by a seller who is "under compulsion" to sell within certain time frames.
The carrying costs and need to dispose of the property outweigh the need to wait and find the right buyer and user. The 561 Appraisal price is determined by using the IRS stipulation of "not under compulsion" to buy or sell regardless of the carrying cost and other factors.

**Weighted Average of Market, Income, and Replacement Cost Approaches**
Another example of how this appraisal method is different is that Publication 561 allows for, and encourages, a weighted average of the market (sales) approach, income approach and replacement cost approach. The Bargain Sale 561 appraisal accounts for all approaches using a weighted average determined by the qualified appraiser. However, it remains the appraiser's discretion which approaches are applied.

**Highest and Best Use**
A final example of how the 561 Bargain Sale Appraisal is often higher than what the seller is willing to sell it for, is because IRS Publication 561 makes it clear that the appraised value must be based on the property's highest and best use. And quite often the Seller is not patient enough to realize the highest and best use of the property, because of things like the high carrying costs of the property, the Seller's own business and investment focus, external factors influencing the seller's motivation and compulsion to sell, and so forth.

These are just a few examples of how often a Bargain Sale Appraisal, based on Publication 561, can be very different than what the Seller is willing to sell it for.

Bargain Sale Analysis and a Bargain Sale Opinion of Value, as defined by Charity Partners Network and the Welfont Group:

*"Our researchers specifically look for properties that fit our investment criteria, are hard to sell within certain time parameters, and would obtain a higher appraised value than what the seller can sell it for under compulsion, duress, or certain time limits. Once potential properties have been selected, we do an internal valuation to determine where a certified appraiser will likely appraise a specific property. If our internal valuation is favorable and we like the property, then we make an offer. If the seller accepts our offer, then go through the actual appraisal process with the seller."*

## Exposure Time & Marketing Period

The exposure period is "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market".[3]

The marketing period is "the reasonable marketing time is an estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of an appraisal."[4]

Based on conversations with local brokers, the subject's marketing and exposure periods are estimated to be approximately 24-36 months to an unmotivated seller, wishing to receive fair market value for their property under the definition of market value utilized in this appraisal (see above). Refer to page 12 for Extraordinary Assumptions and/or Atypical Limiting Conditions.

---

[3] USPAP Standard No. 6 Adopted September 16, 1992.
[4] USPAP Advisory Opinion G-7, 1994, page 89.

## *Appraisal Process Summary*

The following presents the appraisal process performed in this Appraisal Report:

The use of the Cost Approach is predicated on the assumption that a prudent investor is not warranted in paying more for a given property than its cost of production. This appraisal centers on the valuation of a ±38 year old retail center. Due to the difficulty and highly subjective nature of estimating depreciation in a property of the subject's age, the Cost Approach has limited credibility, and was not granted emphasis in the final reconciliation of value.

The Sales Comparison Approach is developed from a limited statistical sampling of sales of "like-kind" properties. In the case of the subject analysis, the lack of resent sales of truly comparable multi-tenant retail properties in the Gary market made it necessary for the appraiser to expand their search area for comparable sales data. Based on the number and degree of required adjustments and the perceived compatibility of the sales comparables, the resulting estimate of value for the subject property is considered generally reliable, but due to the lack of comparable trade data in the immediacy of the subject, the Sales Approach was assigned a supportive role in the reconciliation of value.

The Income Capitalization Approach is chiefly reliable in the appraisal of properties which are capable of generating income. In this appraisal, the Income Approach was considered a reliable and appropriate indicator of value for the subject, and weighted accordingly in the final reconciliation of fair market value.

# MARKET AREA ANALYSIS

## *Introduction*

The initial analysis undertaken concerning the valuation of the subject property focuses upon various "external" factors, (i.e., factors beyond the subject property's physical boundaries), that influence market value and potential marketability. In addition to communicating the subject's physical context within Shelby County, Tennessee, a national and regional market analysis is performed to ascertain the subject's geopolitical context. Geopolitical forces that affect market value and marketability include the subject's position relative to area demographic shifts and the local market's infrastructure. Consideration is also given to the subject's position relative to area economic trends and growth cycles. Having considered the effects of these various forces, informed conclusions concerning the health of the area and local market can be drawn.

# NATIONAL MARKET ANALYSIS

Initially, this analysis will focus on the macro economy of the nation. A national map showing the subject's regional market is shown below and a summary of the national economy follows.

**National Map**




## *Overview*

U.S. GDP growth will rise to 2.5 percent in 2018. It's the same as the in 2017, but better than the 2.1 percent growth in 2016. The increase in gross domestic product will drop to 2.1 percent in 2019 and 2.0 percent in 2020. That's according to the most recent forecast released at the Federal Open Market Committee meeting on December 13, 2017. This forecast begins to take into account the impact of Trump's policies.

The unemployment rate will drop to 3.9 percent in 2018 and 2019, but rise to 4.0 percent in 2020. That's better than the 4.1 percent rate in 2017, and the 4.7 percent rate in 2016. It's also better than the Fed's 6.7 percent target.

But Federal Reserve Chair Janet Yellen admits a lot of workers are part-time and would prefer full-time work. Also, most job growth is in low-paying retail and food service industries. Some people have been out of work for so long that they'll never be able to return to the high-paying jobs they used to have.

That means structural unemployment has increased. These traits are unique to this recovery. They also make the unemployment rate seem low. Yellen considers the real unemployment rate to be more accurate. That rate is usually double the widely-reported rate.

Inflation will be 1.9 percent in 2018, 2.0 percent in 2019 and beyond. Inflation was 1.7 percent in 2017. These rates are lower than the 2.1 percent rate in 2016, and the 0.7 percent inflation experienced in 2015. The low rates in those years were caused by declining oil prices. The core inflation rate strips out those volatile gas and food prices. The Fed prefers to use that rate when setting monetary policy. The core inflation rate will be 1.9 percent in 2018, 2.0 percent in 2019 and 2020. (It's unusual that the core rate is that similar to the regular inflation rate.) Fortunately, the core rate is close to the Fed's 2.0 percent target inflation rate. That gives the Fed room to raise rates to a more normal level. Here's more on the U.S. Inflation Rate History and Forecast.

U.S. manufacturing is forecast to increase faster than the general economy. Production will grow 2.8 percent in 2018. Growth will slow to 2.6 percent in 2019 and 2 percent in 2020.

The following points summarize some of our general observations relating to the national economy.[5]

**Economy (GDP / Gross Domestic Product):**

- The economy steamed ahead in the third quarter, growing by 3.3%, despite hurricanes that battered the Southeast and U.S. territories during the quarter. Although the storms reduced spending on both home and business construction, a surge of new-car buying took place in September as Texas flood victims replaced damaged vehicles.
- The economic momentum should continue into the fourth quarter, with 2.7% growth. Consumer spending is likely to remain strong, given the jump in consumer sentiment surveys in October. Business investment in equipment is picking up. And extra spending to repair damage from the hurricanes will continue to boost the economy. Tens of thousands of houses still need to be repaired, and tens of thousands of vehicles need to be replaced. Houston alone will need to ship or truck in tons of freight to replace what was lost.
- Expect a pickup in growth to 2.6% in 2018, after 2017's 2.2% full-year pace. Beyond momentum, the economy likely will get an extra boost when congressional Republicans pass their tax plan. Rising household wealth and income, further job gains (albeit at a reduced rate), and credit utilization are underpinning consumer spending. However, expect motor vehicle sales to slow significantly once flood-related replacement buying tapers off.
- 2018 will also be a good year for business spending, with a high level of equipment purchases and increasing business construction. Spending on inventories will rise as well. Home building should rev up, given the shortage of homes for sale relative to demand from would-be buyers.
- Government spending is likely to stay flat, except for defense, and thus contribute little to GDP growth. Federal hiring is no longer completely frozen but will remain extremely slow, partly because of the dearth of middle-management political appointees who approve new federal government hires. State and local governments' spending plans are cautious, given the uncertainty of federal funding for Medicaid and other programs supported by Uncle Sam.

[5] Data obtained from Kiplinger's Economic Outlooks, 2017

- The Federal Reserve is expected to hike interest rates on December 13 and twice next year. Despite the low 1.4% inflation rate for core consumer items, the Fed will decide that GDP growth is strong enough to justify boosting the short-term federal funds rate to 3% by 2020 (from 1.25% now), unless the economy slows sharply. The Fed's rate hike will push up the bank prime lending rate to 6.25% by 2020, weighing on auto sales and other consumer spending that is financed in the short term. However, the long-term rates that finance mortgages are likely to stay low if, as we expect, inflation remains tepid.

**Employment:**

- November's 228,000 new jobs indicate a growing economy and rebuilding efforts in hurricane-damaged areas. Although rebuilding accounts for roughly 35,000 of the new positions, that still leaves a large enough gain for the rest of the country to indicate continuing economic growth. Hiring is going strong in warehousing, health services and temporary help, and picked up in manufacturing, construction and retail. Manufacturing hiring has benefited from improving export prospects, but some of it is related to high levels of production in the auto industry and its suppliers. This pace is expected to ease next year as auto production flattens.
- Unemployment held at 4.1% in November. Look for it to drop to 3.9% next year as it becomes harder for employers to find suitable candidates. The short-term unemployment rate (less than six months) has fallen to its lowest level in 65 years, indicating that the labor market should be really tight right now.
- Tight labor markets are also evident in high levels of job openings in construction, transportation, warehousing, health care and food services. Openings in the last two categories are at their highest level in 15 years.
- But worker scarcity has not translated into strong wage gains yet. November wage gains were only 2.3% for nonsupervisory employees and 2.5% for all employees. Wage growth has been stuck around 2.5% for a couple of years. However, expect it to pick up in 2018, likely reaching 3% by the end of the year.

**Interest Rates:**

- Long-term interest rates are heading up next year, but will be outpaced by short-term rates. The modest pickup in inflation will keep long rates from rising as much as short ones. The deficit increase that would accompany tax legislation under consideration by Congress would move long rates up or down, depending on the final law, compared to current expectations.
- The Fed will keep raising short rates because it is focused on the falling unemployment rate and other indicators that show a tightening labor market. The Fed very much wants to stay ahead of any inflation that rising wages may generate, and will probably lift short-term rates by a quarter of a percentage point once more in 2017, likely at its December 13 meeting. And it probably will raise rates at least twice in 2018. That would put the federal funds rate at 2.0% heading into 2019.
- We think today's 2.35% yield on the 10-year Treasury note will hit 2.8% by the end of 2018. The bank prime rate that auto loans and home equity loans are based on will bump up from 4.25% to 5.0% by the end of 2018. The 30-year fixed-rate mortgage is likely to rise to 4.4% from today's 3.95%. The 15-year fixed-rate mortgage should rise to 3.7% from 3.3% currently.

**Inflation:**

- Inflation will rise slightly next year, in keeping with a gradually strengthening economy. Price inflation for housing, medical care and other services will bump up from low levels in 2017 to more typical gains in 2018, causing total inflation to rise from 1.9% to 2.1% next year. Housing costs will likely gain 3.5% in 2018, up from 3.2%; medical services prices will gain 2.8% in 2018, up from 1.9% in 2017; and prices of other services will rise 2.6% in 2018, up from 1.8%. Food, energy and other goods are likely to rise at a rate like 2017's.

- Prices rose a modest 0.1% in October as gasoline prices retreated a bit. New-vehicle prices continued to drop, while used-car prices jumped — likely the result of hurricane-damaged cars being replaced. Prices of shelter are rising a bit faster, probably because low housing inventories are boosting home prices and rents. Price growth of medical care has picked up as well, as doctors' offices raise their fees after an extended period of little change.
- Despite low inflation, the Federal Reserve will keep boosting interest rates. The Fed is likely to raise rates by a quarter-point at its December meeting. The central bank sees inflation running close enough to its 2% target to gradually bump up interest rates to a more typical range, after keeping rates extraordinarily low after the Great Recession.

**Trade:**

- Global trade volumes are on the rise, supported by healthy economic activity in much of the world, which is providing a modest lift for U.S. exports. That is a plus for manufacturing activity, which has strengthened notably in export-oriented industries. Those companies are also benefiting from a cheaper U.S. dollar, which makes their products cheaper for foreigners to buy, in turn creating more jobs for Americans.
- But imports are heading up too, particularly in the closing months of the year as retailers stock up for the holiday shopping season. National unemployment is a low 4.1%; incomes are rising; and economic growth in the United States is increasing at the best pace since the 2007-09 recession. That is fueling more domestic demand, which is consistent with imports now outpacing gains on the export side of the ledger. As a result, we look for 2017's trade gap to be around $535 billion, up 6% from 2016's $504 billion deficit. 2018's shortfall will likely grow 5%-6%.
- So far in 2017, exports are up by about 6.4% from a year earlier; however, imports are ahead 6.5%. The Trump administration takes the view that deficits are a sign of economic weakness and that they are caused by unfair trade practices by China and other nations, leading it to seek rewrites of major trade deals, such as the North American Free Trade Agreement. President Trump also pulled the United States out of the Trans-Pacific Partnership at the start of this year, which would have bound 12 Pacific Rim nations in a free-trade pact.

**Business Spending:**

- Business spending will close the year with good momentum, helped by an improving world economy and a cheaper U.S. dollar. Despite a blip downward in new orders during October, manufacturing industries continue to be on a 14-month expansion roll. That puts the industrial sector on track for more investment outlays in 2018. A 3%-4% increase in core business spending is in the works for both this year and next, possibly a little better if Republicans can overhaul the nation's tax system.
- Those increases are modest compared with the early 2000s, when spending on plant expansions and equipment often jumped at double-digit rates. But they're a positive note when contrasted with the flat performances of 2015 and 2016. If the GOP slashes corporate tax rates, the cuts could spur spending at home. They would also make it less costly to repatriate some of the trillion dollars of profits now stashed overseas to avoid taxation.
- Core capital goods orders, a category including nondefense items and excluding aircraft, slipped 0.5% in October. That was surprising after three straight months of gains. However, it followed an upward revision in September orders, implying brisk business spending plans at the start of the fourth quarter. Year-over-year, these orders, which are closely watched as a proxy for spending plans, are up 4.4%. Shipments of finished nondefense capital goods edged up 0.4% in October, ahead 4% from 2016 levels.
- Stabilizing energy prices are driving oil and gas drilling, which is contributing to healthier business investment. Orders for machinery were up in October, as were orders for computers, communications gear and electrical equipment. Demand for new cars and trucks climbed strongly as automakers benefited from consumers' replacing vehicles lost in the floods of hurricanes Harvey, Irma and Maria. But orders for both military and civilian

aircraft dipped at double-digit rates from September — not entirely surprising, because orders tend to come in sporadic, big-dollar batches.

**Energy:**

- Gasoline prices continue to creep lower. The national average price of regular unleaded slipped two cents from a week ago, to $2.46 per gallon. We expect the price at the pump to keep declining, albeit very slowly, with the national average landing near $2.40 by Christmas. Diesel, meanwhile, should keep edging higher. Now averaging $2.84 per gallon, diesel is up a couple of pennies from a month ago and will likely near $2.90 in January.
- Oil prices have been volatile but haven't showed any clear trend, either up or down. OPEC's move to keep its production cuts in place for another year didn't seem to have much effect on the market. At a bit over $57 per barrel, benchmark West Texas Intermediate crude is little changed from a week ago. Some traders are looking for prices to rise from here because of stronger economic growth around the world, plus OPEC's cap on its oil sales. But U.S. crude production keeps climbing, which threatens to offset some of OPEC's cutback and keep markets well-supplied. We think that oil prices are due for a bit of a pullback, with WTI trading from $50 to $55 per barrel in February.
- Even the arrival of wintry weather in the eastern United States hasn't been enough to light a fire under natural gas prices. In fact, the benchmark gas futures contract has traded down recently, under $3 per million British thermal units (MMBtu). We look for natural gas prices to keep hovering near $3 per MMBtu into the new year, unless severe cold weather grips the heavily populated Northeast and Mid-Atlantic. Otherwise, there just won't be enough heating demand to lift prices out of their current trading range.

**Housing:**

- The housing market will continue to grow in 2018 roughly at the same rate as in 2017. A moderate pace in construction of new single-family housing and the low turnover of existing homes means inventories will stay lean. Price growth will slow down just a bit next year as mortgage rates rise a tad.
- Total housing starts will average 1.27 million units in 2018, a 5.6% increase from 2017 (we expect them to average 1.203 million units this year). Single-family starts will rise 8.2% next year. The increase would have been larger, but builders continue to cope with the scarcity of ready-to-build lots, skilled workers and credit. Multifamily starts will stabilize after cutbacks caused by apartment overbuilding in some metro areas. A slight pickup in rents recently indicates that demand for apartments remains steady.
- Home sales should trend steadily upward in 2018. We expect new-home sales to rise 9.8% next year. Those sales rose 6.2% in October and are on track for wrapping up a solid year. New-home sales are still well below their historical average, leaving room for improvement in 2018. Look for existing-home sales to rise 1.6% next year, totaling 5.6 million — the second straight year of modest growth linked to tight inventories. These sales should end 2017 at a 5.51 million pace — the best since 2006, but only 1.3% above 2016.
- The S&P CoreLogic Case-Shiller National Home Price Index rose 6.2% in September from a year ago. Home prices increased this year amid low mortgage rates, high employment and few existing homes on the market.

**Retail:**

- Excluding e-commerce, retail sales posted healthy growth in the second half of 2017, rising from 1.5% in the first half to 2.5%. That pales compared to the expected 14% gain in e-commerce, but it is an encouraging sign nonetheless for beleaguered brick-and-mortar retailers.
- Sales growth will wane after hurricane damage caused sales of autos and building materials to spike. October sales rose modestly, 0.2%, after posting a strong 1.9% gain in September. Restaurateurs saw a boost, too, and gasoline prices rose because of hurricane damage to refineries.

- Excluding gasoline, 2017's sales are likely up 4.0%, a bit above 2016's 3.8% pace. Building materials should rise 7.8%, up from last year's 5.7%. Restaurant sales will rise 3.2%, down from last year's 5.6%. Increases for most other categories will look like last year's.
- E-commerce sales will grow 15% in 2017, the same as in 2016. E-commerce has shown remarkably solid growth over the past seven years and will account for 9% of retail sales (13% of all goods sales) by the end of this year. In-store sales excluding building materials will rise 2.0%, a slight pickup from last year's 1.4% gain.

## *Conclusion*[6]

The U.S. economic outlook is healthy according to the key economic indicators. The most critical indicator is gross domestic product, which measures the nation's production output. The GDP growth rate is expected to remain between the 2 percent to 3 percent ideal range. Unemployment is forecast to continue at the natural rate. There isn't too much inflation or deflation. That's a Goldilocks economy.

President Trump promised to increase economic growth to 4 percent. That's actually faster than is healthy. Growth at that pace leads to an overconfident irrational exuberance. That creates a boom that least to a damaging bust. Find out what causes these changes in the business cycle.

The economic expansion is projected to continue in 2018 and 2019. Buoyant asset prices and strong business and consumer confidence will support consumption and investment growth. The impact of slowing employment growth on consumption will be partly offset by wage growth acceleration as the labor market tightens further.

Fiscal policy is projected to become more supportive in 2018 as measures are assumed to be introduced lowering tax rates on corporate and personal income and stimulating investment and consumption. At a time when unemployment is at its lowest level since 2000, the assumed fiscal boost will also contribute to further wage growth, thereby providing the conditions for monetary policy to continue normalizing gradually. Policies to help people return to employment would underpin stronger growth of activity while reducing inequalities. Deregulation and tax reform would support stronger investment and help lift productivity.

Financial stability has strengthened since the crisis and regulatory oversight has improved considerably, but vulnerabilities have emerged during the extended period of exceptional monetary easing. In particular, asset prices are elevated and high leverage exposes the corporate sector to shocks. House prices exceed pre-crisis levels in several big cities. Although regulatory oversight imposes a burden on some financial firms, reforms to minimize these burdens need to ensure that vulnerabilities are not allowed to build up further.

As the drag of past exchange rate appreciation and oil price movements abated, economic growth picked up pace in mid-2017. Reconstruction after recent major hurricanes will boost GDP in the short term, largely offsetting the damage caused by the storms to households and firms in the affected areas. At the national level, private consumption remains robust, supported by wealth gains from buoyant asset prices and stronger income growth. In the business sector, confidence remains strong and measures of activity and expectations appear to have been little affected by the hurricanes. Business investment is rebounding from the lull following the fall in oil prices and past exchange rate appreciation. On the other hand, residential investment remains relatively subdued.

---

[6] OECD Economic Outlook, Volume 2017, Issue 2

**United States**




1. S&P/Case-Shiller national home price index, sa.
2. Employment refers to payroll employed in the non-farm industry.
*Source:* Thomson Reuters; and OECD Economic Outlook 102 database.

The unemployment rate is now near rates last recorded in 2000, employment continues to grow and participation in the labor force has edged up (especially for women), even though demographic pressures are slowing labor force growth. These trends have helped reduce poverty and raise household income. Several measures of average wage growth remain moderate, in part due to compositional changes as higher-skilled higher-paid baby boomers have begun to retire in larger numbers. As this process continues, labor force growth will slow, gradually reducing the pace of private consumption growth. Measures that assist people on the side-lines of the labor market transition into employment could help mitigate demographic pressures and further boost incomes, particularly of lower-income households.

United States: **Demand and output**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| | Current prices USD billion | Percentage changes, volume (2009 prices) | | | | |
| **GDP at market prices** | 17 427.6 | 2.9 | 1.5 | 2.2 | 2.5 | 2.1 |
| Private consumption | 11 863.7 | 3.6 | 2.7 | 2.7 | 2.4 | 1.9 |
| Government consumption | 2 562.7 | 1.3 | 1.0 | 0.1 | 2.0 | 2.4 |
| Gross fixed capital formation | 3 432.8 | 3.5 | 0.6 | 3.0 | 3.8 | 3.9 |
| Final domestic demand | 17 859.1 | 3.3 | 2.1 | 2.4 | 2.6 | 2.4 |
| Stockbuilding[1] | 78.0 | 0.2 | -0.4 | -0.1 | 0.1 | 0.0 |
| Total domestic demand | 17 937.1 | 3.5 | 1.7 | 2.3 | 2.7 | 2.4 |
| Exports of goods and services | 2 373.6 | 0.4 | -0.3 | 3.2 | 3.4 | 3.4 |
| Imports of goods and services | 2 883.2 | 5.0 | 1.3 | 3.4 | 4.4 | 4.9 |
| Net exports[1] | - 509.5 | -0.8 | -0.2 | -0.1 | -0.2 | -0.3 |
| *Memorandum items* | | | | | | |
| GDP deflator | _ | 1.1 | 1.3 | 1.8 | 2.1 | 2.2 |
| Personal consumption expenditures deflator | _ | 0.3 | 1.2 | 1.6 | 1.9 | 2.1 |
| Core personal consumption expenditures deflator[2] | _ | 1.3 | 1.8 | 1.5 | 1.7 | 2.1 |
| Unemployment rate (% of labour force) | _ | 5.3 | 4.9 | 4.4 | 3.9 | 3.7 |
| Household saving ratio, net (% of disposable income) | _ | 6.1 | 4.9 | 3.7 | 3.8 | 3.8 |
| General government financial balance (% of GDP) | _ | -4.3 | -5.0 | -4.6 | -4.5 | -4.5 |
| General government gross debt (% of GDP) | _ | 105.0 | 106.9 | 105.2 | 106.1 | 107.2 |
| Current account balance (% of GDP) | _ | -2.4 | -2.4 | -2.4 | -2.6 | -2.8 |

1. Contributions to changes in real GDP, actual amount in the first column.
2. Deflator for private consumption excluding food and energy.
*Source:* OECD Economic Outlook 102 database.

The Federal Reserve has raised its policy rates and begun to reduce slowly the size of its balance sheet. The Fed is projected to continue to remove policy accommodation at a gradual pace as the labor market tightens further and stronger wage growth becomes apparent. It faces challenges in managing this process. Inflation continues to run below the longer-term objective of 2% and measures of inflation expectations remain relatively weak. Moving too quickly could further entrench weak inflation expectations, making the attainment of the objective more difficult. On the other hand, sustained low interest rates may exacerbate existing financial distortions. In particular, leverage in the corporate sector has increased and in some vulnerable firms is close to historic highs. Financial stability is protected by the capital buffers held by financial firms and regulation. Hence, efforts to reduce regulatory burdens should be mindful not to re-introduce vulnerabilities.

As the monetary authority's stance gradually becomes less accommodative, the federal government's fiscal stance is becoming mildly expansionary. Tax reform is assumed to be implemented in the second quarter of 2018 with a reduction of tax rates for personal and corporate income. The measures will stimulate business investment and personal consumption during 2018 and 2019. Overall, the underlying general government primary deficit is assumed to increase by 0.5 percentage points of GDP between 2017 and2019, reflecting the actions of the federal government. State and local government spending is assumed to pick up gradually as the expansion continues, but their overall fiscal stance remains broadly neutral.

GDP growth is projected to increase temporarily in 2018 due to the tax reform. Household spending remains robust although slowing labor force growth will gradually constrain consumption in 2019. Accelerating wage growth, as the labor market tightens further, is projected to support real disposable income. In addition, the fiscal measures introduced in 2018 will underpin higher wages as well. Higher wage growth will create stronger inflationary pressures which will allow monetary policy to continue reducing accommodation. The tax measures will buttress business investment. The widespread improvements in external demand strengthen export growth, even though this is largely offset by higher imports of investment goods.

Risks to the outlook remain sizeable. The size, structure and timing of the fiscal stimulus remain uncertain. A sustained and widespread global upturn could lift activity further through global value chain linkages, underpinning stronger export growth and investment. Stronger business investment may support a stronger-than-projected pick-up in productivity growth and may boost wages further. In these cases, even stronger labor market tightening may stoke wage pressures, ultimately requiring the Federal Reserve to tighten more rapidly. On the other hand, there are also a number of financial market risks. Elevated leverage ratios in the corporate sector need careful monitoring and action to ensure that these risks are contained. Emerging interest rate differentials between the United States and other major currency areas may contribute to an appreciation of the dollar and possibly increased financial market tensions and turbulence due to unpredictable currency flows. Finally, a rise of trade protectionism could disrupt global supply chains and dent growth.

# REGIONAL ANALYSIS

## *Introduction*

The short- and long-term value of real estate is influenced by a variety of factors and forces that interact within a given region. Regional analysis serves to identify those forces that affect property value, and the role they play within the region. The four primary forces that influence real property value include environmental characteristics, governmental forces, social factors, and economic trends. These forces determine the supply and demand for real property, which, in turn, affect market value.

The subject is located along the west side of Hickory Hill Road, within the SWQ of its intersection with Winchester Road, within the City of Memphis, Shelby County, Tennessee. This location is within the southwest portion of Shelby County, approximately ±12.25 miles southeast of the Memphis CBD, within the central portion of the Memphis Metropolitan Statistical Area (MSA), in the southwestern portion of the State of Tennessee. The subject's location within the regional market can be better visualized by viewing the map below.

**Regional Area Map – Shelby County**



## *Critical Observations*

The following bullet points, charts, and tables summarize some of our general observations relating to the subject's regional market.

**POPULATION:**

- In the identified area, the current year population is 1,374,938. In 2010, the Census count in the area was 1,324,829. The rate of change since 2010 was 0.45% annually. The five-year projection for the population in the area is 1,406,235 representing a change of 0.45% annually from 2018 to 2023. Currently, the population is 48.1% male and 51.9% female.




**HOUSEHOLDS:**

- The household count in this area has changed from 494,602 in 2010 to 512,647 in the current year, a change of 0.44% annually. The five-year projection of households is 524,018, a change of 0.44% annually from the current year total. Average household size is currently 2.63, compared to 2.63 in the year 2010. The number of families in the current year is 344,959 in the specified area.




**HOUSING:**

- Currently, 51.9% of the 578,005 housing units in the area are owner occupied; 36.8%, renter occupied; and 11.3% are vacant. Currently, in the U.S., 56.0% of the housing units in the area are owner occupied; 32.8% are renter occupied; and 11.2% are vacant. In 2010, there were 555,082 housing units in the area - 57.1% owner occupied, 32.0% renter occupied, and 10.9% vacant. The annual rate of change in housing units since 2010 is 1.81%. Median home value in the area is $161,244, compared to a median home value of $218,492 for the U.S.
- In five years, median value is projected to change by 2.36% annually to $181,217.

**INCOME:**

- Current median household income is $52,585 in the area, compared to $58,100 for all U.S. households. Median household income is projected to be $57,834 in five years, compared to $65,727 for all U.S. households.
- Current average household income is $73,722 in this area, compared to $83,694 for all U.S. households. Average household income is projected to be $83,047 in five years, compared to $96,109 for all U.S. households.
- Current per capita income is $27,873 in the area, compared to the U.S. per capita income of $31,950. The per capita income is projected to be $31,323 in five years, compared to $36,530 for all U.S. households.




## *Conclusion*

In light of the social and economic attributes of the defined regional market, it is clear that the Muncie MSA benefits by the following:

- MSA Location
- Relatively low cost of doing business
- Relatively low cost of living

In light of the social and economic influences within this market, we are cautiously optimistic as to the future outlook over the forecast horizon for the Regional Market Area. This market has a low cost of living and doing business and proximity to local area attractions. Currently, population trends are generally stable, and the number of households is expected to remain generally stable through 2023. Household income is expected to grow over the next five years, which bodes well for the commercial real estate sector in the county. The market's real estate values are forecast to remain generally commensurate with regional and state averages.

# LOCAL MARKET AREA ANALYSIS

## *Introduction*

A market area is considered a "...geographic or locational delineation of the market for a specific category of real estate."[7] An analysis of the subject's market area is pertinent when attempting to estimate the market value of real property. The reason for this analysis is to identify and forecast trends in the market area that will influence demand. The market area profile is provided to outline the primary area of influence on the subject property. The Market Analysis section, which follows, provides additional information concerning the subject's market.

7 The Appraisal of Real Estate, Thirteenth Edition, Appraisal Institute, 2008, Page 55.

## *Primary Market Area*

The subject is located along the west side of Hickory Hill Road, within the SWQ of its intersection with Winchester Road, within the City of Memphis, Shelby County, Tennessee. This location is within the southwest portion of Shelby County, approximately ±12.25 miles southeast of the Memphis CBD, within the central portion of the Memphis Metropolitan Statistical Area (MSA), in the southwestern portion of the State of Tennessee. The subject's location within this defined market can be better visualized by viewing the Local Market Area Map below.

**Local Market Area Map**




The above shows the primary market area. The primary market area, as defined, includes diverse land use, including single-family and multi-family residential, retail, office, some light industrial and various special uses. Retail use is dominant along the frontage pieces with residential use bordering this dominate usage.

## *Secondary & Tertiary Market Areas*

The secondary market areas include competing commercial pockets within Memphis that are experiencing similar stability. Tertiary market areas include other markets within Shelby County, or surrounding counties, with similar access to major transportation routes that offer comparable economic characteristics and share similar linkage with employment centers.

## *Change & Transition*

As a part of the market area analysis, change and transition in the defined area are reviewed. There is only modest land use change occurring in the primary market area. This is a well-established market and vacant land is in limited supply within this defined area, though vacant sites still exist sporadically in this market. There has been some activity in the form of changing land use and some minor development and/or redevelopment activity. Overall however, the primary market area is stable with no significant change or transition expected that would adversely affect the subject.

## *Life Cycle of Market Area*

An area of harmonious land use generally progresses through four stages. These stages do not have to be sequential in nature. "At any point in the cycle, a major change can interrupt the order of the stages."[8] The stages include growth, stability, decline and revitalization. The growth stage is a period during which the market area receives public acceptance and favor. During the stability stage, there is a period of equilibrium with neither gain nor loss in value of properties. In the decline period there is evidence of diminishing demand. There can be a period of revitalization with renewal, modernization and increasing demand after decline.

The best characterization of the primary market area would be stability. The primary market area pushed through the major growth stage of the life cycle many years ago and now the market is limited to occasional fill-in development and some redevelopment along the major intersections within the market. There is limited land available for expansion in the defined market; however, some vacant tracts exist sporadically within this market. Nonetheless, the primary market area as defined previously is stable with no significant expansion expected. This is not necessarily a sign of low demand however; rather, it is evidence that the market is without a significant vacant land base needed to physically fund any major growth within the city limits.

## *Market Area Access*

Access to the local interstate system is best provided via Hickory Hill Road itself, taken north 1.75 miles to State Route 385 (Bill Morris Parkway), and then northwest ±1.25 miles to Interstate 240 (I-240) at interchange #17. Secondary access is provided by way of numerous primary and secondary thoroughfares that blanket the local Memphis market, including various city streets, US Highways, State Routes and other primary and secondary thoroughfares.

## *Land Use in Primary Market Area*

Land use in the primary market area includes a concentration of retail and other commercial properties on the frontage pieces along the primary thoroughfares in the immediate area. Intermixed along the subject's corridor are various light-industrial, commercial, residential, and special uses.

In summary, the uses in proximity to the subject properties are discussed as follows:

---

8 The Appraisal of Real Estate, Thirteenth Edition, Appraisal Institute, 2008, Page 167.

| Neighboring Property Use | |
|---|---|
| **North:** | An adjacent retail center (Hickory Ridge Crossing) is located north of the subject site. |
| **South:** | A United States Post Office branch is located adjacent south of the subject site. |
| **East:** | Mixed use is located east of the subject, including retail and office uses. |
| **West:** | Residential use is located adjacent west of the subject tract. |

An aerial location map of the local market and a summary of the Local Market Analysis follow.

### Local Market Area Aerial Map




## *Conclusion*

In light of the local market's social and economic attributes, the appraiser is cautiously optimistic about the short-term outlook. The area benefits from good transportation linkages, with modest population, household, and employment stability expected as well. The Memphis market benefits from the existence of the Mississippi River and is one of the largest regional markets in the southwestern portion of the state.

# LOCAL MARKET AREA PHOTOGRAPHS



**Above:** Hickory Hill Road – Looking North Past Subject

**Below:** Hickory Hill Road – Looking South Past Subject



# SITE DESCRIPTION SUMMARY

| | |
|---|---|
| **SITE DESCRIPTION:** | The subject site consists of a ±6.58 gross acre site, under a single parcel. |
| **PARCEL NUMBER:** | 09-3400-0-0383 |
| **BRIEF LEGAL DESCRIPTION:** | See Addendum – No Survey Provided |
| **CONFIGURATION:** | Irregular |
| **SITE ACCESS:** | Access and visibility to the subject tract are considered to be average for commercial development. Access is provided by curbs cuts along Hickory Hill Road. |
| **VISIBILITY:** | Average |
| **TOPOGRAPHY:** | √ Generally Level ◻ Rolling ◻ Sloping |
| **STREET GRADE:** | √ Above Grade ◻ Below Grade ◻At Grade |
| **SITE DRAINAGE:** | √ Storm Sewers ◻ Retention Area √ Site |
| **SOIL CONDITIONS:** | Adequate for building improvements |
| **CURRENT ZONING:** | CMU-1 – Commercial Mixed Use (subject represents a legal conforming use) |
| **UTILITIES:** | Municipal |
| **NEIGHBORING PROPERTY USE:** | See Page 31 |
| **ENVIRONMENTAL ISSUES:** | It is expressly assumed that there are no hidden or non-apparent conditions of the property or subsoil that would render the subject property more or less valuable than an otherwise comparable property. |
| **APPRAISED VALUE:** | Appraised Land Value $1,339,300<br>Appraised Improvement Value $1,387,000<br>Total Appraised Value $2,726,300 |
| **PROPERTY ASSESSMENT:** | $1,090,520 |
| **REAL PROPERTY TAXES:** | $79,018.93 (2018) |
| **EASEMENTS/ENCROACHMENTS:** | Review of public records does not indicate any easements or encroachments that would have an adverse impact on the use, marketability, or value of the site. |
| **FLOOD HAZARD STATUS:** | Zone X |
| **FLOOD HAZARD COMMENTS:** | The subject improvements do not appear to be located within a designated flood hazard area, as established by the Department of Housing and Urban Development, Federal Emergency Management Agency (FEMA), Federal Insurance Administration, per Panel 47157C0465F, dated 9/28/2007. |
| **ADVERSE SITE INFLUENCES:** | No known or disclosed to the appraiser. |

## Street Location Map




## Bird's Eye Aerial Map – North



## Aerial Plat Map




## Plat Map



## Zoning Map




## Flood Map



# IMPROVEMENT DESCRIPTION SUMMARY

| | |
|---|---|
| **PRIMARY IMPROVEMENT:** | The subject property consists of a ±68,029 gross square foot multi-tenant retail center, originally developed in 1981, situated on a ±6.58 gross acre site, under a single parcel. The subject improvements are divided between twelve (12) suites total, of various sizes and configurations. Net rentable area (NRA) is also estimated to be ±68,029, as no significant common area exists. The site improvements consist of adequate asphalt and concrete paved parking (±84,670 SF), with ±680 striped spaces (parking ratio of 10/1,000), lighting, signage and landscaping for the trade area. The subject is in overall average condition for its age and market location. |
| **YEAR BUILT (AGE):** | ±1981 (±38 Years of Age) |
| **EFFECTIVE AGE:** | ±20 Years – Estimated |
| **REMAINING ECONOMIC LIFE:** | ±25 Years (based on a 45-year economic lifespan) |
| **DESIGN:** | Multi-Tenant Retail Center |
| **UNIT MIX:** | ±12 Units (Various Sizes) |
| **OCCUPANCY:** | ±100% (Fully Occupied) |
| **FOUNDATION:** | Concrete slab with concrete footings |
| **FRAME:** | Concrete Block |
| **FLOOR STRUCTURE:** | Poured Concrete slab |
| **FLOOR COVER:** | Typical Retail/Adequate |
| **CEILING:** | Typical Drop Acoustical Tiles |
| **CEILING HEIGHT:** | ±10-12 Feet |
| **INTERIOR CONSTRUCTION:** | Typical; framed |
| **PLUMBING:** | General Plumbing |
| **FIRE PROTECTION:** | Adequate |
| **HVAC (HEATING & COOLING):** | Full HVAC |
| **ELECTRICAL:** | Electrical – Finished |
| **EXTERIOR WALL:** | Concrete Block, Brick Veneer & Stucco |
| **ROOF COVERING:** | Rubber Membrane |

| | | | | |
|---|---|---|---|---|
| **SITE IMPROVEMENTS:** | The site improvements consist of adequate asphalt and concrete paved parking (±84,670 SF), lighting, signage and landscaping for the trade area. | | | |
| **PERSONAL PROPERTY:** | None Considered | | | |
| **CONDITION:** | Average | | | |
| **MARKETABILITY:** | □ Good | √ Average | □ Fair | □ Poor |
| **APPEAL:** | □ Good | √ Average | □ Fair | □ Poor |
| **FUNCTIONAL UTILITY:** | □ Good | √ Average | □ Fair | □ Poor |
| **CONDITION:** | The overall condition of the subject is deemed average, and typical of competing properties in the local market. | | | |

# REPRESENTATIVE SUBJECT PHOTOS



Subject Exterior – West View



Subject Exterior – Southwest View



Subject Exterior – West View (Additional)



Subject Exterior – Northwest View



Subject Exterior – Southwest View




Subject Exterior – Representative Storefront

# REPRESENTATIVE SUBJECT PHOTOS – CONTINUED



Subject Exterior – Southwest View (East Elevation)



Subject Exterior – West View (Rear)



Subject Exterior – South Elevation (Rear)



Subject Exterior – North View (Rear)



Subject Exterior – Northeast (Loading Dock)



Subject Exterior – North View (West Elevation)

# HIGHEST AND BEST USE ANALYSIS

## *Introduction:*

The highest and best use analysis of the subject is discussed on the following pages. This analysis incorporates the information presented in the Market Analysis section, as well as any unique characteristics of the subject described previously. The highest and best use of a property is defined as: "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property—specific with respect to the user and timing of the use—that is adequately supported and results in the highest present value."[9] There are four stages of analysis used when estimating highest and best use:

1. **Legally Permissible:** Those uses permitted by zoning and deed restrictions.
2. **Physically Possible:** Uses to which it is physically possible to improve the site.
3. **Financially Feasible:** Possible and permissible uses that produce a net return.
4. **Maximally Productive:** Among the feasible uses, that use which produces the highest net return.

The highest and best use analysis is provided to form a conclusion of the most profitable and productive use of a site. Such optimum use may be based upon highest and most profitable continuous use to which the property is adapted or is likely to be in demand in the near future. However, a probable use that depends upon; future events, or; a combination of likely uses which depend upon future events, or; "likely happenings," are not to be included within the analysis. In short, any use that is shown to be dependent on an uncertain act of another person, or body of persons, is not to be considered in the analysis.

In the first part of this two-part analysis, the highest and best use of the land is analyzed. This section discusses the site as if it were not improved with any structures. The conclusion is then used as the basis of the land valuation, which concludes the value of the land at its highest and best use – that use which provides the largest return to the owner.

The concept of highest and best use recognizes the maximum generation of wealth to the property owner. As was previously defined, highest and best use must be considered in two situations:

1. The highest and best use of a site as though it were vacant, and
2. The highest and best use of the property as improved.

The first situation considers that a parcel of land is either vacant or that it can be made vacant through demolition of existing improvements. The key issue in this situation is the determination of what type of building or other improvements, if any, that should be built upon the land if it were vacant. The concept underlying this analysis is that the prevailing use on the site may not be the highest and best use. The second situation is considering the highest and best use of a property as improved. This relates to the use that should be made of the property as it exists, or the ideal form of improvement.

Ultimately, the use that maximizes the property's net operating income on a long-term basis is its highest and best use. The four criteria presented previously must be considered serially in an attempt to determine the highest and best use. This includes first, an investigation of uses that are legally permissible. After permissible legal uses are reviewed, an analysis of uses that are physically possible is conducted. From the uses that are both physically possible and legally permissible, the financially feasible alternatives are reviewed, and finally, the most productive use concluded.

---

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010).

## *Highest and Best Use of the Land As Though Vacant:*

The highest and best use of the land is defined as: "Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination. The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements."[10]

The highest and best use of the land (site) "as though vacant" and available for use, may be different than the highest and best use of a subject property as improved. This is true in cases where an existing improvement may not be an appropriate use yet it makes a contribution to the overall property value greater than that of the land value as vacant. Use of the site is dependent upon such physical characteristics as size, configuration, topography, and soil composition. Additional physical influences potentially affecting use include the possibility of the site being exposed to environmental hazards, as well as the potential risk of the subject site's potential improvements being affected by natural disasters such as floods and earthquakes.

The following analysis considers each of the four highest and best use criterions, in turn, for the subject site, as though vacant and available for development.

**Legally Permissible:**
The legally permissible use of a property relates primarily to legal restraints imposed by zoning regulations, building codes, environmental constraints, and other applicable laws and regulations that govern land use. The subject site is currently zoned CMU-1 Commercial District. This zoning allows for a variety of commercial uses, which have a service component and customers, such as retail, office-showroom, service, restaurant, hospitality, etc.

**Physically Possible:**
The physical characteristics of a site can affect the uses. These characteristics include: (1) size; (2) shape; (3) terrain or topography; (4) soil condition; (5) utilities; (6) access characteristics; and (7) surrounding land uses. Each of these site characteristics were described and discussed in the Site Analysis section of this report. A number of uses are physically possible on the subject site. The ±6.58 gross acre site is generally level. Soil and subsoil conditions appear adequate for development as evidenced by area development. Surrounding land uses include a mix of commercial, and residential uses. From a development standpoint, the location and visibility of the site is considered average.

**Financially Feasible:**
Any use that results in a positive residual land value to the owner is considered to be financially feasible. Based on surrounding land use, and local demand, it appears the most financially feasible use of the subject site, as vacant, would be development for some form of retail use, consistent with current zoning regulations.

**Maximally Productive:**
Among financially feasible uses, the use that provides the highest rate of return or value (given a constant rate of return) is the highest and best use. Given the legally permissible and physically possible discussions set forth above, holding the site for future commercial development is to be the only financially feasible use at this time. Therefore, it is the opinion of the appraiser that the maximally productive use of the site is to hold for future development.

**Conclusion:**
In conclusion, highest and best use of the subject site, as if vacant, would be to hold for future commercial development, consistent with existing zoning regulations.

---

[10] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010).

## *Highest and Best Use of the Property as Improved:*

*The Dictionary of Real Estate Appraisal* defines highest and best use of the property as improved as: "The use that should be made of a property as it exists. An existing improvement should be renovated or retained as is so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one."[11]

The same criterion is utilized in the determination of highest and best use, as improved as those utilized in the as though vacant analysis; however, with reference to this analysis the improvements are considered in the final determination. The following analysis considers each highest and best use criteria and the existing improvements.

**Legally Permissible:**
The subject improvements contain a total area of ±68,029 square feet of gross building area. Based upon the land area of ±6.58 acres, or approximately ±286,625 square feet, a land-to-building ratio of 4.21:1 is indicated. Adequate parking is available on site (±84,670SF). The construction density and available parking exhibited by the improvements are compatible with similar competitive properties in the market, if not in excess. The subject is considered a legal, conforming use within its zoning district.

**Physically Possible:**
The subject improvements were constructed in 1981, with periodic renovations occurring since development. While the short- and long-lived structural components are considered typical of similarly aged improvements. In short, the subject property exists on the site, thus, proving that it is physically possible.

**Financially Feasible:**
The improvements are considered to contribute a financial return to the site that is far greater than that which would be generated if the land were vacant. Since the return to the land and improvements is deemed greater than the expenses associated with maintaining them, utilization of the improvements through their economic life is suggested.

**Maximally Productive:**
The subject, as improved, provides a positive return to the site. Considering the cost to raze the existing improvements and the lack of demand for new construction, no alternative use would provide a greater return. Therefore, the existing improvements will be representative of the highest and best use of the property as improved. Furthermore, current market rents do not appear to support the cost of new construction in this market, at this time.

**Conclusion:**
In summary, given all legally permissible, physically possible, financially feasible, and maximally productive uses, it is the opinion of the appraiser that the highest and best use of the subject property, as improved, is as a multi-tenant retail center, as it is currently improved and utilized.

---
[11] Ibid.

# VALUATION PROCESS SUMMARY

The valuation process is the orderly program in which the data used to estimate the value of the subject property are acquired, classified, analyzed, and presented. The first step in the process is to define the appraisal problem - i.e., identify the real estate, the effective date of the value estimate, the property rights being appraised, and the type of value sought. Once this has been accomplished, the appraiser collects and analyzes the factors that affect the market value of the subject property. These factors are addressed in the regional and local market analysis, the site and improvement analysis, and the highest and best use analysis, and in the application of the three approaches to value. The three traditional approaches to valuing improved properties are:

1. <u>Sales Comparison Approach</u> – a comparison of the property appraised with reasonably similar, recently conveyed properties for which the price, terms and conditions of sale are known.

2. <u>Income Approach</u> – the processing of a projected net income into a valuation estimate via one or more capitalization techniques.

3. <u>Cost Approach</u> – an estimate of the replacement cost of all structural improvements as if new, less loss in value attributable to depreciation from all causes plus the value of the land as if vacant.

The Sales Comparison Approach is founded upon the principle of substitution that holds that the cost to acquire an equally desirable substitute property without undue delay ordinarily sets the upper limit of value. At any given time, prices paid for comparable properties are construed by many to reflect the value of the property appraised. The validity of a value indication derived by this approach is heavily dependent upon the availability of data on recent sales of properties similar in location, size, and utility to the appraised property.

The Income Capitalization Approach is based on the principle of anticipation that recognizes the present value of the future income benefits to be derived from ownership in a particular property. The Income Approach is most applicable to properties that are bought and sold for investment purposes, and is considered very reliable when adequate income and expense data are available. Since income producing real estate is most often purchased by investors, this approach is valid and is generally considered the most applicable when the property being appraised was designed for, or is easily capable of producing a rental income.

The Cost Approach is based on the premise that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus the amount of depreciation evident in the structures from all causes plus the value of the land and entrepreneurial profit. This approach to value is particularly useful for appraising new or nearly new improvements.

The Appraisal Process is concluded by a review and re-examination of each of the approaches to value that was employed. Consideration is given to the type and reliability of data used, the applicability of each approach to the type of property being appraised and the value being sought.

# THE COST APPROACH – LAND VALUE, "AS-VACANT"

Although the determination of land value is the first component of the Cost Approach, it is also helpful in the determination of the highest and best use. If the highest and best use is to be commercial, it is conceivable that the improvements could be removed and the vacant tract would be worth more than the current improvements; therefore, it is imperative to know the value of the land as if vacant.

Any valid method of comparison must take into account the typical investor's behavior. The test of quality comparable sales information is the comparable sales degree of utility relative to the subject site. Because no two sites are identical, adjustments are made for differences in character. By comparing and contrasting the various comparable vacant site sales with the subject property - as well as with each other so as to ascertain the degree of adjustment for a given site attribute - a single unit price emerges as that which is most reflective of the subject's site's value as though vacant.

## *Land Valuation, "As-Though-Vacant"*

The comparables utilized in this appraisal were selected based on their similar type locations and subsequent, or planned commercial development. The unit of comparison appropriate for this analysis is price per acre. Elements of comparison are characteristics of properties and transactions that cause prices to vary. A unit of comparison is simply a component into which a property may be divided for comparison purposes. In the search for comparable land sales, emphasis was placed on the potential uses of the subject site. Therefore, preferred are sales of retail development or commercial land located within the subject's competitive market of Memphis, Tennessee.

## *Comparable Market Data*

The following table outlines transactions from the Memphis, and surrounding competitive market, concerning land sales developed for commercial use, as well as the active listings of commercial land. The below comparables are arrayed based on price per gross acre. It is this land trade data that is used in the qualitative analysis of the subject site, "As Is".

***VACANT LAND SALES & LISTING DATA – COMPETITIVE MARKET***

| # | Location | City | Sale Date | Zoning / Use | Site Size | Price | $/AC | $/SF |
|---|---|---|---|---|---|---|---|---|
| 1 | 8031 Alexander Rd | Memphis | Listing | Auto Repair | 7.98 | $119,900 | $15,025 | $0.34 |
| 2 | 8540 Tournamen Dr | Memphis | 1/12/2018 | RS-6 | 5.66 | $225,000 | $39,753 | $0.91 |
| 3 | 4455 Getwell Rd | Memphis | 8/15/2018 | Industrial | 3.61 | $158,200 | $43,823 | $1.01 |
| 4 | 0 Winchester Rd | Memphis | 11/1/2017 | CA | 5.40 | $240,000 | $44,444 | $1.02 |
| 5 | Highway 178 & Craft Rd | Memphis | Listing | M-1 | 10.00 | $500,000 | $50,000 | $1.15 |
| 6 | 0 Hickory Hill Rd | Memphis | Listing | CMU-3 | 6.42 | $378,000 | $58,879 | $1.35 |
| 7 | 2526 Whitten Rd | Memphis | 10/16/2018 | Agricultural | 9.00 | $600,000 | $66,667 | $1.53 |
| 8 | 8225 Memphis-Arlington R( | Memphis | 2/1/2019 | Commercial | 4.92 | $350,000 | $71,138 | $1.63 |
| 9 | 3296 Shelby Dr | Memphis | 9/22/2017 | C-L | 4.00 | $300,000 | $75,000 | $1.72 |
| 10 | 5970 Macon Cv | Memphis | 4/29/2016 | Commercial | 3.50 | $400,000 | $114,286 | $2.62 |
| 11 | 3515 Hack Cross Rd | Memphis | Listing | Commercial | 7.83 | $975,000 | $124,521 | $2.86 |
| 12 | 4741 Winchester Rd | Memphis | Listing | Commercial | 6.03 | $805,000 | $133,499 | $3.06 |
| 13 | Lowrance Rd & Stansell Ct | Memphis | 2/7/2019 | CP | 4.00 | $575,000 | $143,750 | $3.30 |
| 14 | 6453 E Shelby Dr | Memphis | Listing | Commercial | 4.00 | $700,000 | $175,000 | $4.02 |
| 15 | 4720 Summer Ave | Memphis | 7/13/2018 | C-H | 5.00 | $1,536,796 | $307,359 | $7.06 |
| | | | | | | Minimum: | $15,025 | $0.34 |
| | | | | | | Maximum: | $307,359 | $7.06 |
| | | | | | | Mean (Avg): | $97,543 | $2.24 |
| | | | | | | Median: | $71,138 | $1.63 |

The previous sales and listings represent closed land transactions and active listings for land comparable to the subject site within the competitive market. These comparables indicate prices ranging between $15,025 and $307,359 per acre, with an average price of $97,543, and a median price of $71,138 per acre.

## *Qualitative Analysis*

When analyzing the data, comparables #1 to #3 are deemed inferior to the subject overall. Conversely, comparables #13 to #15 are superior to the subject, and not reflective of the subject's site value. The best range in value for the subject land, "as though vacant" is represented by comparables #4 to #12, which range between $44,444 and $133,499 per acre, with an average price of $82,048, per acre. It is within this range that the subject's land value should fall.

## *Reconciliation & Calculation of Vacant Land Value*

The sales and listings in the previous table represent the transfer of, or active listings for vacant sites comparable to the subject site throughout the competitive market. These fifteen (15) comparables were analyzed and refined to nine (9), which indicated a range in value of between $44,500 and $133,500 per acre, with an average price of $82,000, per acre, rounded. Given the subject's size (±6.58 gross acres), its value would likely fall near the mean of the refined range.

Calculation of the final opinion of value is located below. All values are rounded to the nearest *$5,000.*

| | Low | High | Value Conclusion |
|---|---|---|---|
| Unit Value (per Acre) | $44,500 | $133,500 | $80,000 |
| Site Size (Acres) | 6.580 | 6.580 | 6.580 |
| Indicated Site Value | $292,810 | $878,430 | $526,400 |
| **Rounded Value** | **$295,000** | **$880,000** | **$525,000** |

The above provides the final conclusion of land value for the subject site, "As-Though-Vacant" and is considered to be adequately supported with recent transactional data. Given the reconciled value conclusion, the existing improvements make a significant contribution to value and the highest and best use, as improved, is supported. Further, this final value conclusion will be utilized in the "As-Improved" Cost Approach section that follows.

# THE COST APPROACH – IMPROVED VALUE

To expound upon the definition presented in the section entitled the Valuation Process Defined, there are several underlying principles that constitute the theoretical foundation to the Cost Approach. They include:

1. That the cost of production is an appropriate measure of value. While cost is not equal to value, under the proper definition and reliable measurement techniques, it can provide a workable measure of value.
2. That the informed and rational buyer would pay no more for an existing and improved property than the cost of producing a similar property with the same utility. This is known as the "principle of substitution."
3. That the present worth of the improvements can be added to the independently estimated value of the site to render a valid estimate of total value. This is known as the "principle of contribution."
4. The site is always valued as if vacant and available to be developed for its highest and best use.

## *Cost Estimates*

There are two theoretical methods used to measure the cost new of the existing improvements via the Cost Approach. One method measures the Reproduction Cost, New with estimated the cost involved in physically "reproducing" the subject building with a structure of identical utility. The Reproduction Cost New is defined as:

*"The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same material, construction standards, design, layout, and quality of workmanship, and embodying all of the deficiencies, super-adequacies, and obsolescence of the subject building."*[12]

Generally speaking, there are several practical difficulties inherent in estimating the reproduction cost new. The primary problem often lies in the propensity for the reproduction cost new to perpetuate all forms of functional obsolescence (if present). The reproduction cost new can be determined by such methods as the Quantity Survey Method and the Segregated Cost Method. An alternative to the Reproduction Cost New analysis is the Replacement Cost New analysis. The Replacement Cost New is defined as:

*"The estimated cost to construct, at current prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modern materials and current standards and design layout."*[13]

The Replacement Cost New can be determined by various methods, including the Calculated Square Foot Method, the Unit-in Place Method, and the Comparative Unit Method. For the purposes of this appraisal analysis, Calculator Square Foot Cost Analysis is utilized. The worksheet presented here in indicates the specific breakdown of the Calculator Square Foot Cost method as measured by the commercial cost estimation arm of the *Marshall & Swift Valuation Service*. The analysis is performed by utilizing construction cost data and information compiled by Marshall and Swift, Inc. from various sources throughout the United States. Additional adjustments have been made for the subject's specific amenities.

---

[12] American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal, Fifth Edition., (Chicago, AIREA), p. 169.

[13] Ibid., p. 168.

## *Depreciation*

Accrued depreciation, the loss in value due to any cause, must also be analyzed in the valuation of the subject property via the Cost Approach. Depreciation is defined as:

*"...a loss in property value from any cause; the difference between the reproduction or replacement cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date."*[14]

Depreciation can be segregated into three forms. They include:

- Physical Depreciation: al loss in value due to the physical deterioration.
- Functional Obsolescence: a loss due to the lack of utility or desirability of the property.
- External Obsolescence: a loss in value due to cause outside the property & independent of it.

The subject improvements were designed and constructed as an Average Cost, Class C, Community Shopping Center. The improvements were built in 1981, with periodic renovations and alterations made since development. Given the present condition of the subject improvements, the subject has an estimated effective age of ±20 years (i.e., remaining economic life of ±25 years). Improvements similar to the subject's typically have a 45-year economic life. As such, they are significantly impacted by physical depreciation, incurable. Based upon the preceding, this was calculated at 45.0%, rounded (20 years / 45 years = 44.44%).

Other forms of accrued depreciation include curable and incurable functional obsolescence, as well as economic, or external obsolescence. Curable and incurable functional obsolescence are defined as:

- *"curable functional obsolescence .....{a financially feasible} curable defect caused by a defect in the structure, materials, or design."*[15]
- *"incurable functional obsolescence....a defect caused by a deficiency or a super-adequacy in the structure, material, or design, which is not financially feasible or practical to correct."*[16]
- Lastly, *economic (or external) obsolesce is attributable to "...a defect, usually caused by negative influences outside a site."*[17]

In addition to physical deterioration, functional obsolescence must be subtracted from the Replacement Cost New when it exists. Functional obsolescence is defined as that loss from cost new due to causes within the property bounds, except the physical deterioration.

Based upon an analysis of the subject improvements, no significant functional obsolescence was identified. The subject property appears to be relatively well designed and functional for its intended use. In addition, no significant external obsolescence is considered present in the local market.

---

[14] The Appraisal Institute, The Appraisal of Real Estate, 13th Edition, (Chicago, Appraisal Institute, 2008), p.364.
[15] American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal, Fifth Edition., (Chicago, AIREA
[16] Ibid., page 100.
[17] Ibid., page 73.

## Entrepreneurial Profit:[18]

Of all development costs, the assessment of entrepreneurial profit constitutes the most perplexing of estimated development costs. This is due to several reasons, primary of which is that there are extremely few sales of comparably developed properties that are sold upon their substantial completion. Even in an ideal appraiser's world where there would be numerous sales of comparable properties the matter of making adjustments would be difficult at best. In addition to attempting to ascertain adjustments based upon various site and improvement attributes, additional adjustments are required that entail extensive study of a comparable neighborhood supply and demand forces.

Our office's estimation of entrepreneurial profit is largely based upon our ongoing survey of property managers, real estate investors, commercial real estate brokers, and developers. Owing to the fact that various survey respondents communicate their "base-line" entrepreneurial profit in various ways, our office adjusts survey data so as to reflect entrepreneurial profit based upon a percentage of the overall scope of development. For the purpose of this analysis, entrepreneurial profit is based upon 15% of the depreciated replacement cost new.

## Indirect Costs

In the construction of the improvements, indirect construction costs are also incurred. These costs include construction fees, professional fees, interest carry on the land, real estate taxes, loan fees, and marketing expenses. The Marshall Valuation costs include the direct building cost and the indirect cost related to professional fees and interest carry on the improvements only. Indirect costs for real estate taxes, loan fees, surveys, and marketing expenses are not included in these estimates. Based upon our experience with numerous other similar properties and their actual construction costs, indirect costs were estimated to be approximately 5.0% of the direct costs.

## Site Improvement Costs

Site improvements include such things as site work (paving, grading, utilities, etc.), parking areas, sidewalks, landscaping, signage, and other miscellaneous costs. In this appraisal, Site Improvement Costs were included at an estimated cost of 10.0% of the direct costs, as a separate line item from the aforementioned Indirect Costs. Any professional fees, or other soft costs, are considered to be included in the aforementioned Indirect Costs above.

## Replacement Cost New

There are numerous methods for estimating replacement cost new. In this instance, the appraiser has utilized the cost figures provided by the Marshall Valuation Service and actual construction costs of similar improvements located throughout the US. The appraiser reviewed the Marshall Valuation Service Cost Manual.

The subject improvements are best classified by Marshall & Swift as a "Class C" Community Shopping Center (413) of "Average Cost" quality construction (Sec. 13, Pg. 34). The appraiser has utilized the base cost of these improvements in the cost table that follows. The base cost was then adjusted by current and local cost multipliers, in addition to a perimeter multiplier, resulting in an adjusted base cost for the existing subject improvements. These adjustments are shown on the following table.

---

[18] Entrepreneurial profit is defined within The Dictionary of Real Estate Appraisal, (5th edition), as follows:

- "A market derived figure that represents the amount an entrepreneur expects to receive for his or her contribution to a project; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represent the entrepreneurs' compensation for the risk and expertise associated with development..." In the Cost approach, expected profit is reflected as entrepreneurial profit.

## *Cost Approach Table – Calculator Method*

| CALCULATOR COST TABLE | | | Average Cost<br>Class C<br>Community Cntr |
|---|---|---|---|
| Direct Costs: | | | |
| Base Cost: | | | $92.72 |
| Height Multiplier: | | | 1.000 |
| Perimeter Multiplier: | | | 1.000 |
| Current Cost Multiplier: | | | 1.010 |
| Local Cost Multiplier: | | | 0.880 |
| Adj. Base Cost: | | | $82.41 |
| Square Feet: | | | 68,029 |
| Indicated Replacement Costs: | | | $5,606,270 |
| Estimated Replacement Cost: | | | $5,606,270 |
| Estimated Physical Depreciation | | 45.00% | ($2,522,821) |
| Estimated Economic (or external) Obsolescence | | 0.00% | $0 |
| Subtotal Direct Costs: | | | $3,083,448 |
| Indirect Costs @: | 5.0% | $154,172 | |
| Site Improvement Costs @: | 10.0% | $308,345 | |
| TOTAL REPLACEMENT COST NEW: | | | $3,545,966 |
| ENTREPRENEURIAL PROFIT @: | 15.0% | | $531,895 |
| COST PLUS PROFIT: | | | $4,077,861 |
| ESTIMATED LAND VALUE: | | | $525,000 |
| AGGREGATED REPLACEMENT COST: | | | $4,602,861 |
| LEASED FEE ADJUSTMENT @: | 0.0% | | $0 |
| ADJUSTED VALUE: | | | $4,602,861 |
| INDICATED VALUE VIA COST APPROACH (ROUNDED): | | | $4,605,000 |

## *Reconciliation of the Cost Approach*

In conclusion, according to the above calculations, the estimated Fair Market Value of the subject property, via the Cost Approach, "As-Is", is $4,602,861, or rounded to:

**FOUR MILLION SIX HUNDRED FIVE THOUSAND DOLLARS**
**($4,605,000)**

*(which equates to approximately $67.69 per square foot of above grade gross building area)*

# SALES COMPARISON APPROACH

The *objective* of the Sales Comparison Approach analysis is to estimate the most probable selling price of the subject property. The underlying rationale of the approach is the principle of substitution; that a prudent purchaser will not pay more for a given property than he or she would be required to pay for a comparable alternative property. Alternately, it is recognized that a prudent seller will not take less than he or she can obtain elsewhere in the market.

The *method* of the Sales Comparison Approach is an empirical investigation where the subject property's estimated market value is ascertained by way of historical sales of comparable properties. In an ideal market situation for applying the Sales Comparison Approach, the following conditions prevail:

- A large number of sales have occurred between buyers and sellers who are knowledgeable and familiar with the local market.
- The sold property is closely comparable to the subject property.
- The terms of sale are identical.
- The sales are all very recent.
- The sales are "normally distributed" in a statistical sense.

Typically, the method involves five steps:

- Research the market to identify similar properties for which pertinent sales, listings, offerings, and/or rental data is available.
- Qualify the prices as to terms, motivating forces, and bona fide nature.
- Compare each of the comparable properties important attributes to the corresponding ones of the property being appraised, under the general categories of time, location, physical characteristics, and conditions of sale.
- Consider all dissimilarities and their probable effect on the price of each sale property to derive individual market value indications for the property being appraised.
- From the pattern developed, formulate an opinion of market value for the property being appraised.

The weakness of the Sales Comparison Approach is the fact that it is based on historical data rather than future expectations and/or the fact that the conditions of comparability may not closely conform to the subject property. The strength lies in the fact that the approach reflects actual behavior of typical purchasers under current (at the time of the data occurrence) market conditions. In short, the reliability depends upon the comparability of the comparable properties, verification of the sales data, the conditions under which the property is sold, the date of sale and the judgment with which adjustments to the data are made.

Any valid method of comparison must take into account the typical investor's behavior. The test of quality comparable sales information is the comparable sales degree of utility relative to the subject. Because no two properties are identical, adjustments are made for differences in character. By comparing and contrasting the various comparable sales with the subject property, a single unit price emerges as that which is most reflective of the subject's value.

The sales that follow represent trade data for similar property types. Sales of properties used in a similar fashion to the subject were considered, with emphasis placed on multi-tenant retail properties. Preferred were those sales located in the Memphis MSA, and of comparable condition, size, location, and overall comparability to the subject.

## *Comparable Sales Map*





*Photo from Google, Inc.*

## *Sales Comparable #1*

| | |
|---|---|
| **Location:** | 6100-6126 Macon Rd, Memphis, TN 38134 |
| **Proximity:** | Memphis Market |
| **Date of Sale:** | 3/25/2019 |
| **Financing Terms:** | Cash Equivalent |
| **Conditions of Sale:** | Arm's Length |
| **Parcel/Tax ID:** | 08-9003-0-0054 |
| **Grantor (Seller):** | Lawrence D. and William P. Johnson, Trustees of the DJ Trust |
| **Grantee (Buyer):** | Brentwood Medical Building, LLC |
| **Deed (Book/Page/Date):** | 19027923 (Instrument No.) |
| **Mortgage Terms:** | Unstated |
| **Assessed Value:** | $1,301,500 |
| **Tax Rate:** | $37,723 (2018 Taxes) |
| **Assessor's FMV:** | Unstated |
| **Price:** | $2,220,000 |
| **Site Size:** | ±3.24 Acres |
| **Improvement Size:** | ±32,090 square feet |
| **Improvement Age at Sale:** | 31 years |
| **Market Appeal:** | Similar to subject |
| **Condition:** | Similar to subject |
| **Exposure:** | Similar to subject |
| **Parking:** | Similar to subject |
| **Other Features:** | Similar to subject |
| **Price per SF:** | $69.18 |
| **Comments:** | This sale is located north of the subject within the Memphis MSA. It represents the sale of a smaller multi-tenant retail center that is of similar aged development and provides a reasonable indication of value following adjustment. |



*Photo from Google, Inc.*

## *Sales Comparable #2*

| | |
|---|---|
| **Location:** | 4279 American Way, Memphis, TN 38118 |
| **Proximity:** | Memphis Market |
| **Date of Sale:** | 12/5/2017 |
| **Financing Terms:** | Cash Equivalent |
| **Conditions of Sale:** | Arm's Length |
| **Parcel/Tax ID:** | 07-3022-D0-0042C |
| **Grantor (Seller):** | Oncall HVAC, LLC |
| **Grantee (Buyer):** | American Shops, LLC |
| **Deed (Book/Page/Date):** | 000000126390 |
| **Mortgage Terms:** | Unstated |
| **Assessed Value:** | $511,900 |
| **Tax Rate:** | $14,837 (2018 Taxes) |
| **Assessor's FMV:** | Unstated |
| **Price:** | $920,000 |
| **Site Size:** | ±1.09 Acres |
| **Improvement Size:** | ±13,525 square feet |
| **Improvement Age at Sale:** | 30 years |
| **Market Appeal:** | Similar to subject |
| **Condition:** | Similar to subject |
| **Exposure:** | Similar to subject |
| **Parking:** | Similar to subject |
| **Other Features:** | Similar to subject |
| **Price per SF:** | $68.02 |
| **Comments:** | This sale is located northwest of the subject within the Memphis MSA. It represents the sale of a significantly smaller multi-tenant retail center that is of similar age and ultimately provides a reasonable indication of value following adjustment. |



*Photo from Google, Inc.*

## *Sales Comparable #3*

| | |
|---|---|
| **Location:** | 5669 Quince Rd, Memphis, TN 38119 |
| **Proximity:** | Memphis Market |
| **Date of Sale:** | 11/2/2016 |
| **Financing Terms:** | Cash Equivalent |
| **Conditions of Sale:** | Arm's Length |
| **Parcel/Tax ID:** | 06-7037-0-0138 |
| **Grantor (Seller):** | Yorkshire Properties, LP |
| **Grantee (Buyer):** | Gregory Realty Group |
| **Deed (Book/Page/Date):** | 000000112344 |
| **Mortgage Terms:** | Unstated |
| **Assessed Value:** | $2,900,000 |
| **Tax Rate:** | $84,053 (2018 Taxes) |
| **Assessor's FMV:** | Unstated |
| **Price:** | $3,700,000 |
| **Site Size:** | ±6.67 Acres |
| **Improvement Size:** | ±52,403 square feet |
| **Improvement Age at Sale:** | 51 years (renovated in 2015) |
| **Market Appeal:** | Similar to subject |
| **Condition:** | Similar to subject |
| **Exposure:** | Similar to subject |
| **Parking:** | Similar to subject |
| **Other Features:** | Similar to subject |
| **Price per SF:** | $70.61 |
| **Comments:** | This sale is located north of the subject within the Memphis MSA. It represents the sale of a slightly smaller multi-tenant retail center that is also older than the subject, but of similar effective age (being renovated) and provides a good indication of value following adjustment. |



*Photo from Google, Inc.*

## *Comparable #4 – ACTIVE LISTING*

| | |
|---|---|
| **Location:** | 5131-5143 Quince Rd, Memphis, TN 38117 |
| **Proximity:** | Memphis Market |
| **Date of Sale:** | N/A – Active Listing |
| **Financing Terms:** | N/A |
| **Conditions of Sale:** | N/A |
| **Parcel/Tax ID:** | 06-7042-0-0034, 06-7042-0-0035 |
| **Grantor (Seller):** | Red Mountain Asset Fund I LLC |
| **Grantee (Buyer):** | N/A |
| **Deed (Book/Page/Date):** | N/A |
| **Mortgage Terms:** | N/A |
| **Assessed Value:** | $2,624,300 |
| **Tax Rate:** | $76,063 (2018 Taxes) |
| **Assessor's FMV:** | Unstated |
| **List Price:** | $5,240,000 |
| **Site Size:** | ±7.23 Acres |
| **Improvement Size:** | ±87,620 square feet |
| **Improvement Age at Sale:** | 59 years (renovated) |
| **Market Appeal:** | Similar to subject |
| **Condition:** | Similar to subject |
| **Exposure:** | Similar to subject |
| **Parking:** | Superior to subject |
| **Other Features:** | Similar to subject |
| **Price per SF:** | $59.80 |
| **Comments:** | This sale is located north of the subject within the St. Louis MSA. It represents the sale of a larger multi-tenant retail center that is older but recently renovated. This active listing provides a reasonable indication of value after the adjustment process. |

# *Comparable Sales Grid*

| Improved Sales Adjustment Grid | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Sale Number | Subject $ | % | Comparable 1 $ | % | Comparable 2 $ | % | Comparable 3 $ | % | Comparable 4 (Listing) $ | % |
| Location | 3695 Hickory Hill Rd | | 6100-6126 Macon Rd | | 4279 American Way | | 1576-5727 Quince Rd | | 5131-5143 Quince Rd | |
| City, State | Memphis, TN | | Memphis, TN | | Memphis, TN | | Memphis, TN | | Memphis, TN | |
| Sale Price | | | $ 2,220,000 | | $ 920,000 | | $ 3,700,000 | | $ 5,240,000 | |
| Plus Buyer Expenditure | | | $ - | | $ - | | $ - | | $ - | |
| Total Buyer Cost | | | $ 2,220,000 | | $ 920,000 | | $ 3,700,000 | | $ 5,240,000 | |
| Net Rentable Area | 68,029 | | 32,090 | | 13,525 | | 52,043 | | 87,620 | |
| Lot Size (Acres) | 6.580 | | 3.240 | | 1.090 | | 6.670 | | 7.230 | |
| Land to Building Ratio | 4.21 | | 4.40 | | 3.51 | | 5.58 | | 3.59 | |
| Price/SF of Building | | | $ 69.18 | | $ 68.02 | | $ 71.10 | | $ 59.80 | |
| Price/SF of Land | | | $ 15.73 | | $ 19.38 | | $ 12.73 | | $ 16.64 | |
| Property Rights | Fee Simple | | Leased Fee | | Leased Fee | | Leased Fee | | Leased Fee | |
| Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Financing Terms | Cash Equivalent | | Cash Equivalent | | Cash Equivalent | | Cash Equivalent | | N/A | |
| Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Conditions of Sale | Arm's Length | | Arm's Length | | Arm's Length | | Arm's Length | | N/A | |
| Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Date of Sale | Current | | Mar-19 | | Dec-17 | | Nov-16 | | Active Listing | |
| Mkt Conditions Adjustment | $0.00 | | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Adjusted Price | | | $ 2,220,000 | | $ 920,000 | | $ 3,700,000 | | $ 5,240,000 | |
| Adjusted Price per Unit | | | 69.18 | | 68.02 | | 71.10 | | 59.80 | |
| Location | Memphis, TN | | Memphis, TN | | Memphis, TN | | Memphis, TN | | Memphis, TN | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Gross Building Area | 68,029 | | 32,090 | | 13,525 | | 52,043 | | 87,620 | |
| Adjustment | | | (3.46) | -5% | (6.80) | -10% | 0.00 | 0% | 2.99 | 5% |
| Bldg Age at Sale | ±38 years | | ±31 years | | ±31 years | | ±50 years (Renovated) | | ±50 years (Renovated) | |
| Adjustment (Condition) | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Occupancy | At Market Occupancy | | Similar | | Similar | | Similar | | Similar | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Design | Multi-Tenant Retail | | Multi-Tenant Retail | | Multi-Tenant Retail | | Multi-Tenant Retail | | Multi-Tenant Retail | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Condition | Average | | Similar | | Similar | | Similar | | Similar | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Market Appeal | Average | | Similar | | Similar | | Similar | | Similar | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Market Exposure | Primary | | Similar | | Similar | | Similar | | Similar | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Parking | ±300 Spaces / ±4.41/1,000 | | ±146 Spaces / ±4.56/1,000 | | ±46 Spaces / ±3.41/1,000 | | ±263 Spaces / ±5.02/1,000 | | Similar | |
| Adjustment | | | 0.00 | 0% | 3.40 | 5% | 0.00 | 0% | 0.00 | 0% |
| Land-to-Building Ratio | 4.21 | | 4.40 | | 3.51 | | 5.58 | | 3.59 | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Other Features | None Noted | | None Noted | | None Noted | | None Noted | | None Noted | |
| Adjustment | | | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Adjusted Price per SF | | | $ 65.72 | | $ 64.62 | | $ 71.10 | | $ 62.79 | |
| Absolute Adjustment | | | $ 3.46 | 5% | $ 10.20 | 15% | $ - | 0% | $ 2.99 | 5% |
| Net Adjustment | | | $ (3.46) | 5% | $ (3.40) | 5% | $ - | 0% | $ 2.99 | 5% |
| Indicated Value Range | | | | | $52.75 to $71.00 | | | | | |
| Reconciled Value per SF | | | | | $65.00 | | | | | |
| Value Indication | | | | | $4,421,885 | | | | | |
| Value Indication Rounded | | | | | $4,420,000 | | | | | |

## Adjustment Process

What follows is an explanation of the adjustments applied in the quantitative analysis on the previous page.

***Property Rights:*** No adjustments were applied for property rights in this analysis.

***Financing Terms:*** All of the comparables utilized (except #4, the active listing) were cash equivalent sales with typical financing and no unusual or adverse terms requiring adjustment.

***Conditions of Sale:*** All of the comparables utilized (except #4) were indicated as being arm's-length sales requiring no adjustment.

***Date of Sale:*** No adjustments were made for date of sale in this analysis.

***Location:*** All of the comparables utilized are located within the west-central portion of the Memphis MSA; therefore, no adjustments were deemed necessary.

***Gross Square Feet:*** Differences in unit gross square footage (GBA) must be accounted for. In this market, smaller properties of similar design and appeal typically command a higher price per square foot than larger properties, due to the principle of economies of scale. The comparables utilized were all deemed substantially similar in size to the subject, requiring no significant adjustment.

***Building Age:*** The subject was developed in 1981, and has an estimated effective age of ±20 years. All of the comparables utilized were determined to share a similar effective age as the subject; therefore, no adjustments were necessary.

***Occupancy:*** All of the comparables were occupied at the time of their respective transfers, and the subject is being valued as occupied; therefore, no adjustments were made for occupancy.

***Design:*** The subject is a multi-tenant retail center. All of the comparables utilized are multi-tenant retail centers; therefore, no adjustments were necessary.

***Market Appeal:*** All of the sales comparables used for analysis were deemed to have similar appeal in the market when compared to the subject, and no adjustments were applied.

***Market Exposure:*** All of the sales comparables used for analysis were deemed to have similar exposure in the market when compared to the subject, and no adjustments were applied.

***Parking Capacity:*** The subject site has ±84,670 square feet of asphalt and concrete paved parking, with a parking ratio of 4.21 (per 1,000 SF of retail space). Comparable #2 had slightly inferior parking capacity and was adjusted positively by 5%.

***Land-To-Building Ratio:*** The comparables utilized all shared similar LBRs when compared to the subject; therefore, no adjustments were deemed justified.

***Additional Features:*** The comparables utilized all shared similar additional features when compared to the subject; therefore, no adjustments were deemed justified.

## *Reconciliation of the Sales Comparison Approach*

Finally, according to the previous analysis and calculations, the subject property's estimated Fair Market Value of the total structure, "as-is", by way of the Sales Comparison Approach, as of the effective date of this appraisal is $4,421,885, or rounded to:

**FOUR MILLION FOUR HUNDRED TWENTY THOUSAND DOLLARS**
**($4,420,000)**

*(which equates to approximately $64.97 per square foot of gross building area)*

# INCOME APPROACH

Commercial real estate is unique in that it is generally purchased in anticipation of future benefits of ownership. These benefits are manifest in the form of return on investment. The Income Capitalization Approach method of valuation is the process whereby anticipated income attributable to the real property is mathematically converted into an estimate of real property value. This approach estimates the stream of income into a present value. Income capitalization is applicable to nearly all properties which are capable of generating an income.

The Income Capitalization Approach involves the principle of anticipation because value is created by the expected benefits from future ownership. It also involves the principle of substitution because a potential investor or purchaser will not likely pay the same for a property with a lower and/or unstable income stream than for a comparable property with a higher income potential.

Recognizing that the subject property is presently capable of generating a steady, measurable stream of income, a model reflecting the projected cash flow stream can be reasonably deduced. By way of accounting for "real-life" factors such as probable vacancy and credit loss, as well as accounting for expenses required to maintain the property so it can continue to command income, the resulting net operating income, (or anticipated stream of income), can be capitalized at an appropriate rate. This mathematical process yields a market value indication that very closely replicates the motivations of buyers and sellers in the marketplace.

## *Income Capitalization Process*

The initial step in the process is to estimate the subject property's potential income from all likely sources. Having ascertained what the end-user market is likely to pay for the use of the subject's real estate, (i.e., market rent analysis), the focus shifts to consideration of vacancy and credit loss. Vacancy and credit loss (V&C) reflects the likelihood that the subject property will not generate income during every month of every year. Even if the subject property were fully occupied, and management was sure that rents were very near market, it is likely that, at some point in time, a collection problem might develop. Having accounted for the likelihood of vacancy and credit loss, an income figure known as the Effective Gross Income, or EGI, is deduced.

Like most things, income-producing properties are susceptible to various forms of degradation. Concerning commercial-use real estate, it is recognized that time, effort and money are required to maintain the property as an income generating entity. This leads to the study of the various real estate related expenses that can be anticipated to occur during the course of an investor's holding period. The summation of all expenses incurred, subtracted from EGI, yields a figure known as net operating income, or NOI.

The final step, as indicated in the above definition, is to mathematically apply a market-derived discount or capitalization rate to the property's net operating income. This mathematical process can yield a viable estimate in one of two manners – direct capitalization or discounted cash flow analysis. In this appraisal, we have utilized Direct Capitalization.

## *Contract Rent and Income Analysis*

As previously noted in the *Interest Appraised* section of this report, the interest being appraised is the fee simple estate. To estimate the value of the fee simple interest, it is important to consider how the terms of any existing leases might affect the projected net operating income (NOI) and resale price of the subject property. In the case of the subject, the appraiser is valuing the Fair Market Value of the Fee Simple interest of the subject, under IRS Regulation 170 and per the guidelines presented in Publication 561. In consideration of this, market data will form the basis of analysis.

## Market Rent and Income Analysis

Having discussed the nature of this analysis and "Fair Market Value", the appraiser will form the basis of their analysis on data researched in the market. The following information presented constitutes a summary of relevant market rental data. A summary table was created using leases of similar retail space within the local market, and competitive regional market area.

***RETAIL RENT COMPARABLES – LOCAL MARKET***

| # | Location | City | Property Type | Date | Yr Built | GBA | NRA | Rent | $/SF | Comparability |
|---|---|---|---|---|---|---|---|---|---|---|
| **S** | **3695 Hickory Hill Rd** | **Memphis** | **Multi-Tenant Retail** | **N/A** | **1981** | **68,029** | **N/A** | **$619,518** | **$9.11** | **N/A** |
| 1 | 2685 S Perkins Rd | Memphis | Multi-Tenant Retail | May-18 | 1993 | 89,762 | 28,450 | $142,250 | $5.00 | Inferior |
| 2 | 4680-4728 Millbranch Rd | Memphis | Multi-Tenant Retail | Jan-19 | 1969 | 40,667 | 1,800 | $13,950 | $7.75 | Similar |
| 3 | 4279-4293 American Way | Memphis | Multi-Tenant Retail | May-18 | 1990 | 13,500 | 1,500 | $13,500 | $9.00 | Similar |
| 4 | 909-913 Kelly Rd | Memphis | Multi-Tenant Retail | Dec-18 | 1964 | 4,836 | 1,200 | $10,800 | $9.00 | Similar |
| 5 | 1621-1625 Getwell Rd | Memphis | Multi-Tenant Retail | Nov-18 | 1968 | 6,440 | 2,040 | $19,196 | $9.41 | Similar |
| 6 | 5144 Riverdale Rd | Memphis | Multi-Tenant Retail | Jan-19 | 2004 | 17,220 | 2,800 | $28,000 | $10.00 | Superior |
| 7 | 3705 Malco Way | Memphis | Multi-Tenant Retail | Jun-18 | 1998 | 26,962 | 1,620 | $19,440 | $12.00 | Superior |
| 8 | 4701-4715 Elvis Presley Blvd | Memphis | Multi-Tenant Retail | Nov-18 | 1955 | 26,000 | 2,000 | $24,000 | $12.00 | Superior |
| 9 | 5144 Riverdale Rd | Memphis | Multi-Tenant Retail | Sep-18 | 2004 | 17,220 | 1,400 | $17,500 | $12.50 | Superior |
| 10 | 6518-6564 Quince Rd | Memphis | Multi-Tenant Retail | Jan-19 | 1984 | 73,755 | 1,400 | $18,200 | $13.00 | Superior |
| 11 | 7911 Shelby Dr | Memphis | Multi-Tenant Retail | Jun-18 | 2008 | 26,000 | 3,276 | $45,864 | $14.00 | Superior |
| | | | | | | | | Minimum: | $5.00 | |
| | | | | | | | | Maximum: | $14.00 | |
| | | | | | | | | Mean (Avg): | $10.33 | |
| | | | | | | | | Median: | $10.00 | |

The eleven (11) lease comparables presented above represent a rental range of between $5.00 and $14.00 per net rentable square foot, with an average of $10.33, and median rate of $10.00 per square foot. The comparables span the spectrum of smaller and larger tenant space, reflecting a wide range of rental rates.

Of the eleven (11) comparables, comparables #2-5 are all ranked most "Similar" to the subject's space overall. These comparables range between $7.75 and $9.41 per square foot of NRA (net rentable area), with an average rate of $8.79, and a median rate of $9.00, per net rentable square foot.

It should be noted that the subject's 2018 historical average contract rental rate was $9.11 per square foot of NRA. This rate falls toward the higher end of the refined range.

## Reconciliation of Market Rent

Given all the data researched, as well as the subject's location, configuration, size, current condition and overall appeal, an average market rental rate of $9.00 per square foot appears reasonable for the subject's space, under a triple-net (NNN) expense structure, typical of similar retail space within the competitive market.

Note: this rate reflects a blended rental rate, recognizing that the subject's smaller retail units will command higher market rental rates than the anchor space, or larger units within the subject center.

Finally, when utilizing the reconciled market rental rate of $9.00 per square foot of net leasable area (±68,029 NRSF, as calculated), this results in a potential gross income estimate of $612,261. This estimate will be utilized in the reconstructed operating income statement that follows.

## Vacancy and Collection Loss

A vacancy and collection loss expense is charged to the forecast potential gross income to cover loss of income due to unexpected vacancy or collection losses. Vacancy happens by tenant turnovers and evictions. Collection loss may occur from a tenant "skipping-out" or by simply not paying rent.

The appraiser researched vacancy rates, as reported by *RealtyRates.com*. The *4th Quarter 2018 Market Survey* publication lists the Memphis market's average "Class A & B Neighborhood, Community & Strip Retail Centers" vacancy rates as being ±10.1 for anchored, and ±9.9% for un-anchored centers, respectively.

Based on the subject's perceived position within the marketplace, its configuration, size, and location, as well as current economic conditions and local trends, an estimate of 10.0% is considered an appropriate vacancy rate for the subject property, as stabilized. To this estimate, an additional 5.0% is added to anticipate and account for any collection losses that may occur. The total V&C included in the Operating Income Statement that follows is ±15.0%.

## Fixed and Variable Expenses

The subject requires various expenditures in order to be maintained as an income producing property. Concerning estimating expenses for the subject property, historic operating statements for the subject would typically be utilized. This data would then be compared with market-balanced information to derive reasonable operating expense estimates for the subject property. Subtracting these anticipated expenses from the effective gross income (EGI) yields a figure known as the net operating income (NOI). This figure represents the income to be capitalized from which a value via the Income Approach is deduced for the subject property.

In the case of the subject, as a multi-tenant retail center, triple net (NNN) leases would be typical, stipulating that the lessee is responsible for most, or all, expenses attributable to the subject property. In this analysis, only a management fee of 3.0% has been included in the subject's operating income statement. It should be noted that reserves for replacement have also not been included, as these are typically handled as a one-time capital expenditure in the year of occurrence by participants (i.e., owners and investors) in the local market.

## Direct Market Overall Capitalization Rate Extraction

In developing an overall reversionary rate ($R_o$) for purposes of capitalizing the subject's estimated income streams, a survey was made of comparable properties with adequate income and expense data. The table on the following page contains data from which an overall capitalization rate was developed for the subject property. In each case, the overall rate was developed using net operating income before reserves.

**National Published Rates**

The following chart illustrates the various rates used in the appraisal industry as reported by *Korpacz Real Estate Investment Survey®*, which was subsequently renamed the *PwC Real Estate Investment Survey™* in 2010. The four main categories (retail, office, industrial and apartments) reflect the investor's reaction to those real estate classifications most often purchased by the typical commercial real estate investor.

In this analysis, we have researched the national warehouse market. The most recent quarter available to the appraiser is the 3rd Quarter of 2018.

### *CAPTIALIZATION RATES – PwC REAL ESTATE INVESTMENT SURVEY®*

**Economic Indicators** | PwC Real Estate Investor Survey, Q3 2018

| | Regional Mall | | CBD Office | | Warehouse | | Apartment | |
|---|---|---|---|---|---|---|---|---|
| | Q3 2018 | Q2 2018 | Q3 2018 | Q2 2018 | Q3 2018 | Q2 2018 | Q3 2018 | Q2 2018 |
| **Discount Rate (IRR)[a]** | | | | | | | | |
| Range (%) | 5.00 – 11.50 | 5.00 – 11.50 | 5.25 – 9.00 | 5.25 – 9.00 | 5.25 – 9.00 | 5.00 – 9.00 | 5.25 – 10.00 | 5.25 – 10.00 |
| Average (%) | 7.55 | 7.55 | 6.89 | 6.91 | 6.38 | 6.36 | 7.20 | 7.20 |
| Change (bps) | | 0 | | -2 | | +2 | | 0 |
| **Overall Cap Rate (OAR)[a]** | | | | | | | | |
| Range (%) | 4.00 – 10.00 | 4.00 – 10.00 | 3.00 – 7.50 | 3.00 – 7.50 | 1.50 – 6.25 | 3.00 – 6.50 | 3.50 – 8.50 | 3.50 – 8.50 |
| Average (%) | 6.30 | 6.30 | 5.44 | 5.47 | 4.62 | 4.80 | 5.23 | 5.26 |
| Change (bps) | | 0 | | -3 | | -18 | | -3 |
| **Residual Cap Rate** | | | | | | | | |
| Range (%) | 4.25 – 10.00 | 4.25 – 10.00 | 4.50 – 8.50 | 4.50 – 8.50 | 4.50 – 7.25 | 4.50 – 7.25 | 4.00 – 8.50 | 4.00 – 8.50 |
| Average (%) | 6.80 | 6.83 | 6.11 | 6.11 | 5.64 | 5.69 | 5.57 | 5.61 |
| Change (bps) | | -3 | | 0 | | -5 | | -4 |

The information presented in the previous chart provides insight into typical investment requirements for real estate similar to the subject (retail) for the 3rd Quarter of 2018. The most current overall capitalization rates (OARs) ranged between 4.00% and 10.00% with an average of 6.30%. The general trend seen is that rates have risen slightly since the previous quarter.

<u>Given the national published data, and in consideration of the subject's location, age, and appeal, an overall rate of ±9.0 would appear reasonable for the subject</u>. It should be noted that the rates reported by PwC include all retail properties. Therefore, in addition to this national published data, the appraiser has also researched capitalization rates for retail centers, specifically.

It should be noted that the rates reported by PwC are typically Class "A" properties in large markets, and the RealtyRates.com rates are based on Class "A" and "B" properties. Smaller markets, or lower class properties, would typically fall towards the high end of the data range. Therefore, in addition to this national and regional published commercial data, the appraiser has also researched capitalization rates within the local competitive market.

**<u>Local Comparable Data</u>**
The following table contains additional local and regional data from which an overall capitalization rate was developed for the subject property. In each case, the overall rate was developed using net operating income before reserves.

### *RETAIL OVERALL RATE COMPARABLES – MEMPHIS MSA*

| # | Street Address | City | Status | GBA (SF) | Yr Built | Sale/List Price | NOI | OAR |
|---|---|---|---|---|---|---|---|---|
| **S** | **3695 Hickory Hill Rd** | **Memphis** | **Pending** | **68,029** | **1981** | **$3,995,000** | **$435,455** | **10.90%** |
| 1 | 4279 American Way | Memphis | 12/05/2017 | 13,525 | 1987 | $920,000 | $69,644 | 7.57% |
| 2 | 7990 Trinity Rd | Cordova | Listing | 47,923 | 1999 | $6,500,000 | $532,350 | 8.19% |
| 3 | 1315-1355 N Germantown Pkwy | Cordova | 06/29/2018 | 30,000 | 1988 | $5,200,000 | $440,440 | 8.47% |
| 4 | 2075 N Germantown Pkwy | Bartlett | 07/07/2017 | 24,056 | 1999 | $2,300,000 | $204,010 | 8.87% |
| 5 | 5131-5143 Quince Rd | Memphis | Listing | 87,620 | 1960 | $5,240,000 | $468,980 | 8.95% |
| 6 | 3625-3683 Hickory Hill Rd | Memphis | 11/01/2018 | 89,717 | 1981 | $2,600,000 | $234,000 | 9.00% |
| 7 | 1576-5727 Quince Rd | Memphis | 11/02/2016 | 52,403 | 1966 | $3,700,000 | $354,830 | 9.59% |
| 8 | 5728-5760 Stage Rd | Bartlett | Listing | 86,762 | 1973 | $5,600,000 | $556,080 | 9.93% |
| 9 | 2794-2838 Coleman Rd | Memphis | 07/26/2018 | 41,960 | 1986 | $1,500,000 | $161,400 | 10.76% |
| 10 | 6100-6126 Macon Rd | Memphis | 03/25/2019 | 32,090 | 1988 | $2,220,000 | $266,400 | 12.00% |
| 11 | 4210 Altruria Rd | Bartlett | 07/13/2017 | 45,000 | 2000 | $2,000,000 | $270,200 | 13.51% |
| | | | | | | | Minimum: | 7.57% |
| | | | | | | | Maximum: | 13.51% |
| | | | | | | | Mean (Avg): | 9.71% |
| | | | | | | | Median: | 9.00% |

The comparables above represent an overall rate (OAR) range of between 7.57% and 13.51%, with an average (mean) rate of 9.71%, and a median capitalization rate of 9.00%. Given the subject's age, location, and appeal, an overall capitalization rate (OAR) of 9.50% appears reasonable for the subject, based on the regional data researched.

**Band of Investment**

The band of investment is a capitalization technique wherein the components of capital investment are analyzed, weighted, and combined, resulting in a range of potential capitalization rates. The following table highlights the 4th *Quarter 2018 RealtyRates.com Investor Survey* data used to determine the individual component values.

***4Q 2017 INVESTOR SURVEY – REALTYRATES.COM®***

| RealtyRates.com INVESTOR SURVEY - 4th Quarter 2018* RETAIL - UN-ANCHORED CENTERS | | | | | | |
|---|---|---|---|---|---|---|
| **Item** | **Input** | | | | | **OAR** |
| **Minimum** | | | | | | |
| Spread Over 10-Year Treasury | 1.05% | **DCR Technique** | 1.30 | 0.052702 | 0.75 | **5.14** |
| Debt Coverage Ratio | 1.30 | **Band of Investment Technique** | | | | |
| Interest Rate | 3.94% | Mortgage | 75% | 0.052702 | 0.039526 | |
| Amortization | 35 | Equity | 25% | 0.081524 | 0.020381 | |
| Mortgage Constant | 0.052702 | OAR | | | | **5.99** |
| Loan-to-Value Ratio | 75% | **Surveyed Rates** | | | | **5.69** |
| Equity Dividend Rate | 8.15% | | | | | |
| **Maximum** | | | | | | |
| Spread Over 10-Year Treasury | 6.98% | **DCR Technique** | 2.15 | 0.128000 | 0.50 | **13.76** |
| Debt Coverage Ratio | 2.15 | **Band of Investment Technique** | | | | |
| Interest Rate | 9.87% | Mortgage | 50% | 0.128000 | 0.064000 | |
| Amortization | 15 | Equity | 50% | 0.179731 | 0.089866 | |
| Mortgage Constant | 0.128000 | OAR | | | | **15.39** |
| Loan-to-Value Ratio | 50% | **Survey** | | | | **14.62** |
| Equity Dividend Rate | 17.97% | | | | | |
| **Average** | | | | | | |
| Spread Over 10-Year Treasury | 4.02% | **DCR Technique** | 1.73 | 0.084088 | 0.63 | **9.07** |
| Debt Coverage Ratio | 1.73 | **Band of Investment Technique** | | | | |
| Interest Rate | 6.91% | Mortgage | 63% | 0.084088 | 0.052555 | |
| Amortization | 25 | Equity | 38% | 0.125717 | 0.047144 | |
| Mortgage Constant | 0.084088 | OAR | | | | **9.97** |
| Loan-to-Value Ratio | 63% | **Surveyed Rates** | | | | **10.96** |
| Equity Dividend Rate | 12.57% | | | | | |

Based on the information in the previous chart, typical mortgage rates for properties similar to the subject have been estimated as follows: a 60% and 70% loan to value ratio (rounded), and an interest rate of 7.0% (using the mean, or average, rounded) and a 15-year amortization period (based on the effective age of the subject).

Utilizing these parameters, a mortgage constant of 10.786% has been concluded. Assuming an equity dividend rate range of 8% to 12%, which is generally consistent with the range of rates indicated above, yields the following capitalization rate analysis.

| Band of Investment | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.70 | x | 0.107860 | = | 0.075502 | | 0.70 | x | 0.107860 | = | 0.075502 |
| 0.30 | x | 0.080000 | = | 0.024000 | | 0.30 | x | 0.120000 | = | 0.036000 |
| | | | | 0.099502 | | | | | | 0.111502 |
| 0.60 | x | 0.107860 | = | 0.064716 | | 0.60 | x | 0.107860 | = | 0.064716 |
| 0.40 | x | 0.080000 | = | 0.032000 | | 0.40 | x | 0.120000 | = | 0.048000 |
| | | | | 0.096716 | | | | | | 0.112716 |

The Band of Investment analysis indicates a range of 9.67% to 11.27%. with an average of 10.51%, and a median rate of 10.55%.

The RealtyRates.com survey of investors (Un-anchored Retail Centers) indicates a range of between 5.69% and 14.62%, with an average rate of 10.96%.

Given the analysis conducted by way of the Band of Investment technique, as well as the subject's location, configuration, tenant mix, and current market conditions, the most reasonable overall rate for subject is determined to be ±10.50%.

**Reconciliation of the Capitalization Rate Analysis**
In this analysis, the appraiser researched capitalization rates from published commercial sources, those extracted from sales and active listings in the local competitive market, as well as rates developed through use of the band of investment technique. Primary reliance is placed on the market extraction method, with support from the secondary sources and methods.

The table below sets forth the overall capitalization rate conclusion for the subject property using the methods previously described.

| Source / Method | Capitalization Rate |
|---|---|
| Investor Surveys | 9.00% |
| Market Extraction | 9.50% |
| Band of Investment | 10.50% |
| **Reconciled Capitalization Rate** | **10.00%** |

Based upon the totality of the data presented, and in consideration of current market conditions, the overall physical condition of the subject property, as well as its location within the Saint Louis market, local economic trends and perceived position in the marketplace, **a capitalization rate of 10.0% appears reasonable for the subject**, emphasizing the market derived capitalization rates and band-of-investment technique. This reconciled rate will be utilized in the calculation of value by way of direct capitalization that follows.

## *Direct Capitalization*

Direct Capitalization is the process of capitalizing the subject's estimated net operating income into value using a capitalization rate derived from market data. The overall capitalization rate is extracted directly from sales data with adequate income and expense information to determine the net operating income. The net income at the date of sale is then divided by the sale price to develop an overall rate representing what the investor was willing to pay for the income stream.

The table below contains a reconstructed operating income statement for the subject, utilizing market rent and a triple-net (NNN) expense structure. The resulting estimate of net income (NOI) from market rent is then utilized to calculate a value for the subject's fee simple interest through direct capitalization.

***RECONSTRUCTED OPERATING STATEMENT***

| | Square Feet | Rent/SF | Total |
|---|---|---|---|
| **Gross Income (NRA):** | 68,029 | $9.00 | $612,261 |
| Vacancy and Collection Loss at 15% | | | (91,839) |
| **Effective Gross Income (EGI):** | | | **$520,422** |
| **Operating Expenses (OE):** | **$/SF GBA** | **Total** | |
| Taxes (Rounded) | $0.00 | $0 | $0 |
| Insurance | $0.00 | $0 | $0 |
| Management Fee (Est. at 3% of EGI) | $0.61 | $15,613 | $15,613 |
| Common Area Maintenance (CAM) | $0.00 | $0 | $0 |
| Additional Exp. (Reserves) | $0.00 | $0 | $0 |
| Total Operating Expenses | | | ($15,613) |
| **Net Operating Income Before Reserves** | | | **$504,809** |
| Divided by the overall rate (OAR) | | | 10.00% |
| Indicated Value | | | $ 5,048,092 |
| Value Indication, Rounded | | | $ 5,050,000 |

## *Reconciliation of the Income Approach (Direct Capitalization)*

Finally, according to the above calculations, the estimated Fair Market Value of the subject property's Fee Simple estate interest, "As-Is", via the Income Approach (direct capitalization), is $5,048,092, or rounded to:

**FIVE MILLION FIFTY THOUSAND DOLLARS**
**($5,050,000)**

*(which equates to approximately $74.23 per square foot of above grade gross building area)*

# RECONCILIATION AND VALUE ESTIMATES

The reconciliation section ties together the information provided throughout this report to reconcile a final opinion of value for the subject property. Final reconciliation is defined as: "The last phase in the development of a value opinion in which two or more value indications derived from market data are resolved into a final value opinion, which may be either a final range of value or a single point estimate."[19] The following summarizes the indicated value estimates previously determined:

| Approach to Value | Indicated Value | Rounded Value |
|---|---|---|
| Cost Approach | $4,602,861 | $4,605,000 |
| Sales Comparison Approach | $4,421,885 | $4,420,000 |
| Income Capitalization Approach | $5,048,092 | $5,050,000 |

## *Reconciled Final Value Estimate*

All three traditional approaches to value were utilized in this analysis. Due to the age of the improvements, the Cost Approach was not granted significant weight. The Sales Comparison Approach is considered generally reliable, but due to the income-driven nature of multi-tenant retail properties, the Sales Comparison Approach is considered less credible than generally desired. Further, due to the investment nature of the retail market, the Income Approach was deemed most credible for the subject, and was assigned additional emphasis (i.e., weight) in the final reconciliation of fair market value.

The table below reconciles the appraiser's allocation of weight (weighted average) on the individual approaches utilized in this report, and provides a final estimate of fair market value for the subject.

| Final Value Conclusion | | | |
|---|---|---|---|
| Approach | Value | Allocation (%) | Allocation ($) |
| Cost Approach | $4,605,000 | 10% | $460,500 |
| Sales Comparison Approach | $4,420,000 | 40% | $1,768,000 |
| Income Capitalization Approach | $5,050,000 | 50% | $2,525,000 |
| | | Weighted Value Conclusion: | $4,753,500 |
| | | **Less any Deferred Maintenance:** | **$0** |
| | | Adjusted Value Conclusion: | $4,753,500 |
| | | Final Reconciled Value Estimate (Rounded): | $4,755,000 |

Finally, based upon the preceding analyses, the Fair Market Value of the fee simple interest of the subject property, "As-Is", all subject to the general underlying assumptions and limiting conditions contained herein, as of the effective date being April 9, 2019, is reconciled to:

**FOUR MILLION SEVEN HUNDRED FIFTY-FIVE THOUSAND DOLLARS**
**(*$4,755,000)**
***Refer to page 12 for any Extraordinary Assumptions & Limiting Conditions.**

[19] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010).

# ADDENDUM

# SUBJECT PROPERTY LEGAL DESCRIPTION

## PROPERTY IN MEMPHIS, SHELBY COUNTY, TENNESSEE:

Legal Description — Tract I:--

Beginning at a point in the west line of Hickory Hill Road 622.19 feet southwardly from the south line of Winchester Road (106' ROW) and said point being in the south line of the William Webb Property as described in Instrument Y9-4342; thence, south 02 degrees 17 minutes 59 seconds west with the west line of Hickory Hill Road a distance of 10.65 feet; thence south 02 degrees 07 minutes 07 seconds west with the west line of Hickory Hill Road a distance of 328.23 feet to a point in the north line of the City of Memphis Light Gas and Water Division Property; thence, north 86 degrees 26 minutes 32 seconds west with the north line of the said City of Memphis Light Gas and Water Division Property a distance of 147.63 feet to a point in the west line of said Memphis Light Gas and Water Division Property; thence, south 02 degrees 08 minutes 07 seconds west with the west line of said Memphis Light Gas and Water Division Property a distance of 72.18 feet to a point in the north line of the US Postal Service Property as described in Instrument V3-6480; thence, north 87 degrees 55 minutes 17 seconds west with the north line of the said US Postal Service Property a distance of 551.40 feet to a point in the east line of Section A, Fonnie Harris Subdivision as recorded in plat book 24, page 60; thence, north 02 degrees 09 minutes 20 seconds east with the east line of the said Section A, Fonnie Harris Subdivision a distance of 402.22 feet to a point in the BPT Southeastern Centers Property as described in Instrument CE-6468; thence, south 88 degrees 07 minutes 21 seconds east with the south line of the said BPT Southeastern Centers Property and the William Webb Property as described in Instrument Y9-4342 a distance of 698.69 feet to the point of beginning and containing 6.24 Acres.

# QUALIFICATIONS OF THE APPRAISER

## ANDREW J. BRYANT, MAI, ASA, IFAS

11715 Fox Road, Suite 400-127, Indianapolis, Indiana 46236
Phone: (317) 730-2423 | Email: andrew@bryantassetadvisors.com

### PROFESSIONAL EXPERIENCE

**President** — **September 2011 - Present**
Bryant Asset Advisors, LLC
San Diego California / Indianapolis, Indiana

- *Principal and senior appraiser involved in the valuation of both real and personal property, analysis of various real estate sectors and economies, expanding new and existing client base, as well as the supervision, management, and training of appraisal staff.*

**Senior Staff Appraiser & Independent Contractor** — **October 2004 – May 2014**
Access Valuation
Indianapolis, Indiana

- *Senior commercial appraiser on staff, and independent contractor, as of 2014. Responsibilities include the valuation of commercial and residential properties, analysis of various real estate sectors and economies, expanding new and existing client base, as well as the supervision and training of junior appraisal staff.*

**Residential Real Estate Appraiser** — **June 2003 – October 2004**
RPE-Cobb & Associates
Greenwood, Indiana

- *Responsibilities included the valuation of residential properties, analysis of real estate markets, and expanding new and existing client base.*

### PROFESSIONAL LICENSES/CERTIFICATIONS

- **Indiana Certified General Appraiser**, License # CG41100046 (Granted: 6/10/14 / Expires: 6/30/20)
- **Kentucky Certified General Appraiser**, License # 004852 (Granted: 3/19/14 / Expires: 6/30/19)
- **Michigan Certified General Appraiser**, License # 1201074293 (Granted: 2/8/12 / Expires: 7/31/20)
- **Ohio Certified General Appraiser**, License # 2012000299 (Granted: 3/19/14 / Expires: 3/6/19)
- **Pennsylvania Certified General Appraiser**, License # GA003996 (Granted: 5/7/13 / Expires: 6/30/19)
- **New Jersey Certified General Appraiser**, License # 42RG00259100 (Granted: 11/6/17 / Exp: 12/31/19)

### PROFESSIONAL/ASSOCIATION MEMBERSHIPS & DESIGNATIONS

- **MAI Designated Member**, Appraisal Institute
- **ASA Designated Member (Real Property)**, American Society of Appraisers
- **IFAS, Senior Member (Non-Residential)**, National Association of Independent Fee Appraisers

### FORMAL EDUCATION

- **School of Construction Technology** – Indiana University/Purdue University - Indianapolis (IUPUI)

## PROFESSIONAL EDUCATION

- Foundations of Real Estate Appraisal, Indiana University, 2003
- Appraising the Single Family Residence, Indiana University, 2003
- Standards of Professional Appraisal Practice, Indiana University, 2003
- Appraising 2-4 Family Residential Properties, Indiana University, 2003
- Introduction to Income Capitalization, Education Resource, 2004
- Basic Income Capitalization, Education Resource, 2005
- Analytics with the Site-To-Do-Business, Appraisal Institute, 2007
- 7-Hour USPAP Course, Access Education, 2007
- Indiana Appraisal laws & Regulations, Access Education, 2007
- Residential Lot Valuation, Education Resource, 2008
- Surveying & Legal Descriptions, Education Resource, 2008
- Assessment Procedures, Education Resource, 2008
- Psychology of Sales Comparison Analysis & Market Consistency, Ed. Resource, 2008
- Sales Comparison Design, Analysis & Adjustment, Education Resource, 2008
- 2010-2011 National USPAP Course, McKissock Education, 2010
- Indiana Appraisal laws & Regulations, McKissock Education, 2010
- Ad Valorem Tax Consultation, McKissock Education, 2010
- Continued Issues in Appraising, McKissock Education, 2010
- Private Appraisal Assignments, McKissock Education, 2010
- Statistics, Modeling and Finance, McKissock Education, 2011
- General Appraiser Site Analysis and Cost Approach, McKissock Education, 2011
- General Appraiser Sales Comparison Approach, McKissock Education, 2011
- General Appraiser Report Writing and Case Studies, McKissock Education, 2011
- General Appraiser Market Analysis and Highest & Best Use, McKissock Education, 2011
- General Appraiser Income Approach II, Appraisal Institute, 2011
- Personal Property Appraiser Certification, National Auctioneers Association, 2011
- 2012-2013 National USPAP Course, McKissock Education, 2011
- Business Practices and Ethics, Appraisal Institute, 2012
- Advanced Income Capitalization, Appraisal Institute, 2012
- Advanced Concepts & Case Studies, Appraisal Institute, 2012
- Uniform Appraisal Standards for Federal Land Acquisition, Appraisal Institute, 2012
- General Appraiser Report Writing and Case Studies, Appraisal Institute, 2013
- Advanced Market Analysis and Highest & Best Use, Appraisal Institute, 2013
- Quantitative Analysis, Appraisal Institute, 2013
- 2014-2015 National USPAP Course, McKissock Education, 2014
- Appraisal of Land Subject to Ground Leases, Mckissock Education, 2015
- 2016-2017 National USPAP Course, McKissock Education, 2016
- Appraisal of Assisted Living Facilities, McKissock Education, 2016
- Basic Hotel Appraising, McKissock Education, 2016
- Managing Appraiser Liability, McKissock Education, 2016
- Michigan License Law, McKissock Education, 2016
- 2016-2017 National USPAP Course, McKissock Education, 2017
- 2018-2019 7-Hour National USPAP Course, McKissock Education, 2018
- Land and Site Valuation, McKissock Education, 2018

## APPRAISAL EXPERIENCE

- Single-Family Residential, Multi-Family Residential, Condominiums, Residential Small Income Producing Properties, Residential Lots, Agricultural Land, Vacant Commercial/Industrial Land, Single and Multi-Tenant Office, Single and Multi-Tenant Retail, Single and Multi-Tenant Industrial, Hotels, Mobile Home Parks, Automobile and RV Dealerships, Self-Storage Facilities, Churches/Worship Facilities, Schools, Funeral Homes, Cemeteries, and Crematories, Residential and Commercial Subdivisions, Farms, Conservation Easements, Special Use Properties (Landfills, Intermodal Facilities), and other real property types.

# APPRAISER'S LICENSE

**Indiana Professional Licensing Agency**
**Real Estate Appraiser Board**
402 West Washington St., Room W072, Indianapolis, IN 46204 (317) 234-3009

## Certified General Appraiser License

| License Number | Expiration Date | License Status |
|---|---|---|
| CG41100046 | 06/30/2020 | Active |

**Andrew Jeffery Bryant**
7328 River Birch Ln
Indianapolis IN 46236

*Eric J. Holcomb*
Eric J. Holcomb
Governor
State of Indiana

*Deborah J. Frye*
Deborah J. Frye
Executive Director
Indiana Professional Licensing Agency

**STATE OF TENNESSEE**
**DEPARTMENT OF**
**COMMERCE AND INSURANCE**

**MR. ANDREW BRYANT**

13156

ID NUMBER: 58857
LIC STATUS: TEMPORARY
EXPIRATION DATE: September 26, 2019

**Real Estate Appraiser Commission**
**Appraiser Temporary Practice Permit**
THIS IS TO CERTIFY THAT ALL REQUIREMENTS
OF THE STATE OF TENNESSEE HAVE BEEN MET

# ENGAGEMENT LETTER – PAGE 1

BRYANT
ASSET
ADVISORS
Real Estate Appraisal & Consulting Services

11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
Office: (317) 730-2423
Fax: (317) 863-1017
info@bryantassetadvisors.com
www.bryantassetadvisors.com

March 11, 2019

Mr. Ronald Underberg
Chief Manager
American Properties, Co, G.P.
5720 Stage Road
Suite E
Bartlett, TN 38134

**RE:3685 Hickory Hill Road, Memphis, TN 38115**

Dear Mr. Underberg,

This letter serves as a formal proposal to determine the Bargain Sale Opinion of Value, based on IRS Publication 561, of the real property referenced above. Once signed by Seller, this letter will serve as a formal agreement to perform the assignment as outlined below.

The scope of this appraisal assignment will include: (1) inspection of the property (if necessary and as determined by the appraiser(s)), (2) collection of data concerning the subject property and available market date, (3) determination of the property's highest and best use, and (4) application of the three traditional approaches to value, per IRS Publication 561.

No attempt will be made to determine "sentimental," "book," "historic," or "investment" value. The report will for the sole and private use of the client. Further, the appraisal may not be used for any other use, except as noted above. The assignment will be subject to the limiting conditions extraordinary and atypical assumptions and applicable hypothetical conditions all of which will be included within the final report. It is assumed, the property is in compliance with all applicable laws and regulations in regards to environmental concerns.

We understand that in the performance of our work, we might have the opportunity to be privy to certain materials and communications and/or witness certain events in reference to this project and, hereby, agree to keep such information confidential. We will not communicate, publish nor otherwise utilize the findings without your explicit authorization.

The fee for this service will be $7,500.00, inclusive of all expenses. The appraisal fee is the responsibility of the Seller, unless otherwise specified in the PSA. We would anticipate report delivery no later than April 12, 2019, barring any unforeseen circumstances.

The fee shall apply to all work undertaken to derive a value estimate and prepare an Appraisal Report. For this fee, you will receive an electronic version of the appraisal (in PDF format).

# ENGAGEMENT LETTER – PAGE 2

BRYANT ASSET ADVISORS
Real Estate Appraisal & Consulting Services

11715 Fox Road, Suite 400-127
Indianapolis, IN 46236
Office: (317) 730-2423
Fax: (317) 863-1017
info@bryantassetadvisors.com
www.bryantassetadvisors.com

The assignment will be prepared and conveyed in compliance with the Uniform Standards of Professional Appraisal Practice and performed by Andrew J. Bryant, MAI, ASA, MRICS, an Indiana Certified General Appraiser and Christopher D. Bryant, CCIM, ASA, MRICS, a California Certified General Appraiser, working under a temporary license in Tennessee.

If this letter properly outlines the assignment and you agree to the terms and conditions, please sign below. Your signature and returning a copy of this letter to TAG (via email) is required to formally engage our services for this assignment.

If you have any questions or require further information, please do not hesitate to phone our office at 858-243-8724.

Sincerely,

[signature]

Christopher Bryant, ASA, CCIM, MRICS
**Commercial Real Estate Investment & Valuation Advisory**
Bryant Asset Advisors, LLC
858-243-8724 D
Chris@bryantassetadvisors.com

**AGREED AND ACCEPTED:**

**Seller/Buyer:**

American Properties Co., GP
Underberg Property Mgmt., LLC
General Partner

Name
[signature: Ronald ...]
Title
Chief Manager

**Seller/Listing Broker Site Inspection Contact:**

Contact Name

Contact Phone & Email

**Tax Appraisal Group (TAG):**

Lynda Scull, Owner
Contact Name

813-362-2494/Lynda@taxappraisalgroup.com
Contact Phone & Email