EXHIBIT H

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| | |
|---|---|
| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-1 |
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | $2,105,000.00 | Charitable contributions | 519 | 00170.02-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items.).*

See attached 886A-1

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| | |
|---|---|
| Taxpayer's / Representative's Signature | Date |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| | |
|---|---|
| Team Manager — Digitally signed by Q2JDB Date: 2021.09.30 14:17:58 -05'00' | Date |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Form 1065, Schd K, Line 13A-Contributions
Increase (Decrease) to Income

| | | 201912 |
|---|---|---|
| Per Return | $ | 2,595,000 |
| Per Exam | $ | 490,000 |
| Adjustment | $ | 2,105,000 |

**ISSUES**

1. Did the "IRS 561 Appraisal" meet the substantiation requirements under the regulations?
2. If not, then what amount would the taxpayer be allowed to deduct as a charitable contribution?

**ISSUE SUMMARY**

American Properties Co, GP (the taxpayer) sold property with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to Food Assistance Inc. (the charity) for $2,160,000. The taxpayer reporting a $1,098,138 gain based on the sales proceeds and deducted $2,595,000 as a charitable contribution. The transaction is commonly called a "bargain sale".

The property was then sold on the same day it was purchased by the charity to Hickory Hills, LLC (HH, LLC) for $2,650,000.

The transaction was marketed to the taxpayer by the Welfont Group (Welfont). Welfont specifically markets what it calls an "IRS 561 Appraisal" which professed to provide a higher FMV than a normal appraisal. As part of its services, Welfont identified the appraiser and managed the appraisal process.

The key issue is, did the "IRS 561 Appraisal" meet the substantiation requirements under the regulations in order to be considered a qualified appraisal. If the appraisal was not a qualified appraisal, then the taxpayer would not be allowed a charitable contribution based on the appraised FMV.

**FACTS**

The taxpayer is a general partnership founded in 1997 by Ronald Underberg (Mr. Underberg). The taxpayer owns and manages commercial real estate locations in the surrounding Memphis, TN area. From 1997 to present, the taxpayer has purchased and sold numerous commercial real estate locations.

The partnership had the following partners as of 12/31/19.

| Partner | Ownership % |
| --- | --- |
| UNDERBERG PROPERTY MANAGEMENT LLC | 1.32% |
| RONALD UNDERBERG | 16.84% |
| BARBARA SCHAFFER | 15.64% |
| SUSAN PERSIN | 15.60% |
| ELI JACOB PERSIN TRUST | 7.57% |
| ALEXANDER R UNDERBERG TRUST | 7.57% |
| BARRY R UNDERBERG TRUST | 7.57% |
| KYLE J SCHAFFER TRUST | 7.57% |
| JOSEPH L SCHAFFER TRUST | 7.57% |
| SPENCER ISAAC PERSIN TRUST | 7.18% |
| MIKE UNDERBERG | 5.59% |
| | 100.00% |

Underberg Property Management, LLC is the general partner with Mr. Underberg as the Chief Manager. Mike Underberg, Barbara Schaffer, and Susan Persin are the children of Mr. Underberg. The remaining partners are grandchildren of Mr. Underberg.

Mr. Underberg died on December 28, 2020. Other than the opening conference, Mr. Underberg was not interviewed as part of the IRS audit.

Bargain Sale

On May 6,2019 the taxpayer sold commercial property located at 3685 Hickory Ridge Crossing, Hickory Hill Road, Memphis, TN 38115 (the property) with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to the charity for $2,160,000. The taxpayer treated the sale as a Bargain Sale under in IRC § 170.

Subsequent sale of HH, LLC

After purchasing the property from the taxpayer, the charity then sold it that same day to HH, LLC for $2,650,000. Denis Rodger is listed as the Chief Manager of HH, LLC.

Documents obtained from HH, LLC show that the initial purchase agreement was entered into between the charity and HH, LLC on February 15, 2019 with an initial purchase price of $3,000,000. The purchase was contingent on the charity first purchasing the property from the taxpayer.

E-mails obtained from the taxpayer show that an appointment was made through Welfont for Denis Rodger to inspect the property on February 27, 2019.

Interviews conducted with HH, LLC brokers, Select Real Equity Advisors indicated that the price was reduced to $2,650,000 due to rental discrepancies. For example, upon review it

was determined that Mike Jewelers was given rent and common area maintenance (CAM) concessions of approximately $109,000.

E-mails obtained from the taxpayer show questions and concerns raised by HH, LLC such as the Mike Jewelers rent, and CAM concessions were discussed and questioned with the taxpayer using Welfont as the intermediary. [1]

Taxpayer Reporting Requirements

The taxpayer reported the sale of the land and building on Form 4797 and reported a $1,098,138 gain with a sales price of 2,160,000 and a cost basis of $1,061,862. The cost basis was allocated based on a percentage of the FMV allocated between the sale and the contribution.

The taxpayer reported the bargain sale on Form 8283. The form listed the appraised value of the property as $4,755,000 with a bargain sale price received of $2,160,000. The difference of $2,595,000 was treated as a charitable contribution. The form was properly signed and dated by the appraiser and by the charity. All of the required information regarding the property, the appraiser and the charity were included.

The charitable contribution of $2,595,000 was reported on the taxpayer's Form 1065, Schedule K, Line 13a.

Charity Reporting Requirements

The charity is a 501(c) charity which provides groceries on wheels to low-income and disabled seniors in Guilford County, North Carolina.

The taxpayer provided a Form 8282 signed by Jane Carlson Executive Director of the charity on January 7, 2021. The Form 8282 confirmed the property was sold by the charity on May 6, 2019 and provided that the charity received $20,323.11 from the sale.

A letter dated the same date was attached which contained the following statement, "As you know, Welfont Services, LLC handled all aspects of the transactions related to the acquisition and disposition of the property." The letter stated they should contact Welfont with any questions. [2]

Brokerage Agreement

* * * *

[1] Exhibit A-Rent & CAM E-Mails
[2] Exhibit B- Form 8282 and Charity Letter

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

On 05/08/2018, the taxpayer entered into a brokerage agreement with Marcus & Millichap for the sale of the property with a purchase price of $4,288,000. The listed brokers commission is 4%. [3]

The primary broker for Marcus & Millichap was Mickey Davis who is located at the Memphis, TN office. Mr. Davis specializes in retail investment properties and has more than 20 years of experience in commercial real estate.

Broker Interview

The broker, Mickey Davis was interviewed on 05/06/01 and provided the following relevant information.

Mr. Underberg's motivation for the sale was to divest of the property so he would have cash for retirement. There was no discussion of Section 1031 exchanges or other tax deferral methods that would not produce cash.

The properties were initially listed for $4,288,000 per the broker agreement. As a stream of lower offers came in the property's listing price was adjusted to the $3,600,000. Mr. Davis was unaware that Mr. Underberg had previously obtained an appraisal from Valbridge Property Advisors for $3,390,000.

Mr. Davis was also unaware of the subsequent sale of the property to HH, LLC until after the fact. He was unaware there would be a double escrow. He remembered someone from the buyer inspecting the property but was unaware that it was Denis Rodgers or that he did not represent Food Assistance Inc.

When asked if Mr. Underberg had discussed the issue with his accountant, Mr. Davis remembered generally that he had. Mr. Underberg indicated that he had discussed it and that it was ok to go forward with the bargain sale but could not remember any additional details about the conversation.

Letters of Intent

Due to the marketing efforts by Marcus & Millichap, the taxpayer received the following letters of intent offering to purchase the property. However, none of the offers were accepted. [4]

* * * *

[3] Exhibit C- Marcus & Millichap Brokerage Agreement
[4] Exhibit D- Letters of Intent

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

| Date | Purchaser | Offer |
|---|---|---|
| 7/17/2018 | NEIS Acquisitions, LLC | $ 3,200,000 |
| 8/29/2018 | Kohanian Holdings, LLC | $ 2,300,000 |
| 11/13/2018 | Hakimi Capital | $ 3,340,000 |
| 12/17/2018 | Justin Depree | $ 3,335,000 |
| 12/28/2018 | Munish Agarwal | $ 3,200,000 |

Welfont Group. LLC

Welfont Group, LLC (Welfont) is a brokerage firm that advertises as specializing in bargain sales. https://realestatebargainsale.com/

E-mails provided by the taxpayer and public documents reflect the following timeline. [5]

- 12/4/18- Welfont was first introduced to Mikey Davis at Marcus & Millichap in an e-mail from James Rainer at Newmark Knight Frank. Mr. Rainer e-mailed Mr. Davis requesting a call with Welfont. Welfont was interested in submitting a letter of intent on the property and they wanted to explain the potential structure prior to submitting the offer.
- 12/4/18- E-mail from Taylor Weaver with Welfont describing the bargain sale and the potential tax savings. Attached to the e-mails was the initial offer.
- 12/5/18- Letter of Intent and "IRS Section 170 Bargain Sale Opinion of Value" sent to Marcus & Millichap.
- 12/19/18-Mr. Davis submitted the offer to Mr. Underberg.
- 01/17/2019-Taxpayer entered into a purchase agreement with Food Assistance, Inc.
- 02/29/2019-Denis Rodgers with Hickory Hills, LLC meet with the taxpayer to inspect the property.
- 04/19/2019-Appraisal report completed by Bryant Asset Advisors, LLC.
- 04/19/2019-Purchase price agreement was amended to increase the purchase price by $160,000.
- 05/06/2019-Property was sold by the taxpayer to Food Assistance Inc.
- 05/06/2019-Property was sold by Food Assistance Inc. to John Rodgers of Hickory Hill, LLC.

Welfont Letter of Intent

The letter of intent laid out the basic terms the charity required to purchase the property. [6]

The letter provides the following:

* * * *

[5] See IDR response to RA-2 and RA-3 for E-mails.
[6] Exhibit E- Welfont Documents

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

- That the buyer shall purchase the property through an IRS Section 170 Bargain Sale purchase, which consists of a combination of cash and a charitable contribution (" Bargain Sale").
- A Bargain Sale occurs when a seller sells a property to a 50l(c)(3) organization and is then able to use the difference between appraised value and cash received as a tax deduction through a charitable contribution.

| | |
|---|---|
| a. Cash Amount: | $2,000,000 |
| b. Charitable Contribution Amount (Tax Deduction): | $3,388,000 |
| c. Projected Tax Savings Estimate (% of Charitable Contribution): | $1,253,560 |
| d. Total Estimated Cash Benefit (a+c): | $3,253,560 |
| e. Cash Equivalent Value (pretax estimate of an equivalent cash offer): | $3,469,443 |

- Seller agrees to pay the Seller's Broker any commissions or fees at their agreed upon rate based on the Total Cash Benefit {per Paragraph 5(d), Total Cash Benefit is a calculation of the (Cash Amount+ Projected Tax Savings) to the Seller as determined by the appraisal. Said commission or fee shall be split equally between the Seller's Broker and Buyer's Broker or an affiliate Buyer's Broker designee, who shall serve as a cooperating broker.
- Seller shall engage an appraiser to prepare an appraisal for the Property during the Inspection Period (the "Appraisal").
- The terms of this LOI shall remain confidential. Buyer and Seller shall not disclose the existence of this LOI or any of its terms, except to their respective accountants, attorneys, and other advisors as necessary to fulfill its due diligence.

<u>Welfont Offer</u>

Included with the letter of intent was a document from Welfont titled "Offer". The document included an analysis of the bargain sale including a comparison of the cash received and estimated tax savings as if the transaction were completed as a traditional sale vs a bargain sale. The offer also makes the following statement, "In addition to the cash received at closing, sellers receive the IRS Form 8283 completed by the non-profit or 501(c)(3), along with the qualified appraisal. These two documents specify the charitable deduction amount eligible to be claimed on tax filings."[7]

<u>Welfont Opinion of Value</u>

Included with the letter of intent was a document from Welfont titled "opinion of value".

* * * *

[7] Ibid

The stated purpose of the documents was "This report is an IRS Section 170 Bargain Sale Opinion of Value (based on IRS Publication 561 guidelines} on the subject property described below for the purposes of determining value of donated property. It is not the actual appraisal, but a good faith estimates of where the appraisal will come in."

The opinion of value provided the follow value for the property. [8]

| Approach | Weight | Value |
|---|---|---|
| Replacement Cost | 20% | $5,806,227 |
| Approach Income Approach | 60% | $6,224,590 |
| Sale Comparison Approach | 20% | $2,458,115 |
| Weighted Average | | $5,387,623 |

Shawn Marcel, senior acquisitions manager at The Welfont Group provided the following statement in a 2017 news article. [9] "Assume for a moment that your client has a vacant manufacturing facility on the outskirts of the downtown core. It has been a vacant building for the past 12 months, since the most recent tenants moved out, adding to blight. This property does not create jobs, increase the tax rolls, or improve the area. If anything, it is doing the exact opposite, as it may attract vandalism or worse.

By selling this property to a 501(c)(3) nonprofit through a Bargain Sale transaction, the property owner gets to value the property at its highest and best use, not the current lower value. The valuation should be done by a certified appraiser with the MAI designation. It is then sold to the nonprofit at the highest and best use appraisal. The seller receives a minority portion of this value in cash at closing and the remainder is received as tax deductions and rebates from the state and federal governments.

It is important to understand that the charity is under no obligation to hold the property for any length of time or to sell it for the highest and best use appraised value. This opportunity allows the charity to offer the property for a much-reduced price, which encourages the property's resale, giving the property the opportunity to get back into full use."

Purchase Agreement

The purchase agreement between the taxpayer and the charity was entered into on 1/09/2019 with a listed purchase price of $2,000,000. The purchase agreement was amended on 4/19/2019 to increase the purchase price by $160,000 to account for the appraisal that was obtained. [10]

* * * *

[8] Ibid

[9] https://rss.alabamanewscenter.com/2016/12/22/commercial-real-estates-best-kept-secret-fleshed-acrecon-2017

[10] Exhibit F- Purchase Agreement

The agreement provides the following.

- That the transaction was facilitated by the Welfont Group. LLC.
- The brokers for the transaction were Marcus & Millichap Real Estate Memphis. TN which represented the Seller's interest and Welfont or its assignee. which represents Buyers interest.
- The seller agreed to pay a real estate sales commission ("Sales Commission") equal 4% of the estimated cash benefit. Cash benefit is the combined total cash payment at Closing and the estimated net tax savings (net tax savings is a calculation of the Appraisal multiplied by the Sellers federal and state income tax bracket) determined by the appraisal noted in Paragraph 4 of this Agreement at the Closing.
- The seller agreed that the sales commission would be shared equally between Seller's Broker and Welfont.
- It was the responsibility of the Seller to obtain an appraisal, however, both parties agreed that the Welfont Group. LLC would coordinate and facilitate the appraisal with an independent appraisal management company or another qualified appraiser.
- If the appraised value of the property disclosed by the appraisal is less than 95% of the anticipated appraised value of $5,388.000.00 (or less than $5,118,600). Seller may choose to terminate this Agreement by written notice to Buyer and Escrow Agent within five (5) business days after receipt of the Appraisal.

<u>Appraisals</u>

There were four appraisals conducted on the property sold by the taxpayer. Each of which are discussed in detail below.

1. Property Tax Appraisals
2. Valbridge Property Advisors Appraisal (Valbridge Appraisal)
3. Bryant Asset Advisors, LLC (Bryant Appraisal)
4. Mark S. Bove, MAI Appraisal Review Report with an Opinion of Value. (IRS Appraisal)

Property Tax Appraisal

The taxpayer appealed the property tax appraisal for the property for the years 2015-2018. As part of the appeals process the taxpayer was asked to provide in their opinion what the fair market value of the property was at that point in time. Fair Market Value was defined as what a willing buyer would pay a willing seller on the open market. [11]

* * * *

[11] Exhibit G-Property Tax Appraisals

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

| Year | Original Assessed Value | Tapayer Stated FMV | First Appeals Assessed Value | Second Appeals Assessed Value |
|---|---|---|---|---|
| 2015 | 1,500,000 | 1,000,500 | 1,500,000 | NA |
| 2016 | 1,500,000 | 1,000,000 | 1,500,000 | NA |
| 2017 | 2,991,100 | 1,794,660 | 2,726,300 | 2,400,000 |
| 2018 | 2,726,300 | 2,182,000 | 2,726,300 | 2,400,000 |

Valbridge Appraisal

On 06/07/2018, the taxpayer obtained an appraisal from Valbridge Property Advisors for the property. The appraisal determined the fair market value to be $3,390,000. The stated purpose of the appraisal was for tax planning purposes.

Under client and intended user, the appraisal provided the following "American Properties is the client for this assignment. American Properties is the intended user of this report and there are no other intended users." [12]

Bryant Appraisal

The purchase agreement discussed above provided that both parties agreed that the Welfont Group. LLC would coordinate and facilitate the appraisal with an independent appraisal management company or another qualified appraiser.

In an e-mail dated March 11, 2019, Lynda Scull from the Tax Appraisal Group contacted Mickey Davis with Marcus & Millichap regarding the "Memphis, TN Appraisal". [13]

The e-mail stated in part, "per your conversation with Welfont, attached please find the engagement letters for the appraisal of the property located at 3685 Hickory Hill Drive, Memphis, TN for Seller's review and approval. "

The e-mail contained two engagement letters which were subsequently signed by the taxpayer.

1. On March 11, 2019 the taxpayer signed an engagement letter with Tax Appraisal Group to manage the appraisal process which included the selection of a licensed appraiser to determine the Bargain Sale Opinion of Value, based on IRS Publication 561, of the real property. The fee for the service was $1,000. Per the closing statement, the fee was deducted from the buyer's column.

2. On March 11, 2019 the taxpayer signed an engagement letter with Bryant Asset Advisors, LLC to provide a "Bargain Sale Opinion of Value, based on IRS Publication 561. The scope of the appraisal included the determination

* * * *

[12] Exhibit H-Valbridge Appraisal
[13] Exhibit J-Appraisal Engagement E-mail and Letters

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

of the property's highest and best use, and application of the three traditional approaches to value, per IRS Publication 561. The appraisal fee was $7,500. Per the closing statement, the fee was deducted from the buyer's column.

On April 12, 2019 the taxpayer was provided with an appraisal report from Andrew J. Bryant, MAI, ASA with Bryant Asset Advisors LLC. The appraisal report determined the FMV of the property to be $4,755,000. [14]

Under client Identification, the appraisal provided the following "American Properties, Co., G.P., in addition to affiliates and-or assigns, including Food Assistance, Inc., and the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's market value ("Fair Market Value") for financial decision making purposes in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will be utilized to develop a deduction for the seller's (owner's) federal income tax. No other user is intended or permitted."

The report defined FMV base as the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

The report refers to an "IRS 561 Appraisal" and stated that the IRS allows the Seller to obtain an IRS 561 appraisal for the purpose of a Bargain Sale transaction. The appraisal method is not like a typical bank quick-sale appraisal, nor an insurance appraisal. It's specifically for the purposes of estimating the value of donated property.

The report provides the following differences between a traditional appraisal and an IRS 561 Appraisal.

1. In real estate transactions, one of the biggest reasons that a 561 Appraisal may be higher than list price for large and hard to move properties with significant carrying costs is because the list price is often determined by a seller who is "under compulsion" to sell within certain time frames. The carrying costs and need to dispose of the property outweigh the need to wait and find the right buyer and user. The 561 Appraisal price is determined by using the IRS stipulation of "not under compulsion" to buy or sell regardless of the carrying cost and other factors.

* * * *

[14] Exhibit I-Bryant Appraisal

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

2. Another example of how this appraisal method is different is that Publication 561 allows for, and encourages, a weighted average of the market (sales) approach, income approach and replacement cost approach. The Bargain Sale 561 appraisal accounts for all approaches using a weighted average determined by the qualified appraiser. However, it remains the appraiser's discretion which approaches are applied.

3. A final example of how the 561 Bargain Sale Appraisal is often higher than what the seller is willing to sell it for, is because IRS Publication 561 makes it clear that the appraised value must be based on the property's highest and best use. And quite often the Seller is not patient enough to realize the highest and best use of the property, because of things like the high carrying costs of the property, the Seller's own business and investment focus, external factors influencing the seller's motivation and compulsion to sell, and so forth.

The report stated that the FMV determined in the report was predicated on several extraordinary assumptions being met or realized, based on the Internal Revenue Service (IRS). IRC §170, and Publication 561 guidelines.

These included.

1. The aggressive and creative marketing of the asset be handled by an independent professional, globally dominant, commercial investment & leasing brokerage team (Cushman & Wakefield, CBRE, NKF, HHF or similar) specializing in industrial real estate.

2. Marketing time of the asset be nearly open ended (24-36+ months) and void of any undue pressure or motivation on the part of the seller.

3. Exposure time is assumed to have been {24-36+ months) preceding the effective date of value:

4. Necessary capital investment be made to repair all items of deferred maintenance (as described herein).

5. Property being professionally maintained throughout the prescribed marketing period to exhibit pride of ownership; outreach be made to the local city, municipality, or county, to explore any public- private partnership opportunities that might benefit the marketing efforts or serve to enhance the appeal of the subject property.

6. Historically low interest rates remain stable.

7. National economic conditions remain stable and continue on a positive trend; local market conditions remain stable to upwardly trending; development/redevelopment trends continue to take root and benefit more properties within the subject's regional trade area.

8. Given the current upward economic trends seen in the real estate sector, it is the opinion of the appraiser that the subject property will be an attractive investment for an investor or group of investors, seeking a well-located commercial property in the near future.
9. The final value conclusions and exposure/marketing time periods presented herein, explicitly assume the subject property to have been marketed at or near the price point of the final correlated value presented within this report. Any previous marketing, asset pricing or pricing representations for the subject have not been given considerable weight due to the fact they were likely established by a highly motivated owner/seller with differing motivations than those of a typical Seller under the definition of "Fair Market Value" as defined by the Internal Revenue Service (IRS), IRC §170, and Publication 561.

IRS Appraisal

On February 22, 2021 the IRS Senior Appraiser, Mark Bovee, MAI completed the IRS Appraisal and concluded that the highest and best use for the subject is as a neighborhood shopping center. Based on the highest and best use, the fair market value was $3,200,000. [15]

The IRS Appraisal rejected the Bryant Appraisal as a meaningful valuation of this property for a Treas., Reg. § 1.170 Non-Cash Charitable Donation and concluded the following.

1. The appraisal provides a prospective opinion of value and does not value the property "as is" but as of a date 2 to 3 years hence. (prospective value)
2. The appraisal fails to analyze the terms and conditions of the current leases.
3. The appraisal develops a cost approach for a property type that is exclusively valued by buyers and sellers on its income characteristics, fails to provide market support for depreciation, and fails to identify functional/external obsolescence
4. The report fails to address functional and external obsolescence with a 40- year old neighborhood shopping center.

* * * *

[15] Exhibit K-IRS Appraisal

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

5. The appraisal does not consider nor identify the impact of restrictive deed covenants on the property.
6. The appraisal excludes certain sale transactions and then reconciles to an unsupportable unit price in the sales comparison approach.
7. The appraisal does not support the expense projections per square foot, does not display historic accounting statements, nor provide adjustments thereto.
8. The direct capitalization of income is deficient in use of a 15.0% vacancy and credit loss rate which does not address the 60% to 70% tenant retention rate (by implication a 30% to 40% non-retention rate).
9. The appraisal includes unacceptable assignment conditions with the requirement that the client, who was never identified in the report, produce a protective order which would allow the appraiser to avoid answering questions concerning the work product.
10. The appraisal fails to comply with USPAP Standard Rule 2-2(a)(i) as to identification of the client.
11. In order to justify this type of valuation, the appraisal asserts that an IRS Pub 561 appraisal is different from other appraisals; but, offers no statutory, legal, logical, or industry standard that would recognize such a departure from generally accepted practices.
12. The appraisal contains a multiple number of minor boilerplate errors that individually do not have an impact on value but taken collectively affect credibility and quality of work.

Advice from Tax Advisor

IDR RA-9 asked the power of attorney and tax preparer if the taxpayer received written or oral tax advice or legal advice regarding the transaction.

The response provided that oral advice was given to the taxpayer regarding the CPA's firms research into whether a "bargain sale" in general was supported by the Internal Revenue Code and Regulations and what the tax impact of the bargain sale offer put forth by Welfont would be on the partners. The communication was provided to the taxpayer between December 2018 and July 2019. [16]

**LAW**

Internal Revenue Code

IRC. §170(a)(1) provides that, there shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable

* * * *

[16] See IDR response to RA-9

contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

Treas. Reg. § 1.170A–1(c)(1) provides that, if a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution.

Treas. Reg. § 1.170A–1(c)(2) provides that, the fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers.

Treas. Reg. § 1.170A–1(c)(3) provides that, if a donor makes a charitable contribution of property, such as stock in trade, at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of property contributed would have been sold by the donor at the time of the contribution.

IRC. §170(f)(11)(A)(i) provides that, in the case of an individual, partnership, or corporation, no deduction shall be allowed under subsection (a) for any contribution of property for which a deduction of more than $500 is claimed unless such person meets the requirements of subparagraphs (B), (C), and (D), as the case may be, with respect to such contribution.

(B) Property description for contributions of more than $500--In the case of contributions of property for which a deduction of more than $500 is claimed, the requirements of this subparagraph are met if the individual, partnership or corporation includes with the return for the taxable year in which the contribution is made a description of such property and such other information as the Secretary may require. The requirements of this subparagraph shall not apply to a C corporation which is not a personal service corporation or a closely held C corporation.

IRC. §170(f)(11)(C) provides that, in the case of contributions of property for which a deduction of more than $5,000 is claimed, the requirements of this subparagraph are met if the individual, partnership, or corporation obtains a qualified appraisal of such property and attaches to the return for the taxable year in which such contribution is made such information regarding such property and such appraisal as the Secretary may require.

IRC. §170(f)(11)(E) provides that, the term "qualified appraisal" means, with respect to any property, an appraisal of such property which, (I) is treated for purposes of this paragraph as a

qualified appraisal under regulations or other guidance prescribed by the Secretary, and (II) is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed under subclause (I).

Treas. Reg. § 1.170A–17 (a)(1) provides that, for purposes of section 170(f)(11) and § 1.170A–16(d)(1)(ii) and (e)(1)(ii), the term qualified appraisal means an appraisal document that is prepared by a qualified appraiser (as defined in paragraph (b)(1) of this section) in accordance with generally accepted appraisal standards (as defined in paragraph (a)(2) of this section) and otherwise complies with the requirements of this paragraph (a).

Treas. Reg. § 1.170A–17 (a) (2) provides that, for purposes of paragraph (a)(1) of this section, generally accepted appraisal standards means the substance and principles of the Uniform Standards of Professional Appraisal Practice, as developed by the Appraisal Standards Board of the Appraisal Foundation.

Treas. Reg. § 1.170A–17 (a) (3)(i) provides that a qualified appraisal must include—

(A) A description in sufficient detail under the circumstances, taking into account the value of the property, for a person who is not generally familiar with the type of property to ascertain that the appraised property is the contributed property.

(B) In the case of real property or tangible personal property, the condition of the property.

(C) The valuation effective date, as defined in paragraph (a)(5)(i) of this section.

(D) The fair market value, within the meaning of § 1.170A–1(c)(2), of the contributed property on the valuation effective date.

(ii) The terms of any agreement or understanding by or on behalf of the donor and donee that relates to the use, sale, or other disposition of the contributed property, including, for example, the terms of any agreement or understanding that—

(A) Restricts temporarily or permanently a donee's right to use or dispose of the contributed property.

(B) Reserves to, or confers upon, anyone, other than a donee or an organization participating with a donee in cooperative fundraising, any right to the income from the contributed property or to the possession of the property, including the right to vote contributed securities, to acquire the property by purchase or otherwise, or to designate the person having income, possession, or right to acquire; or

(C) Earmarks contributed property for a particular use.

(iii) The date, or expected date, of the contribution to the donee.

(iv) The following information about the appraiser:

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

(A) Name, address, and taxpayer identification number.

(B) Qualifications to value the type of property being valued, including the appraiser's education and experience.

(C) If the appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person, whether an individual, corporation, or partnership, or an independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number of the partnership or the person who employs or engages the qualified appraiser;

(v) The signature of the appraiser and the date signed by the appraiser (appraisal report date).

(vi) The following declaration by the appraiser: "I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. 330(c)".

(vii) A statement that the appraisal was prepared for income tax purposes.

(viii) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, or the replacement-cost-less-depreciation approach; and

(ix) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the

Treas. Reg. § 1.170A–17 (a)(9) provides that, the fee for a qualified appraisal cannot be based to any extent on the appraised value of the property. For example, a fee for an appraisal will be treated as based on the appraised value of the property if any part of the fee depends on the amount of the appraised value that is allowed by the Internal Revenue Service after an examination.

Treas. Reg. § 1.170A–17(b)(1) provides that, for purposes of section 170(f)(11) and § 1.170A–16(d)(1)(ii) and (e)(1)(ii), the term qualified appraiser means an individual with verifiable education and experience in valuing the type of property for which the appraisal is performed, as described in paragraphs (b)(2) through (4) of this section.

Treas. Reg. § 1.170A–17(b)(5) Individuals who are not qualified appraisers. The following individuals are not qualified appraisers for the appraised property:

(v) Any individual who is either—

(A) Related, within the meaning of section 267(b), to, or an employee of, an individual described in paragraph (b)(5)(ii), (iii), or (iv) of this section.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

(C) An independent contractor who is regularly used as an appraiser by any of the individuals described in paragraph (b)(5)(ii), (iii), or (iv) of this section, and who does not perform a majority of his or her appraisals for others during the taxable year.

(vi) An individual who is prohibited from practicing before the Internal Revenue Service by the Secretary under 31 U.S.C. 330(c) at any time during the three-year period ending on the date the appraisal is signed by the individual.

Treas. Reg. 1.70A-13(c)(5)(II) provides that, an individual is not a qualified appraiser with respect to a particular donation, even if the declaration specified in paragraph (c)(5)(i) of this section is provided in the appraisal summary, if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property (e.g., the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property).

Treas. Reg. §1.170A—17(a)(3)(iv)(c) requires that an appraiser engaged by a person other than the donor provide the name, address, identification number of the entity or person who employs or engages the appraiser.

Case Law

In Tennessee Carolina Transp., Inc. v. Commissioner, 65 TC 440, 444 (1975), the court found that where five or six prospective purchasers inspected property and declined to pay asking price. This indicated that fair market value was less than asking price.

In T. H. Symington & Son, Inc., 35 B.T.A. 711, 756 (1937), the court found that the price at which property is sold in an arm's-length transaction is the best evidence of its fair market value at the time of the sale.

In Harding v. Commissioner, T.C. Memo.1995–216, the court found that the qualified appraisal requirement was not satisfied where the appraisal was "purely hypothetical", was "at best, the maximum conceivable estimate value for the property", and "did not take into account the extant realities"

In Estate of Spruill v. Commissioner, 88 T.C. 1228, the court found that while subsequent events are generally not relevant in fixing a property's fair market value on a given date, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value, except where a material change in circumstances occurs between the valuation date and the date of sale which renders the subsequent sale unforeseeable.

In Cooley v. Commissioner, 33 T.C. 223 (1959) the court found that, "fair market value is not to be determined in a vacuum. To the contrary, it must be determined with respect to the particular property in question at the time of contribution, subject to any conditions or restrictions on marketability."

In Alli v. C.I.R., T.C. Memo 2014-15 (2014), the court found that in order for the IRS to have sufficient information to evaluate the appraisal, the appraisal must show that it took into account the conditions, if any, on the disposition of the contributed property. Because the taxpayer's appraisal did not include the terms of any agreement or understanding with Volunteers of American, the appraisal did not comply with section 1.170A–13(c)(3)(ii)(D). The appraisal did not disclose that, Volunteers of America's policy was to find a prospective purchaser before it would accept a donation in order to minimize the organization's liability exposure. Volunteers of America wished to sell the property quickly and entered into a contract on September 10, 2008, to sell the property to an investor in California for $60,000. This investor was the only person who expressed interest in purchasing the property.

Publication 561

Pub. 561 provides in part, the following.

1. Fair market value (FMV) is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.
2. The weight given an appraisal depends on, the completeness of the report, the qualifications of the appraiser, and the appraiser's demonstrated knowledge of the donated property. An appraisal must give all the facts on which to base an intelligent judgment of the value of the property.
3. The appraisal will not be given much weight if.
    a. All the factors that apply are not considered.
    b. The opinion is not supported with facts such as purchase price and comparable sales or,
    c. The opinion is not consistent with known facts.
4. The appraiser's opinion is never more valid than the facts on which it is based; without these facts it is simply a guess.
5. In general, there are three main approaches to the valuation of real estate. An appraisal may require the combined use of two or three methods rather than one method only.

Uniform Standards of Professional Appraisal Practice (USPAP)

The USPAP Standards Rule 1-2(a) requires that in developing a real property appraisal, an appraiser must identify the client and other intended users. Furthermore, Standard Rule 2-2(a)(i) requires that the client be identified in the appraisal report.

The USPAP Standards Rule 1-5 provides, when the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business: (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

**TAXPAYERS POSITION**

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

**DISCUSSION**

It's the Governments position that the concept of an IRS 561 Bargain Sale Appraisal used in the Bryant Appraisal is purely a tax strategy developed and facilitated by Welfont and disregards several of the fundamental aspects of what determines FMV.

In this case all of the parties involved in the transaction knew that the FMV of the Bryant IRS 561 Appraisal was overstated.

1. The taxpayer had previously obtained a Valbridge Appraisal which stated the FMV was $3,390,000.
2. The taxpayer had argued for the years 2015-2018 that the properties FMV was less than the assessed value. The taxpayer had argued the FMV was $2,182,000 as late as 2018.
3. The taxpayer had the property for sale and received five offers with the highest offer being $3,340,000.
4. Welfont and the charity knew that HH, LLC had made an offer for the purchase of the property prior to the completion of the Bryant Appraisal. The initial offer on the property was $3,000,000 which was then lowered to $2,650,000 after negotiations with HH, LLC.
5. The appraiser, Andrew J. Bryant was aware or should have been made aware of all of the above.

Qualified appraisal

The amount treated as a charitable contribution is required to be determined based on the properties FMV at the time of the contribution. For charitable contributions greater than $5,000 taxpayer's must substantiate the FMV and in order to do so, they must have obtained a qualified appraisal of the property and attach the appraisal to their tax return.

It's the Governments position that the appraisal failed to meet the definition of a qualified appraisal due to the following.

1. An IRS 561 Appraisal as defined by Welfont and in the Bryant Appraisal does not meet the definition of FMV within the meaning of Treas. Reg. §1.170A-1(c)(2).
2. The donor and donee failed to disclose key facts that caused the FMV to be misstated.

Definition of FMV

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The key element of a qualified appraisal is the definition of FMV. Under Treas. Reg. §1.170A-1(c)(2) , "fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts as the price that property would sell for on the open market."

The Bryant appraisal distinguishes between a typical appraisal and a "special" 561 Bargain Sale appraisal and states that an IRS 561 appraisal is specifically for the purpose of estimating the value of donated property. As its sole authority, the Bryant Appraisal cites IRS Publication 561. In defining the terms "Bargain Sale Analysis" and a "Bargain Sale Opinion of Value" the Bryant appraisal cites the Charity Partners Network and the Welfont Group.

However, there is nothing in the Internal Revenue Code, IRS regulations, Tax Court cases or even Publication 561 that supports the assertion that FMV for a bargain sale is in any way different from FMV for a normal sale of property. Additionally, neither the Charity Partners Network nor Welfont have any type of authority regarding federal income tax matters.

Willing Buyer and Willing Seller

The Bryant appraisal states that Bargain Sale Appraisal, based on Publication 561, can be very different than what the Seller is willing to sell it for. The appraisal assumes the seller is under no compulsion to sell the property and could hypothetically receive a higher price under certain hypothetical conditions if the seller were willing to wait for those conditions to appear. The higher price is based off a hypothetical "highest and best" use of the property that can only be obtained if the hypothetical conditions are meet.

For example, the Bryant Appraisal assumes the following "extraordinary" assumptions.

1. The marketing for the property is aggressive and creative and performed by a globally dominant, commercial investment and leasing brokerage firm specializing in industrial real estate.
2. Marketing time of the property is nearly open ended (24-36+ months).
3. The necessary capital investments have been made to repair all items of deferred maintenance.
4. The property is professionally maintained.
5. Ignores any previous marketing, asset pricing or pricing representations because they were "likely" established by a highly motivated seller with different motivations than those of a typical seller under the definition of "Fair Market Value" as defined by IRC §170 and Publication 561.

The Bryant appraisal assumes there are multiple hypothetical highest and best uses of the property and it is only a matter of choosing between the multiple uses. However, this is

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

critically false and presents an option of different highest and best uses that does not exist. There is only one highest and best uses for any one property.

The Bryant appraisal acknowledges this fact in defining highest and best use but then ignores its own definition. Page 41 of the Bryant Appraisal defines "highest and best use" and provides the following, "The highest and best use analysis is provided to form a conclusion of the most profitable and productive use of a site. Such optimum use may be based upon highest and most profitable continuous use to which the property is adapted or is likely to be in demand in the near future. However, a probable use that depends upon; future events. or; a combination of likely uses which depend upon future events. or; "likely happenings," are not to be included within the analysis. In short, any use that is shown to be dependent on an uncertain act of another person, or body of persons, is not to be considered in the analysis."

By assuming the "hypothetical" conditions listed above, the Bryant appraisal does not provide the FMV of the property but instead provides a "hypothetical" FMV. In such case, the courts have found that the qualified appraisal requirement was not satisfied "where the appraisal was purely hypothetical, was at best, the maximum conceivable estimate value for the property, and did not take into account the extant realities." See Harding v. Commissioner.

The Bryant appraisal's assumptions ignore the reality that the taxpayer was already a willing seller and had willing buyers. The taxpayer had in fact, held the property for sale for a period of several months and at an asking price of $3,600,000 which was much lower than the Bryant Appraised FMV. The Bryant Appraisal also ignores that during that time the taxpayer received at least five offers none of which were higher than $3,340,000.

Ignoring these facts in determining the FMV is contrary to several court cases. In Cooley v. Commissioner, the court found that fair market value was not to be determined in a vacuum but instead must be determined with respect to the particular property in question at the time of contribution. In Tennessee Carolina Transp., Inc. v. Commissioner, the court found that where five or six prospective purchasers inspected property and declined to pay asking price. This indicated that fair market value was less than asking price.

The Bryant Appraisal not only ignores the previously discussed "willing buyers" but ignores the fact that the property was actually purchased by HH, LLC from the charity for $2,650,000. The documents show that the HH, LLC offer was made well in advance of the completion of the appraisal and should have been available to the appraiser since the charity was represented by the Welfont Group. As stated in T. H. Symington & Son, Inc., "the price at which property is sold in an arm's-length transaction is the best evidence of its fair market value at the time of the sale."

In contrast, based on the Welfont marketing material and interviews, their interpretation of an "IRS 561 Appraisal" allows the charity to be under no obligation to hold the property or to sell it for the appraised value. Indeed, as was the case here, it is expected for the charity to offer the property for a much-reduced price.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | **Issue Number:**<br>**5701-1** |
|---|---|---|
| **Name of Case: American Properties, CO GP**<br>**Entity: American Properties, CO GP** | | **Year/Period Ended:**<br>**201912** |

Again, this is contrary to case law. In Estate of Spruill v. Commissioner, the court found that while subsequent events are generally not relevant in fixing a property's fair market value on a given date, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value, except where a material change in circumstances occurs between the valuation date and the date of sale which renders the subsequent sale unforeseeable. In this case there were no material changes which would have affected the FMV.

Disclosure of Key Facts

The principal purpose of the qualified appraisal requirements is to provide a means for the IRS to obtain sufficient information to support a taxpayer's claimed valuation of a charitable contribution.

In determining the FMV of any property, the appraisal must give all the facts on which to base an intelligent judgment of the value of the property. An appraisal will not be considered a qualified appraisal if all the factors that apply are not considered or the opinion is not consistent with known facts. The appraiser's opinion is never more valid than the facts on which it is based.

There were several key facts that the taxpayer, the charity, and the appraiser either failed to disclose or were not adequality addressed in the Bryant Appraisal. By not disclosing or considering the key facts the taxpayer failed to substantiate the FMV and caused the Bryant Appraisal to not be a qualified appraisal.

The taxpayer did not include the following facts.

1. The taxpayer failed to disclose the fact that they had obtained a pervious appraisal to their broker and that the appraised value was $3,360,000. We know from interviews that the taxpayer did not provide this information to their broker and we can assume it was not provided to the appraiser since it was not disclosed. There is no indication from the e-mails obtained or the interviews conducted that this fact was discussed with the appraiser or that the taxpayer questioned why the FMV per the Bryant Appraisal was much higher.

2. The Appraiser failed to disclose their relationship with Welfont and the charity in the appraisal. The Welfont Offer makes it clear that the services they are providing include providing the sellers with an IRS Form 8283 completed by the charity and providing a qualified appraisal. Its Welfont and not the taxpayer which selected Mr. Bryant to perform the appraisal and at closing it's the charity and not the taxpayer that pays for the appraisal.

   This creates a conflict of interest for the Appraiser that was not disclosed or discussed in the appraisal report. The appraisal should at a minimum discuss the relationship between Mr. Bryant and Welfont or even list Welfont or the charity as the client of the appraisal.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Per USPAP Standard Rule 2-2(a)(i) the client is required to be identified in the appraisal report. However, the Bryant appraisal never clearly identifies who the client is. In the client identification , the Bryant Appraisal states that American Properties, Co., G.P., in addition to affiliates and-or assigns, including Food Assistance, Inc., and the Internal Revenue Service (IRS), may rely upon the report but does not here or anywhere else in the report, identify who the actual client is. Compare this to the Valbridge Appraisal which clearly states in the client identification section that American Properties is the client and the intended user for the appraisal.

3. As discussed above, the Bryant Appraisal fails to acknowledge or discuss the pending sale of the property to HH, LLC. Acknowledgment of a pending sale of the property is required by USPAP Standards Rule 1-5.

   The failure to acknowledge the pending sale is also contrary to case law. In Alli v. C.I.R., which is very similar to the current case, the court found that in order for the IRS to have sufficient information to evaluate the appraisal, the appraisal must show that it took into account the fact that the charity intended to sell the property. Because the taxpayer's appraisal did not include the terms of any agreement or understanding with the charity, the court found that the appraisal was not a qualified appraisal.

As stated above, it's the Governments position that the concept of an IRS 561 Bargain Sale Appraisal is purely a tax strategy marketed and facilitated by Welfont. The transaction's main purpose was to maximize the financial benefit to American Properties Co, GP rather than benefit the charity.

Nothing reflects this fact more than looking at how much each participant in the transaction benefited.

The following is a summary of the amounts received by the respective parties in the transaction.

| | | |
|---|---|---|
| Taxpayer | $908,250 | 35% tax benefit of the charitable contribution |
| HH, LLC | $735,750 | 35% tax benefit of FMV of property less purchase price. |
| Welfont | $491,895 | Estimated Broker Commissions and Fees |
| Marcus & Millichap | $ 62,403 | Broker Commissions |
| Charity | $ 20,232 | Actual cash received by the charity |
| Newmark Grubb & Frank | $ 17,473 | Referral Fee |
| Bryant Appraisal Group | $ 7,500 | Appraisal Fee |

The charity which Welfont and the taxpayer reports to be the beneficiary of a $2,595,000 charitable contribution received a meager $20,232.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-1 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Based on this fact and the facts provided above its clear that the Bryant Appraisal disregarded several of the fundamental aspects of what determines FMV. The Bryant appraisal failed to meet the definition of a qualified appraisal due to the following.

1. An IRS 561 Appraisal as defined by Welfont and in the Bryant Appraisal does not meet the definition of FMV within the meaning of Treas. Reg. §1.170A-1(c)(2).
2. The donor and donee failed to disclose key facts that caused the FMV to be misstated.

**CONCLUSION**

It's the Governments position that FMV as defined in Treas. Reg. §1.170A-1(c)(2) would be $2,650,000. This is the amount the property was purchased for by HH, LLC on the same date the taxpayer transferred the property in a bargain sale to the charity. E-mails show the $2,650,000 was a negotiated arms-length sale between a willing seller and a willing buyer conducted on the open market. All of the parties had a reasonable knowledge of the relevant facts (such as the rent and CAM concessions) and those facts were used to negotiate the price from the initial offer of $3,000,000 down to $2,650,000

The taxpayer's charitable contribution deduction would be limited to $490,000 which is the difference between the properties FMV of $2,650,000 and the $2,160,000 sales price to the charity.

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| | |
|---|---|
| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-2 |
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | ($836,470.00) | "Net gain (loss) - Form 4797, Part II" | 409 | 01001.02-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items.).*

## See attached 886A-2

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| | |
|---|---|
| Taxpayer's / Representative's Signature | Date |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| | |
|---|---|
| Team Manager<br>Digitally signed by Q2JDB<br>Date: 2021.09.30 14:19:07 -05'00' | Date |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-2 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

**Form 4797, Part 1, Ln 7**
**Increase(Decrease) to Income**

| | | 201912 |
|---|---|---|
| Per Return | $ | 5,164,076 |
| Per Exam | $ | 4,327,606 |
| Adjustment | $ | (836,470) |

**ISSUES**

1. What is the correct amount of basis allocated to the bargain sale of property?
2. What is the correct amount of gain reported on the bargain sale of property?

**FACTS**

Bargain Sale

On May 6,2019 the taxpayer sold commercial property located at 3685 Hickory Ridge Crossing, Hickory Hill Road, Memphis, TN 38115 (the property) with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to the charity for $2,160,000. The taxpayer treated the sale as a Bargain Sale under in IRC § 170.

Taxpayer Reporting Requirements

The taxpayer reported the sale of the land and building on Form 4797 and reported a $1,098,138 gain with a sales price of 2,160,000 and a cost basis of $1,061,862. The cost basis was allocated based on a percentage of the FMV allocated between the sale and the contribution.

The taxpayer reported the bargain sale on Form 8283. The form listed the appraised value of the property as $4,755,000 with a bargain sale price received of $2,160,000. The difference of $2,595,000 was treated as a charitable contribution. The form was properly signed and dated by the appraiser and by the charity. All of the required information regarding the property, the appraiser and the charity were included.

The charitable contribution of $2,595,000 was reported on the taxpayer's Form 1065, Schedule K, Line 13a.

IRS Adjustments-5701-1

In Notice of Proposed Adjustment 5701-1, the Government determined that the $4,755,000 FMV of the bargain sale property was incorrect and should instead be $2,650,000.

**LAW**

Internal Revenue Code

Treas. Reg. §1.1011–2(a)(1) provides in part, that f for the taxable year a charitable contributions deduction is allowable under section 170 by reason of a sale or exchange of property, the taxpayer's adjusted basis of such property for purposes of determining gain

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-2 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

from such sale or exchange must be computed as provided in section 1011(b) and paragraph (b) of this section.

Treas. Reg. §1.1011–2(b) provides that, for purposes of determining gain on a sale or exchange to which this paragraph applies, the adjusted basis of the property which is sold or exchanged shall be that portion of the adjusted basis of the entire property which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the entire property. The amount of such gain which shall be treated as ordinary income (or long-term capital gain) shall be that amount which bears the same ratio to the ordinary income (or long-term capital gain) which would have been recognized if the entire property had been sold by the donor at its fair market value at the time of the sale or exchange as the amount realized on the sale or exchange bears to the fair market value of the entire property at such time. The terms ordinary income and long-term capital gain, as used in this section, have the same meaning as they have in paragraph (a) of § 1.170A–4. For determining the portion of the adjusted basis, ordinary income, and long-term capital gain allocated to the contributed portion of the property for purposes of applying section 170(e)(1) and paragraph (a) of § 1.170A–4 to the contributed portion of the property, and for determining the donee's basis in such contributed portion, see paragraph (c)(2) and (4) of § 1.170A–4. For determining the holding period of such contributed portion, see section 1223(2) and the regulations thereunder.

**TAXPAYERS POSITION**

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

**DISCISSION**

A bargain sale of property to a charitable organization is treated as part sale and part charitable contribution. The basis of the property must be allocated between each part based on the FMV assigned to each.

The taxpayer's original allocation assumed a sales price of $2,160,000 divided by a total FMV of $4,755,000. This amount was then multiplied by the total basis of the building and land of $2,328,972 to arrive at the basis allocated to the sales portion of the bargain sale.

This resulted in the following allocation.

Original Allocation of Basis

$$\frac{\$2,160,000}{\$4,755,000} = 45\% * \$2,328,972 = \$1,057,956$$

The taxpayer added an additional $3,906 Section 754 adjustment to arrive at the $1,061,862 basis amount reported on the F4797.

Using the FMV determined in IRS Notice of Proposed Adjustment 5701-1, the allocation would be as follows.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-2 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Adjusted Allocation of Basis

$$\frac{\$2{,}160{,}000}{\$2{,}650{,}000} = 82\% * \$2{,}328{,}972 = \$1{,}898{,}332$$

The Governments position is that the basis allocated to the sales portion of the bargain sale would be $1,898,332. The gain on the sale of the property would be $2,160,000 less $1,898,332 for a total of $261,668.

**CONCLUSION**

The gain reported on the bargain sale of property would be reduced from $1,098,138 to $261,668. This would reduce the total gain reported on Form 4797 by $836,470.

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| | |
|---|---|
| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-3 |
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | $151,330.00 | Accuracy-Related Penalties | 624-01 | 06662.00-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items).*

See attached 886A-3

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| | |
|---|---|
| Taxpayer's / Representative's Signature | Date |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| | |
|---|---|
| Team Manager [signature] Digitally signed by Q2JDB Date: 2021.09.30 14:19:41 -05'00' | Date |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

PRIMARY POSITION.

| Increase or (Decrease) to Income | |
|---|---|
| | 201912 |
| I.R.C. Sec. 6662 Accuracy-related Penalty | $217,669 |

**ISSUES**

1. Would the taxpayer be liable for the 20% an accuracy-related penalty for substantial valuation misstatement under chapter 1?

**ISSUE SUMMARY**

American Properties Co, GP (the taxpayer) sold property with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to Food Assistance Inc. (the charity) for $2,100,000. The taxpayer reporting a $1,098,138 gain based on the sales proceeds and deducted $2,595,000 as a charitable contribution. The transaction is commonly called a "bargain sale".

The property was then sold on the same day it was purchased by the charity to Hickory Hills, LLC (HH, LLC) for $2,650,000.

The transaction was marketed to the taxpayer by the Welfont Group (Welfont). Welfont specifically markets what it calls an "IRS 561 Appraisal" which professed to provide a higher FMV than a normal appraisal. As part of its services, Welfont identified the appraiser, managed the appraisal process.

IRS 5701-1 determined that the appraisal provided was not a qualified appraisal and therefore the FMV determined would not be accepted. An adjustment of $2,045,000.

The key issue is, would the 20% accuracy-related penalties apply. For the penalties not to apply, the taxpayer must establish that they acted with reasonable cause and in good faith in accepting the appraised FMV.

**FACTS**

The taxpayer is a general partnership founded in 1997 by Ronald Underberg (Mr. Underberg). The taxpayer owns and manages commercial real estate locations in the surrounding Memphis, TN area. From 1997 to present, the taxpayer has purchased and sold numerous commercial real estate locations.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The partnership had the following partners as of 12/31/19.

| Partner | Ownership % |
|---|---|
| UNDERBERG PROPERTY MANAGEMENT LLC | 1.32% |
| RONALD UNDERBERG | 16.84% |
| BARBARA SCHAFFER | 15.64% |
| SUSAN PERSIN | 15.60% |
| ELI JACOB PERSIN TRUST | 7.57% |
| ALEXANDER R UNDERBERG TRUST | 7.57% |
| BARRY R UNDERBERG TRUST | 7.57% |
| KYLE J SCHAFFER TRUST | 7.57% |
| JOSEPH L SCHAFFER TRUST | 7.57% |
| SPENCER ISAAC PERSIN TRUST | 7.18% |
| MIKE UNDERBERG | 5.59% |
| | 100.00% |

Underberg Property Management, LLC is the general partner with Mr. Underberg as the Chief Manager. Mike Underberg, Barbara Schaffer, and Susan Persin are the children of Mr. Underberg. The remaining partners are grandchildren of Mr. Underberg.

Mr. Underberg died on December 28, 2020. Other than the opening conference, Mr. Underberg was not interviewed as part of the IRS audit.

Bargain Sale

On May 6,2019 the taxpayer sold commercial property located at 3685 Hickory Ridge Crossing, Hickory Hill Road, Memphis, TN 38115 (the property) with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to the charity for $2,160,000. The taxpayer treated the sale as a Bargain Sale under in IRC § 170.

Subsequent sale of HH, LLC

After purchasing the property from the taxpayer, the charity then sold it that same day to HH, LLC for $2,650,000. Denis Rodger is listed as the Chief Manager of HH, LLC.

Documents obtained from HH, LLC show that the initial purchase agreement was entered into between the charity and HH, LLC on February 15, 2019 with an initial purchase price of $3,000,000. The purchase was contingent on the charity first purchasing the property from the taxpayer.

E-mails obtained from the taxpayer show that an appointment was made through Welfont for Denis Rodger to inspect the property on February 27, 2019.

Interviews conducted with HH, LLC brokers, Select Real Equity Advisors indicated that the price was reduced to $2,650,000 due to rental discrepancies. For example, upon review it

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | **Issue Number:**<br>5701-3 |
| --- | --- | --- |
| **Name of Case: American Properties, CO GP**<br>**Entity: American Properties, CO GP** | | **Year/Period Ended:**<br>201912 |

was determined that Mike Jewelers was given rent and common area maintenance (CAM) concessions of approximately $109,000.

E-mails obtained from the taxpayer show questions and concerns raised by HH, LLC such as the Mike Jewelers rent, and CAM concessions were discussed and questioned with the taxpayer using Welfont as the intermediary. [1]

Taxpayer Reporting Requirements

The taxpayer reported the sale of the land and building on Form 4797 and reported a $1,098,138 gain with a sales price of 2,160,000 and a cost basis of $1,061,862. The cost basis was allocated based on a percentage of the FMV allocated between the sale and the contribution.

The taxpayer reported the bargain sale on Form 8283. The form listed the appraised value of the property as $4,755,000 with a bargain sale price received of $2,160,000. The difference of $2,595,000 was treated as a charitable contribution. The form was properly signed and dated by the appraiser and by the charity. All of the required information regarding the property, the appraiser and the charity were included.

The charitable contribution of $2,595,000 was reported on the taxpayer's Form 1065, Schedule K, Line 13a.

Charity Reporting Requirements

The charity is a 501(c) charity which provides groceries on wheels to low-income and disabled seniors in Guilford County, North Carolina.

The taxpayer provided a Form 8282 signed by Jane Carlson Executive Director of the charity on January 7, 2021. The Form 8282 confirmed the property was sold by the charity on May 6, 2019 and provided that the charity received $20,323.11 from the sale.

A letter dated the same date was attached which contained the following statement, "As you know, Welfont Services, LLC handled all aspects of the transactions related to the acquisition and disposition of the property." The letter stated they should contact Welfont with any questions. [2]

* * * *

[1] Exhibit A-Rent & CAM E-Mails
[2] Exhibit B- Form 8282 and Charity Letter

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Brokerage Agreement

On 05/08/2018, the taxpayer entered into a brokerage agreement with Marcus & Millichap for the sale of the property with a purchase price of $4,288,000. The listed brokers commission is 4%. [3]

The primary broker for Marcus & Millichap was Mickey Davis who is located at the Memphis, TN office. Mr. Davis specializes in retail investment properties and has more than 20 years of experience in commercial real estate.

Broker Interview

The broker, Mickey Davis was interviewed on 05/06/01 and provided the following relevant information.

Mr. Underberg's motivation for the sale was to divest of the property so he would have cash for retirement. There was no discussion of Section 1031 exchanges or other tax deferral methods that would not produce cash.

The properties were initially listed for $4,288,000 per the broker agreement. As a stream of lower offers came in the property's listing price was adjusted to the $3,600,000. Mr. Davis was unaware that Mr. Underberg had previously obtained an appraisal from Valbridge Property Advisors for $3,390,000.

Mr. Davis was also unaware of the subsequent sale of the property to HH, LLC until after the fact. He was unaware there would be a double escrow. He remembered someone from the buyer inspecting the property but was unaware that it was Denis Rodgers or that he did not represent Food Assistance Inc.

When asked if Mr. Underberg had discussed the issue with his accountant, Mr. Davis remembered generally that he had. Mr. Underberg indicated that he had discussed it and that it was ok to go forward with the bargain sale but could not remember any additional details about the conversation.

Letters of Intent

Due to the marketing efforts by Marcus & Millichap, the taxpayer received the following letters of intent offering to purchase the property. However, none of the offers were accepted. [4]

* * * *

[3] Exhibit C- Marcus & Millichap Brokerage Agreement
[4] Exhibit D- Letters of Intent

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

| Date | Purchaser | | Offer |
|---|---|---|---|
| 7/17/2018 | NEIS Acquisitions, LLC | $ | 3,200,000 |
| 8/29/2018 | Kohanian Holdings, LLC | $ | 2,300,000 |
| 11/13/2018 | Hakimi Capital | $ | 3,340,000 |
| 12/17/2018 | Justin Depree | $ | 3,335,000 |
| 12/28/2018 | Munish Agarwal | $ | 3,200,000 |

Welfont Group. LLC

Welfont Group, LLC (Welfont) is a brokerage firm that advertises as specializing in bargain sales. https://realestatebargainsale.com/

E-mails provided by the taxpayer and public documents reflect the following timeline. [5]

- 12/4/18- Welfont was first introduced to Mikey Davis at Marcus & Millichap in an e-mail from James Rainer at Newmark Knight Frank. Mr. Rainer e-mailed Mr. Davis requesting a call with Welfont. Welfont was interested in submitting a letter of intent on the property and they wanted to explain the potential structure prior to submitting the offer.
- 12/4/18- E-mail from Taylor Weaver with Welfont describing the bargain sale and the potential tax savings. Attached to the e-mails was the initial offer.
- 12/5/18- Letter of Intent and "IRS Section 170 Bargain Sale Opinion of Value" sent to Marcus & Millichap.
- 12/19/18-Mr. Davis submitted the offer to Mr. Underberg.
- 01/17/2019-Taxpayer entered into a purchase agreement with Food Assistance, Inc.
- 02/29/2019-Denis Rodgers with Hickory Hills, LLC meet with the taxpayer to inspect the property.
- 04/19/2019-Appraisal report completed by Bryant Asset Advisors, LLC.
- 04/19/2019-Purchase price agreement was amended to increase the purchase price by $160,000.
- 05/06/2019-Property was sold by the taxpayer to Food Assistance Inc.
- 05/06/2019-Property was sold by Food Assistance Inc. to John Rodgers of Hickory Hill, LLC.

Welfont Letter of Intent

The letter of intent laid out the basic terms the charity required to purchase the property. [6]

The letter provides the following:

* * * *

[5] See IDR response to RA-2 and RA-3 for E-mails.
[6] Exhibit E- Welfont Documents

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

- That the buyer shall purchase the property through an IRS Section 170 Bargain Sale purchase, which consists of a combination of cash and a charitable contribution (" Bargain Sale").
- A Bargain Sale occurs when a seller sells a property to a 50l(c)(3) organization and is then able to use the difference between appraised value and cash received as a tax deduction through a charitable contribution.

| | |
|---|---|
| a. Cash Amount: | $2,000,000 |
| b. Charitable Contribution Amount (Tax Deduction): | $3,388,000 |
| c. Projected Tax Savings Estimate (% of Charitable Contribution): | $1,253,560 |
| d. Total Estimated Cash Benefit (a+c): | $3,253,560 |
| e. Cash Equivalent Value (pretax estimate of an equivalent cash offer): | $3,469,443 |

- Seller agrees to pay the Seller's Broker any commissions or fees at their agreed upon rate based on the Total Cash Benefit {per Paragraph 5(d), Total Cash Benefit is a calculation of the (Cash Amount+ Projected Tax Savings) to the Seller as determined by the appraisal. Said commission or fee shall be split equally between the Seller's Broker and Buyer's Broker or an affiliate Buyer's Broker designee, who shall serve as a cooperating broker.
- Seller shall engage an appraiser to prepare an appraisal for the Property during the Inspection Period (the "Appraisal").
- The terms of this LOI shall remain confidential. Buyer and Seller shall not disclose the existence of this LOI or any of its terms, except to their respective accountants, attorneys, and other advisors as necessary to fulfill its due diligence.

Welfont Offer

Included with the letter of intent was a document from Welfont titled "Offer". The document included an analysis of the bargain sale including a comparison of the cash received and estimated tax savings as if the transaction were completed as a traditional sale vs a bargain sale. The offer also makes the following statement, "In addition to the cash received at closing, sellers receive the IRS Form 8283 completed by the non-profit or 501(c)(3), along with the qualified appraisal. These two documents specify the charitable deduction amount eligible to be claimed on tax filings."[7]

Welfont Opinion of Value

Included with the letter of intent was a document from Welfont titled "opinion of value".

* * * *

[7] Ibid

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The stated purpose of the documents was "This report is an IRS Section 170 Bargain Sale Opinion of Value (based on IRS Publication 561 guidelines} on the subject property described below for the purposes of determining value of donated property. It is not the actual appraisal, but a good faith estimates of where the appraisal will come in."

The opinion of value provided the follow value for the property. [8]

| Approach | Weight | Value |
|---|---|---|
| Replacement Cost | 20% | $5,806,227 |
| Approach Income Approach | 60% | $6,224,590 |
| Sale Comparison Approach | 20% | $2,458,115 |
| Weighted Average | | $5,387,623 |

Shawn Marcel, senior acquisitions manager at The Welfont Group provided the following statement in a 2017 news interview. [9] "Assume for a moment that your client has a vacant manufacturing facility on the outskirts of the downtown core. It has been a vacant building for the past 12 months, since the most recent tenants moved out, adding to blight. This property does not create jobs, increase the tax rolls, or improve the area. If anything, it is doing the exact opposite, as it may attract vandalism or worse.

By selling this property to a 501(c)(3) nonprofit through a Bargain Sale transaction, the property owner gets to value the property at its highest and best use, not the current lower value. The valuation should be done by a certified appraiser with the MAI designation. It is then sold to the nonprofit at the highest and best use appraisal. The seller receives a minority portion of this value in cash at closing and the remainder is received as tax deductions and rebates from the state and federal governments.

It is important to understand that the charity is under no obligation to hold the property for any length of time or to sell it for the highest and best use appraised value. This opportunity allows the charity to offer the property for a much-reduced price, which encourages the property's resale, giving the property the opportunity to get back into full use."

Purchase Agreement

The purchase agreement between the taxpayer and the charity was entered into on 1/09/2019 with a listed purchase price of $2,000,000. The purchase agreement was amended on 4/19/2019 to increase the purchase price by $160,000 to account for the appraisal that was obtained. [10]

* * * *

[8] Ibid

[9] https://rss.alabamanewscenter.com/2016/12/22/commercial-real-estates-best-kept-secret-fleshed-acrecon-2017

[10] Exhibit F- Purchase Agreement

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The agreement provides the following.

- That the transaction was facilitated by the Welfont Group. LLC.
- The brokers for the transaction were Marcus & Millichap Real Estate Memphis. TN which represented the Seller's interest and Welfont or its assignee. which represents Buyers interest.
- The seller agreed to pay a real estate sales commission ("Sales Commission") equal 4% of the estimated cash benefit. Cash benefit is the combined total cash payment at Closing and the estimated net tax savings (net tax savings is a calculation of the Appraisal multiplied by the Sellers federal and state income tax bracket) determined by the appraisal noted in Paragraph 4 of this Agreement at the Closing.
- The seller agreed that the sales commission would be shared equally between Seller's Broker and Welfont.
- It was the responsibility of the Seller to obtain an appraisal, however, both parties agreed that the Welfont Group. LLC would coordinate and facilitate the appraisal with an independent appraisal management company or another qualified appraiser.
- If the appraised value of the property disclosed by the appraisal is less than 95% of the anticipated appraised value of $5,388.000.00 (or less than $5,118,600). Seller may choose to terminate this Agreement by written notice to Buyer and Escrow Agent within five (5) business days after receipt of the Appraisal.

Appraisals

There were four appraisals conducted on the property sold by the taxpayer. Each of which are discussed in detail below.

1. Property Tax Appraisals
2. Valbridge Property Advisors Appraisal (Valbridge Appraisal)
3. Bryant Asset Advisors, LLC (Bryant Appraisal)
4. Mark S. Bove, MAI Appraisal Review Report with an Opinion of Value. (IRS Appraisal)

Property Tax Appraisal

The taxpayer appealed the property tax appraisal for the property for the years 2015-2018. As part of the appeals process the taxpayer was asked to provide in their opinion what the fair market value of the property was at that point in time. Fair Market Value was defined as what a willing buyer would pay a willing seller on the open market. [11]

* * * *

[11] Exhibit G-Property Tax Appraisals

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

| Year | Original Assessed Value | Tapayer Stated FMV | First Appeals Assessed Value | Second Appeals Assessed Value |
|---|---|---|---|---|
| 2015 | 1,500,000 | 1,000,500 | 1,500,000 | NA |
| 2016 | 1,500,000 | 1,000,000 | 1,500,000 | NA |
| 2017 | 2,991,100 | 1,794,660 | 2,726,300 | 2,400,000 |
| 2018 | 2,726,300 | 2,182,000 | 2,726,300 | 2,400,000 |

Valbridge Appraisal

On 06/07/2018, the taxpayer obtained an appraisal from Valbridge Property Advisors for the property. The appraisal determined the fair market value to be $3,390,000. The stated purpose of the appraisal was for tax planning purposes.

Under client and intended user, the appraisal provided the following "American Properties is the client for this assignment. American Properties is the intended user of this report and there are no other intended users." [12]

Bryant Appraisal

The purchase agreement discussed above provided that both parties agreed that the Welfont Group. LLC would coordinate and facilitate the appraisal with an independent appraisal management company or another qualified appraiser.

In an e-mail dated March 11, 2019, Lynda Scull from the Tax Appraisal Group contacted Mickey Davis with Marcus & Millichap regarding the "Memphis, TN Appraisal". [13]

The e-mail stated in part, "per your conversation with Welfont, attached please find the engagement letters for the appraisal of the property located at 3685 Hickory Hill Drive, Memphis, TN for Seller's review and approval. "

The e-mail contained two engagement letters which were subsequently signed by the taxpayer.

1. On March 11, 2019 the taxpayer signed an engagement letter with Tax Appraisal Group to manage the appraisal process which included the selection of a licensed appraiser to determine the Bargain Sale Opinion of Value, based on IRS Publication 561, of the real property. The fee for the service was $1,000. Per the closing statement, the fee was deducted from the buyer's column.

2. On March 11, 2019 the taxpayer signed an engagement letter with Bryant Asset Advisors, LLC to provide a "Bargain Sale Opinion of Value, based on IRS Publication 561. The scope of the appraisal included the determination

* * * *

[12] Exhibit H-Valbridge Appraisal
[13] Exhibit J-Appraisal Engagement E-mail and Letters

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | **Issue Number:**<br>**5701-3** |
|---|---|---|
| **Name of Case: American Properties, CO GP**<br>**Entity: American Properties, CO GP** | | **Year/Period Ended:**<br>**201912** |

of the property's highest and best use, and application of the three traditional approaches to value, per IRS Publication 561. The appraisal fee was $7,500. Per the closing statement, the fee was deducted from the buyer's column.

On April 12, 2019 the taxpayer was provided with an appraisal report from Andrew J. Bryant, MAI, ASA with Bryant Asset Advisors LLC. The appraisal report determined the FMV of the property to be $4,755,000. [14]

Under client Identification, the appraisal provided the following "American Properties, Co., G.P., in addition to affiliates and-or assigns, including Food Assistance, Inc., and the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's market value ("Fair Market Value") for financial decision making purposes in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will be utilized to develop a deduction for the seller's (owner's) federal income tax. No other user is intended or permitted."

The report defined FMV base as the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

The report refers to an "IRS 561 Appraisal" and stated that the IRS allows the Seller to obtain an IRS 561 appraisal for the purpose of a Bargain Sale transaction. The appraisal method is not like a typical bank quick-sale appraisal, nor an insurance appraisal. It's specifically for the purposes of estimating the value of donated property.

The report provides the following differences between a traditional appraisal and an IRS 561 Appraisal.

1. In real estate transactions, one of the biggest reasons that a 561 Appraisal may be higher than list price for large and hard to move properties with significant carrying costs is because the list price is often determined by a seller who is "under compulsion" to sell within certain time frames. The carrying costs and need to dispose of the property outweigh the need to wait and find the right buyer and user. The 561 Appraisal price is determined by using the IRS stipulation of "not under compulsion" to buy or sell regardless of the carrying cost and other factors.

* * * *

[14] Exhibit I-Bryant Appraisal

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

2. Another example of how this appraisal method is different is that Publication 561 allows for, and encourages, a weighted average of the market (sales) approach, income approach and replacement cost approach. The Bargain Sale 561 appraisal accounts for all approaches using a weighted average determined by the qualified appraiser. However, it remains the appraiser's discretion which approaches are applied.

3. A final example of how the 561 Bargain Sale Appraisal is often higher than what the seller is willing to sell it for, is because IRS Publication 561 makes it clear that the appraised value must be based on the property's highest and best use. And quite often the Seller is not patient enough to realize the highest and best use of the property, because of things like the high carrying costs of the property, the Seller's own business and investment focus, external factors influencing the seller's motivation and compulsion to sell, and so forth.

The report stated that the FMV determined in the report was predicated on several extraordinary assumptions being met or realized, based on the Internal Revenue Service (IRS). IRC §170, and Publication 561 guidelines.

These included.

1. The aggressive and creative marketing of the asset be handled by an independent professional, globally dominant, commercial investment & leasing brokerage team (Cushman & Wakefield, CBRE, NKF, HHF or similar) specializing in industrial real estate.

2. Marketing time of the asset be nearly open ended (24-36+ months) and void of any undue pressure or motivation on the part of the seller.

3. Exposure time is assumed to have been {24-36+ months) preceding the effective date of value:

4. Necessary capital investment be made to repair all items of deferred maintenance (as described herein).

5. Property being professionally maintained throughout the prescribed marketing period to exhibit pride of ownership: outreach be made to the local city, municipality, or county, to explore any public- private partnership opportunities that might benefit the marketing efforts or serve to enhance the appeal of the subject property.

6. Historically low interest rates remain stable.

7. National economic conditions remain stable and continue on a positive trend; local market conditions remain stable to upwardly trending; development/redevelopment trends continue to take root and benefit more properties within the subject's regional trade area.

8. Given the current upward economic trends seen in the real estate sector, it is the opinion of the appraiser that the subject property will be an attractive investment for an investor or group of investors, seeking a well-located commercial property in the near future.
9. The final value conclusions and exposure/marketing time periods presented herein, explicitly assume the subject property to have been marketed at or near the price point of the final correlated value presented within this report. Any previous marketing, asset pricing or pricing representations for the subject have not been given considerable weight due to the fact they were likely established by a highly motivated owner/seller with differing motivations than those of a typical Seller under the definition of "Fair Market Value" as defined by the Internal Revenue Service (IRS), IRC §170, and Publication 561.

IRS Appraisal

On February 22, 2021 the IRS Senior Appraiser, Mark Bovee, MAI completed the IRS Appraisal and concluded that the highest and best use for the subject is as a neighborhood shopping center. Based on the highest and best use, the fair market value was $3,200,000. [15]

The IRS Appraisal rejected the Bryant Appraisal as a meaningful valuation of this property for a Treas., Reg. § 1.170 Non-Cash Charitable Donation and concluded the following.

1. The appraisal provides a prospective opinion of value and does not value the property "as is" but as of a date 2 to 3 years hence. (prospective value)
2. The appraisal fails to analyze the terms and conditions of the current leases.
3. The appraisal develops a cost approach for a property type that is exclusively valued by buyers and sellers on its income characteristics, fails to provide market support for depreciation, and fails to identify functional/external obsolescence
4. The report fails to address functional and external obsolescence with a 40- year old neighborhood shopping center.

* * * *

[15] Exhibit K-IRS Appraisal

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

5. The appraisal does not consider nor identify the impact of restrictive deed covenants on the property.
6. The appraisal excludes certain sale transactions and then reconciles to an unsupportable unit price in the sales comparison approach.
7. The appraisal does not support the expense projections per square foot, does not display historic accounting statements, nor provide adjustments thereto.
8. The direct capitalization of income is deficient in use of a 15.0% vacancy and credit loss rate which does not address the 60% to 70% tenant retention rate (by implication a 30% to 40% non-retention rate).
9. The appraisal includes unacceptable assignment conditions with the requirement that the client, who was never identified in the report, produce a protective order which would allow the appraiser to avoid answering questions concerning the work product.
10. The appraisal fails to comply with USPAP Standard Rule 2-2(a)(i) as to identification of the client.
11. In order to justify this type of valuation, the appraisal asserts that an IRS Pub 561 appraisal is different from other appraisals; but, offers no statutory, legal, logical, or industry standard that would recognize such a departure from generally accepted practices.
12. The appraisal contains a multiple number of minor boilerplate errors that individually do not have an impact on value but taken collectively affect credibility and quality of work.

Advice from Tax Advisor

IDR RA-9 asked the power of attorney and tax preparer if the taxpayer received written or oral tax advice or legal advice regarding the transaction.

The response provided that oral advice was given to the taxpayer regarding the CPA's firms research into whether a "bargain sale" in general was supported by the Internal Revenue Code and Regulations and what the tax impact of the bargain sale offer put forth by Welfont would be on the partners. The communication was provided to the taxpayer between December 2018 and July 2019. [16]

**LAW**

Internal Revenue Code

IRC § 6662 (a) provides that, if this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

* * * *

[16] See IDR response to RA-9

IRC § 6662(b) provides that, this section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

1. Negligence or disregard of rules or regulations.
2. Any substantial understatement of income tax.
3. Any substantial valuation misstatement under chapter 1.

IRC § 6662(e)(1) (A) provides that for purposes of this section, there is a substantial valuation misstatement under chapter 1 if the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).

Treas. Reg. § 1.6662–3(a) provides in part, that if any portion of an underpayment, as defined in section 6664(a) and § 1.6664–2, of any income tax imposed under subtitle A of the Internal Revenue Code that is required to be shown on a return is attributable to negligence or disregard of rules or regulations, there is added to the tax an amount equal to 20 percent of such portion.

The penalty for disregarding rules or regulations does not apply, however, if the requirements of paragraph (c)(1) of this section are satisfied and the position in question is adequately disclosed as provided in paragraph (c)(2) of this section (and, if the position relates to a reportable transaction as defined in § 1.6011–4(b) (or § 1.6011–4T(b), as applicable), the transaction is disclosed in accordance with § 1.6011–4 (or § 1.6011–4T, as applicable)), or to the extent that the reasonable cause and good faith exception to this penalty set forth in § 1.6664–4 applies.

Treas. Reg. § 1.6662–3(b)(1) provides in part, that the term negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. "Negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. A return position that has a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence. Negligence is strongly indicated where—

(i) A taxpayer fails to include on an income tax return an amount of income shown on an information return, as defined in section 6724(d)(1).

(ii) A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.

Treas. Reg. § 1.6662–3(b)(2) provides in part, that the term disregard includes any careless, reckless, or intentional disregard of rules or regulations. The term "rules or regulations" includes the provisions of the Internal Revenue Code, temporary or final Treasury regulations issued under the Code, and revenue rulings or notices (other than notices of proposed rulemaking) issued by the Internal Revenue Service and published in the Internal Revenue Bulletin.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
| --- | --- | --- |
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe.

A disregard is "intentional" if the taxpayer knows of the rule or regulation that is disregarded. Nevertheless, a taxpayer who takes a position (other than with respect to a reportable transaction, as defined in § 1.6011–4(b) or § 1.6011–4T(b), as applicable) contrary to a revenue ruling or notice has not disregarded the ruling or notice if the contrary position has a realistic possibility of being sustained on its merits.

Treas. Reg. § 1.6662–3(b)(3) provides in part, that reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim.

If a return position is reasonably based on one or more of the authorities set forth in § 1.6662–4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662–4(d)(2). (See § 1.6662–4(d)(3)(ii) for rules with respect to relevance, persuasiveness, subsequent developments, and use of a well-reasoned construction of an applicable statutory provision for purposes of the substantial understatement penalty.) In addition, the reasonable cause and good faith exception in § 1.6664–4 may provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard.

Treas. Reg. § 1.6662–5(a) provides that, if any portion of an underpayment, as defined in section 6664(a) and § 1.6664–2, of any income tax imposed under chapter 1 of subtitle A of the Code that is required to be shown on a return is attributable to a substantial valuation misstatement under chapter 1 ("substantial valuation misstatement"), there is added to the tax an amount equal to 20 percent of such portion. Section 6662(h) increases the penalty to 40 percent in the case of a gross valuation misstatement under chapter 1 ("gross valuation misstatement"). No penalty under section 6662(b)(3) is imposed, however, on a portion of an underpayment that is attributable to a substantial or gross valuation misstatement unless the aggregate of all portions of the underpayment attributable to substantial or gross valuation misstatements exceeds the applicable dollar limitation ($5,000 or $10,000), as provided in section 6662(e)(2) and paragraphs (b) and (f)(2) of this section. This penalty also does not apply to the extent that the reasonable cause and good faith exception to this penalty set forth in § 1.6664–4 applies. There is no disclosure exception to this penalty.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Treas. Reg. § 1.6664–4(a) provides that no penalty may be imposed under section 6662 with respect to any portion of an underpayment upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to, such portion. Rules for determining whether the reasonable cause and good faith exception applies are set forth in paragraphs (b) through (h) of this section.

Treas. Reg. § 1.6664–4 (b)(1) provides in part, that the determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances

Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith.

Reliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith. Similarly, reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect. Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable, and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to reliance on the advice of others.)

For example, reliance on erroneous information (such as an error relating to the cost or adjusted basis of property, the date property was placed in service, or the amount of opening or closing inventory) inadvertently included in data compiled by the various divisions of a multidivisional corporation or in financial books and records prepared by those divisions generally indicates reasonable cause and good faith, provided the corporation employed internal controls and procedures, reasonable under the circumstances, that were designed to identify such factual errors.

Reasonable cause and good faith ordinarily are not indicated by the mere fact that there is an appraisal of the value of property. Other factors to consider include the methodology and assumptions underlying the appraisal, the appraised value, the relationship between appraised value and purchase price, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer or to the activity in which the property is used. (See paragraph (g) of this section for certain rules relating to appraisals for charitable deduction property.)

Treas. Reg. § 1.6664–4 (b)(2) Example 1. A, an individual calendar year taxpayer, engages B, a professional tax advisor, to give A advice concerning the deductibility of certain state and local taxes. A provides B with full details concerning the taxes at issue. B advises A that the taxes are fully deductible. A, in preparing his own tax return, claims a deduction for the taxes. Absent other facts, and assuming the facts and circumstances surrounding B's advice and A's reliance on

such advice satisfy the requirements of paragraph (c) of this section, A is considered to have demonstrated good faith by seeking the advice of a professional tax advisor, and to have shown reasonable cause for any underpayment attributable to the deduction claimed for the taxes. However, if A had sought advice from someone that A knew, or should have known, lacked knowledge in the relevant aspects of Federal tax law, or if other facts demonstrate that A failed to act reasonably or in good faith, A would not be considered to have shown reasonable cause or to have acted in good faith.

Treas. Reg. § 1.6664–4 (c)(1) provides that all facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice (including the opinion of a professional tax advisor) as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law. For example, the taxpayer's education, sophistication, and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith. In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied. The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith. For example, reliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.

Treas. Reg. § 1.6664–4 (c)(1)(i) provides that the advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.
Treas. Reg. § 1.6664–4 (c)(1)(ii) provides that, the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

Treas. Reg. § 1.6664–4 (h)(1) provides that there may be reasonable cause and good faith with respect to a portion of an underpayment that is attributable to a substantial (or gross) valuation misstatement of charitable deduction property (as defined in paragraph (h)(2) of this section) only if—

(i) The claimed value of the property was based on a qualified appraisal (as defined in paragraph (h)(2) of this section) by a qualified appraiser (as defined in paragraph (h)(2) of this section); and

(ii) In addition to obtaining a qualified appraisal, the taxpayer made a good faith investigation of the value of the contributed property.

(2) Definitions. For purposes of this paragraph (h):

I.R.C. § 6664(c)(4)(A) provides the term "charitable deduction property" means any property contributed by the taxpayer in a contribution for which a deduction was claimed under section 170. For purposes of paragraph (3), such term shall not include any securities for which (as of the date of the contribution) market quotations are readily available on an established securities market.

I.R.C. § 6664(c)(4)(B) provides the term "qualified appraisal" has the meaning given such term by section 170(f)(11)(E)(i).
I.R.C. § 6664(c)(4)(C) provides the term "qualified appraiser" has the meaning given such term by section 170(f)(11)(E)(ii).

Case Law

In Glade Creek Partners, LLC v. Commissioner of Internal Revenue, T.C. Memo. 2020-148, the court found that, with respect to adjustments to amounts reported by an LLC, reasonable cause is determined by examining the actions of the managing member. The court also found that, in general, reliance on a promoter is not reasonable or in good faith and is not a defense to an accuracy-related penalty.

In Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279, the court defined negligence as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Negligence is strongly indicated when a "taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."

In Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001), the court found that the taxpayer burden of proof for defenses to accuracy-related penalties and must introduce evidence regarding reasonable cause, substantial authority, or similar defenses.

In Neonatology Assocs., v. Comm'r, 115 T.C. 43, the court found that reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. The good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. Whether a taxpayer relies on advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. A professional may render advice that may be relied upon reasonably when he or she arrives at that advice independently, taking into account, among other things, the taxpayer's purposes for entering into the underlying transaction. Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

inherent conflict of interest that the taxpayer knew or should have known about. Reliance also is unreasonable when the taxpayer knew, or should have known, that the adviser lacked the requisite expertise to opine on the tax treatment of the disputed item.

**TAXPAYERS POSITION**

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

**DISCUSSION**

It's the Governments position that the concept of an IRS 561 Bargain Sale Appraisal used in the Bryant Appraisal is purely a tax strategy developed and facilitated by Welfont and disregards several of the fundamental aspects of what determines FMV. Mr. Underberg knew the FMV was overstated and did not act with reasonable cause or in good faith in choosing to use the Bryant Appraisal to value the charitable contribution. Therefore, the taxpayer would be subject to the substantial valuation misstatement.

A taxpayer may be liable for an accuracy-related penalty of 20 percent for substantial valuation misstatement. However, the accuracy-related penalty does not apply if the taxpayer can prove they acted with reasonable cause and in good faith.

A substantial valuation misstatement exists if the value of any property claimed on a return is 150 percent or more of the value determined to be correct. Taxpayers can establish reasonable cause on the basis of their reasonable reliance on a qualified appraisal by a qualified appraiser and their own good faith with respect to the valuation.

The mere fact that a taxpayer had a property appraised does not establish reasonable cause and good faith. In this case, the Government determined that the Bryant Appraisal was not a qualified appraisal in part due to the fact that Mr. Underberg knew that the FMV of the appraisal was overstated. See IRS 5701-1.

The facts show that Mr. Underberg knew the Bryant Appraisal was overstated based on information he had at the time. Prior to the Welfont initial offer and the Bryant Appraisal, Mr. Underberg had gathered the following relevant information.

1. Property Tax Appeals from 2015-2018 where the taxpayer had argued that the property's FMV was less than the assessed value. The taxpayer had argued the FMV was $2,182,000 as late as 2018.
2. The Valbridge Appraisal which stated the FMV was $3,390,000.
3. The property was held for sale and received five offers with the highest offer being $3,340,000.

At the time of the sale, Mr. Underberg had over 20 years of experience buying and selling commercial real estate. Mr. Underberg initially offered the property for sale at $4,288,000 and after receiving several low offers he obtained the Valbridge Appraisal which determined the

FMV of the property as $3,390,000. Mr. Underberg then lowered the offering price to $3,600,000 acknowledging the fact that he understood the FMV was lower than the initial asking price.

These are all relevant factors because they show Mr. Underberg's efforts to determine the FMV of the property. It also shows that he intentionally disregarded his own efforts and instead chose to use the Bryant Appraisal's FMV because it provided him with the most tax benefits. This was not an honest misunderstanding but instead a negligent disregard for the facts by an experienced and knowledgeable taxpayer.

The Welfont Offer and the Bryant Appraisal both use terms such as "IRS Section 170 Bargain Sale Opinion of Value" and "IRS 561 Appraisal" both of which are terms not commonly used in real estate. Both documents profess to provide a higher appraised FMV than a traditional appraisal. The Bryant appraisal even states that a Bargain Sale Appraisal, based on Publication 561, can be very different than what the "Seller is willing to sell it for".

A reasonable and prudent person, even one without Mr. Underberg's knowledge and experience should have questioned if the appraisal was "too good to be true". Simply relying on Welfont, their promotional material or an appraisal from an appraiser Welfont identified and the charity paid does not qualify as reasonable cause.

In an E-mail, the broker Micky Davis questioned the use of the bargain sale internally and was told it appeared to be "legit" but that they should make it clear that the buyer and seller are relying on their own legal and financial counsel to structure this transaction. Mickey Davis concluded the e-mail chain stating that "We told the seller to take it to his accountant to see if he thought it was a viable option for him."

On the same date, Mickey Davis responded to an e-mail from Welfont and provided in part, that Mr. Underberg was looking at other offers and that he was a seasoned owner who would likely include his CPA when considering the Welfont offer.

Based on IDR responses, Mr. Underberg did discuss the bargain sale with his tax preparer. However, the extent of the tax advice received consisted of oral advice regarding whether a "bargain sale" in general was supported and a written analysis of the net proceeds received and the tax impact each would have on the partners.

A taxpayer will not be considered to have reasonably relied in good faith on professional tax advice if the taxpayer fails to disclose a fact it knows, or should know, to be relevant to the proper tax treatment of an item. In this case, the taxpayer knew the FMV of the property and knew that the Welfont Offer was "too good to be true" based on his own knowledge and years of experience in commercial real estate.

Based on the factors discussed above, it is the Governments position that Mr. Underberg consciously and intentionally disregarded what he knew to be the properties correct FMV and instead used the Bryant Appraisal to value the charitable deduction. The taxpayer did not act with reasonable cause or in good faith and would be subject to the substantial valuation misstatement penalty.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-3 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

## CONCLUSION

A 20% substantial valuation misstatement penalty under IRC § 6662 (b) will be imposed on any portion of an underpayment related to the bargain sale transaction and corresponding charitable contribution. The penalty would be calculated based on the Preliminary Imputed Underpayment (IU) of $1,088,344 * 20% which would be equal to $217,669.

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| | |
|---|---|
| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-4 |
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | $151,330.00 | Accuracy-Related Penalties | 624-01 | 06662.00-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items).*

See attached 886A-4

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| Taxpayer's / Representative's Signature | Date |
|---|---|
| | |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| Team Manager | Date |
|---|---|
| Digitally signed by Q2JDB<br>Date: 2021.09.30 14:21:03 -05'00' | |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

ALTERNATIVE ARGUMENT

Increase or (Decrease) to Income

| | 201912 |
|---|---|
| I.R.C. Sec. 6662 Accuracy-related Penalty | $217,669 |

## ISSUES

1. Would the taxpayer be liable for the 20% an accuracy-related penalty for negligence? `

## ISSUE SUMMARY

American Properties Co, GP (the taxpayer) sold property with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to Food Assistance Inc. (the charity) for $2,100,000. The taxpayer reporting a $1,098,138 gain based on the sales proceeds and deducted $2,595,000 as a charitable contribution. The transaction is commonly called a "bargain sale".

The property was then sold on the same day it was purchased by the charity to Hickory Hills, LLC (HH, LLC) for $2,650,000.

The transaction was marketed to the taxpayer by the Welfont Group (Welfont). Welfont specifically markets what it calls an "IRS 561 Appraisal" which professed to provide a higher FMV than a normal appraisal. As part of its services, Welfont identified the appraiser, managed the appraisal process.

IRS 5701-1 determined that the appraisal provided was not a qualified appraisal and therefore the FMV determined would not be accepted. An adjustment of $2,045,000.

The key issue is, would the 20% accuracy-related penalties apply. For the penalties not to apply, the taxpayer must establish that they acted with reasonable cause and in good faith in accepting the appraised FMV.

## FACTS

The taxpayer is a general partnership founded in 1997 by Ronald Underberg (Mr. Underberg). The taxpayer owns and manages commercial real estate locations in the surrounding Memphis, TN area. From 1997 to present, the taxpayer has purchased and sold numerous commercial real estate locations.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The partnership had the following partners as of 12/31/19.

| Partner | Ownership % |
|---|---|
| UNDERBERG PROPERTY MANAGEMENT LLC | 1.32% |
| RONALD UNDERBERG | 16.84% |
| BARBARA SCHAFFER | 15.64% |
| SUSAN PERSIN | 15.60% |
| ELI JACOB PERSIN TRUST | 7.57% |
| ALEXANDER R UNDERBERG TRUST | 7.57% |
| BARRY R UNDERBERG TRUST | 7.57% |
| KYLE J SCHAFFER TRUST | 7.57% |
| JOSEPH L SCHAFFER TRUST | 7.57% |
| SPENCER ISAAC PERSIN TRUST | 7.18% |
| MIKE UNDERBERG | 5.59% |
| | 100.00% |

Underberg Property Management, LLC is the general partner with Mr. Underberg as the Chief Manager. Mike Underberg, Barbara Schaffer, and Susan Persin are the children of Mr. Underberg. The remaining partners are grandchildren of Mr. Underberg.

Mr. Underberg died on December 28, 2020. Other than the opening conference, Mr. Underberg was not interviewed as part of the IRS audit.

Bargain Sale

On May 6,2019 the taxpayer sold commercial property located at 3685 Hickory Ridge Crossing, Hickory Hill Road, Memphis, TN 38115 (the property) with an "IRS 561 Appraised" fair market value (FMV) of $4,755,000 to the charity for $2,160,000. The taxpayer treated the sale as a Bargain Sale under in IRC § 170.

Subsequent sale of HH, LLC

After purchasing the property from the taxpayer, the charity then sold it that same day to HH, LLC for $2,650,000. Denis Rodger is listed as the Chief Manager of HH, LLC.

Documents obtained from HH, LLC show that the initial purchase agreement was entered into between the charity and HH, LLC on February 15, 2019 with an initial purchase price of $3,000,000. The purchase was contingent on the charity first purchasing the property from the taxpayer.

E-mails obtained from the taxpayer show that an appointment was made through Welfont for Denis Rodger to inspect the property on February 27, 2019.

Interviews conducted with HH, LLC brokers, Select Real Equity Advisors indicated that the price was reduced to $2,650,000 due to rental discrepancies. For example, upon review it

was determined that Mike Jewelers was given rent and common area maintenance (CAM) concessions of approximately $109,000.

E-mails obtained from the taxpayer show questions and concerns raised by HH, LLC such as the Mike Jewelers rent, and CAM concessions were discussed and questioned with the taxpayer using Welfont as the intermediary. [1]

Taxpayer Reporting Requirements

The taxpayer reported the sale of the land and building on Form 4797 and reported a $1,098,138 gain with a sales price of 2,160,000 and a cost basis of $1,061,862. The cost basis was allocated based on a percentage of the FMV allocated between the sale and the contribution.

The taxpayer reported the bargain sale on Form 8283. The form listed the appraised value of the property as $4,755,000 with a bargain sale price received of $2,160,000. The difference of $2,595,000 was treated as a charitable contribution. The form was properly signed and dated by the appraiser and by the charity. All of the required information regarding the property, the appraiser and the charity were included.

The charitable contribution of $2,595,000 was reported on the taxpayer's Form 1065, Schedule K, Line 13a.

Charity Reporting Requirements

The charity is a 501(c) charity which provides groceries on wheels to low-income and disabled seniors in Guilford County, North Carolina.

The taxpayer provided a Form 8282 signed by Jane Carlson Executive Director of the charity on January 7, 2021. The Form 8282 confirmed the property was sold by the charity on May 6, 2019 and provided that the charity received $20,323.11 from the sale.

A letter dated the same date was attached which contained the following statement, "As you know, Welfont Services, LLC handled all aspects of the transactions related to the acquisition and disposition of the property." The letter stated they should contact Welfont with any questions. [2]

* * * *

[1] Exhibit A-Rent & CAM E-Mails
[2] Exhibit B- Form 8282 and Charity Letter

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Brokerage Agreement

On 05/08/2018, the taxpayer entered into a brokerage agreement with Marcus & Millichap for the sale of the property with a purchase price of $4,288,000. The listed brokers commission is 4%. [3]

The primary broker for Marcus & Millichap was Mickey Davis who is located at the Memphis, TN office. Mr. Davis specializes in retail investment properties and has more than 20 years of experience in commercial real estate.

Broker Interview

The broker, Mickey Davis was interviewed on 05/06/01 and provided the following relevant information.

Mr. Underberg's motivation for the sale was to divest of the property so he would have cash for retirement. There was no discussion of Section 1031 exchanges or other tax deferral methods that would not produce cash.

The properties were initially listed for $4,288,000 per the broker agreement. As a stream of lower offers came in the property's listing price was adjusted to the $3,600,000. Mr. Davis was unaware that Mr. Underberg had previously obtained an appraisal from Valbridge Property Advisors for $3,390,000.

Mr. Davis was also unaware of the subsequent sale of the property to HH, LLC until after the fact. He was unaware there would be a double escrow. He remembered someone from the buyer inspecting the property but was unaware that it was Denis Rodgers or that he did not represent Food Assistance Inc.

When asked if Mr. Underberg had discussed the issue with his accountant, Mr. Davis remembered generally that he had. Mr. Underberg indicated that he had discussed it and that it was ok to go forward with the bargain sale but could not remember any additional details about the conversation.

Letters of Intent

Due to the marketing efforts by Marcus & Millichap, the taxpayer received the following letters of intent offering to purchase the property. However, none of the offers were accepted. [4]

* * * *

[3] Exhibit C- Marcus & Millichap Brokerage Agreement
[4] Exhibit D- Letters of Intent

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

| Date | Purchaser | Offer |
|---|---|---|
| 7/17/2018 | NEIS Acquisitions, LLC | $ 3,200,000 |
| 8/29/2018 | Kohanian Holdings, LLC | $ 2,300,000 |
| 11/13/2018 | Hakimi Capital | $ 3,340,000 |
| 12/17/2018 | Justin Depree | $ 3,335,000 |
| 12/28/2018 | Munish Agarwal | $ 3,200,000 |

Welfont Group. LLC

Welfont Group, LLC (Welfont) is a brokerage firm that advertises as specializing in bargain sales. https://realestatebargainsale.com/

E-mails provided by the taxpayer and public documents reflect the following timeline. [5]

- 12/4/18- Welfont was first introduced to Mikey Davis at Marcus & Millichap in an e-mail from James Rainer at Newmark Knight Frank. Mr. Rainer e-mailed Mr. Davis requesting a call with Welfont. Welfont was interested in submitting a letter of intent on the property and they wanted to explain the potential structure prior to submitting the offer.
- 12/4/18- E-mail from Taylor Weaver with Welfont describing the bargain sale and the potential tax savings. Attached to the e-mails was the initial offer.
- 12/5/18- Letter of Intent and "IRS Section 170 Bargain Sale Opinion of Value" sent to Marcus & Millichap.
- 12/19/18-Mr. Davis submitted the offer to Mr. Underberg.
- 01/17/2019-Taxpayer entered into a purchase agreement with Food Assistance, Inc.
- 02/29/2019-Denis Rodgers with Hickory Hills, LLC meet with the taxpayer to inspect the property.
- 04/19/2019-Appraisal report completed by Bryant Asset Advisors, LLC.
- 04/19/2019-Purchase price agreement was amended to increase the purchase price by $160,000.
- 05/06/2019-Property was sold by the taxpayer to Food Assistance Inc.
- 05/06/2019-Property was sold by Food Assistance Inc. to John Rodgers of Hickory Hill, LLC.

Welfont Letter of Intent

The letter of intent laid out the basic terms the charity required to purchase the property. [6]

The letter provides the following:

* * * *

[5] See IDR response to RA-2 and RA-3 for E-mails.
[6] Exhibit E- Welfont Documents

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

- That the buyer shall purchase the property through an IRS Section 170 Bargain Sale purchase, which consists of a combination of cash and a charitable contribution (" Bargain Sale").
- A Bargain Sale occurs when a seller sells a property to a 50l(c)(3) organization and is then able to use the difference between appraised value and cash received as a tax deduction through a charitable contribution.

| | |
|---|---|
| a. Cash Amount: | $2,000,000 |
| b. Charitable Contribution Amount (Tax Deduction): | $3,388,000 |
| c. Projected Tax Savings Estimate (% of Charitable Contribution): | $1,253,560 |
| d. Total Estimated Cash Benefit (a+c): | $3,253,560 |
| e. Cash Equivalent Value (pretax estimate of an equivalent cash offer): | $3,469,443 |

- Seller agrees to pay the Seller's Broker any commissions or fees at their agreed upon rate based on the Total Cash Benefit {per Paragraph 5(d), Total Cash Benefit is a calculation of the (Cash Amount+ Projected Tax Savings) to the Seller as determined by the appraisal. Said commission or fee shall be split equally between the Seller's Broker and Buyer's Broker or an affiliate Buyer's Broker designee, who shall serve as a cooperating broker.
- Seller shall engage an appraiser to prepare an appraisal for the Property during the Inspection Period (the "Appraisal").
- The terms of this LOI shall remain confidential. Buyer and Seller shall not disclose the existence of this LOI or any of its terms, except to their respective accountants, attorneys, and other advisors as necessary to fulfill its due diligence.

Welfont Offer

Included with the letter of intent was a document from Welfont titled "Offer". The document included an analysis of the bargain sale including a comparison of the cash received and estimated tax savings as if the transaction were completed as a traditional sale vs a bargain sale. The offer also makes the following statement, "In addition to the cash received at closing, sellers receive the IRS Form 8283 completed by the non-profit or 501(c)(3), along with the qualified appraisal. These two documents specify the charitable deduction amount eligible to be claimed on tax filings."[7]

Welfont Opinion of Value

Included with the letter of intent was a document from Welfont titled "opinion of value".

* * * *

[7] Ibid

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The stated purpose of the documents was "This report is an IRS Section 170 Bargain Sale Opinion of Value (based on IRS Publication 561 guidelines} on the subject property described below for the purposes of determining value of donated property. It is not the actual appraisal, but a good faith estimates of where the appraisal will come in."

The opinion of value provided the follow value for the property. [8]

| Approach | Weight | Value |
|---|---|---|
| Replacement Cost | 20% | $5,806,227 |
| Approach Income Approach | 60% | $6,224,590 |
| Sale Comparison Approach | 20% | $2,458,115 |
| Weighted Average | | $5,387,623 |

Shawn Marcel, senior acquisitions manager at The Welfont Group provided the following statement in a 2017 news interview. [9] "Assume for a moment that your client has a vacant manufacturing facility on the outskirts of the downtown core. It has been a vacant building for the past 12 months, since the most recent tenants moved out, adding to blight. This property does not create jobs, increase the tax rolls, or improve the area. If anything, it is doing the exact opposite, as it may attract vandalism or worse.

By selling this property to a 501(c)(3) nonprofit through a Bargain Sale transaction, the property owner gets to value the property at its highest and best use, not the current lower value. The valuation should be done by a certified appraiser with the MAI designation. It is then sold to the nonprofit at the highest and best use appraisal. The seller receives a minority portion of this value in cash at closing and the remainder is received as tax deductions and rebates from the state and federal governments.

It is important to understand that the charity is under no obligation to hold the property for any length of time or to sell it for the highest and best use appraised value. This opportunity allows the charity to offer the property for a much-reduced price, which encourages the property's resale, giving the property the opportunity to get back into full use."

Purchase Agreement

The purchase agreement between the taxpayer and the charity was entered into on 1/09/2019 with a listed purchase price of $2,000,000. The purchase agreement was amended on 4/19/2019 to increase the purchase price by $160,000 to account for the appraisal that was obtained. [10]

* * * *

[8] Ibid

[9] https://rss.alabamanewscenter.com/2016/12/22/commercial-real-estates-best-kept-secret-fleshed-acrecon-2017

[10] Exhibit F- Purchase Agreement

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The agreement provides the following.

- That the transaction was facilitated by the Welfont Group. LLC.
- The brokers for the transaction were Marcus & Millichap Real Estate Memphis. TN which represented the Seller's interest and Welfont or its assignee. which represents Buyers interest.
- The seller agreed to pay a real estate sales commission ("Sales Commission") equal 4% of the estimated cash benefit. Cash benefit is the combined total cash payment at Closing and the estimated net tax savings (net tax savings is a calculation of the Appraisal multiplied by the Sellers federal and state income tax bracket) determined by the appraisal noted in Paragraph 4 of this Agreement at the Closing.
- The seller agreed that the sales commission would be shared equally between Seller's Broker and Welfont.
- It was the responsibility of the Seller to obtain an appraisal, however, both parties agreed that the Welfont Group. LLC would coordinate and facilitate the appraisal with an independent appraisal management company or another qualified appraiser.
- If the appraised value of the property disclosed by the appraisal is less than 95% of the anticipated appraised value of $5,388.000.00 (or less than $5,118,600). Seller may choose to terminate this Agreement by written notice to Buyer and Escrow Agent within five (5) business days after receipt of the Appraisal.

Appraisals

There were four appraisals conducted on the property sold by the taxpayer. Each of which are discussed in detail below.

1. Property Tax Appraisals
2. Valbridge Property Advisors Appraisal (Valbridge Appraisal)
3. Bryant Asset Advisors, LLC (Bryant Appraisal)
4. Mark S. Bove, MAI Appraisal Review Report with an Opinion of Value. (IRS Appraisal)

Property Tax Appraisal

The taxpayer appealed the property tax appraisal for the property for the years 2015-2018. As part of the appeals process the taxpayer was asked to provide in their opinion what the fair market value of the property was at that point in time. Fair Market Value was defined as what a willing buyer would pay a willing seller on the open market. [11]

* * * *

[11] Exhibit G-Property Tax Appraisals

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

| Year | Original Assessed Value | Tapayer Stated FMV | First Appeals Assessed Value | Second Appeals Assessed Value |
|---|---|---|---|---|
| 2015 | 1,500,000 | 1,000,500 | 1,500,000 | NA |
| 2016 | 1,500,000 | 1,000,000 | 1,500,000 | NA |
| 2017 | 2,991,100 | 1,794,660 | 2,726,300 | 2,400,000 |
| 2018 | 2,726,300 | 2,182,000 | 2,726,300 | 2,400,000 |

Valbridge Appraisal

On 06/07/2018, the taxpayer obtained an appraisal from Valbridge Property Advisors for the property. The appraisal determined the fair market value to be $3,390,000. The stated purpose of the appraisal was for tax planning purposes.

Under client and intended user, the appraisal provided the following "American Properties is the client for this assignment. American Properties is the intended user of this report and there are no other intended users." [12]

Bryant Appraisal

The purchase agreement discussed above provided that both parties agreed that the Welfont Group. LLC would coordinate and facilitate the appraisal with an independent appraisal management company or another qualified appraiser.

In an e-mail dated March 11, 2019, Lynda Scull from the Tax Appraisal Group contacted Mickey Davis with Marcus & Millichap regarding the "Memphis, TN Appraisal". [13]

The e-mail stated in part, "per your conversation with Welfont, attached please find the engagement letters for the appraisal of the property located at 3685 Hickory Hill Drive, Memphis, TN for Seller's review and approval. "

The e-mail contained two engagement letters which were subsequently signed by the taxpayer.

1. On March 11, 2019 the taxpayer signed an engagement letter with Tax Appraisal Group to manage the appraisal process which included the selection of a licensed appraiser to determine the Bargain Sale Opinion of Value, based on IRS Publication 561, of the real property. The fee for the service was $1,000. Per the closing statement, the fee was deducted from the buyer's column.

2. On March 11, 2019 the taxpayer signed an engagement letter with Bryant Asset Advisors, LLC to provide a "Bargain Sale Opinion of Value, based on IRS Publication 561. The scope of the appraisal included the determination

* * * *

[12] Exhibit H-Valbridge Appraisal
[13] Exhibit J-Appraisal Engagement E-mail and Letters

of the property's highest and best use, and application of the three traditional approaches to value, per IRS Publication 561. The appraisal fee was $7,500. Per the closing statement, the fee was deducted from the buyer's column.

On April 12, 2019 the taxpayer was provided with an appraisal report from Andrew J. Bryant, MAI, ASA with Bryant Asset Advisors LLC. The appraisal report determined the FMV of the property to be $4,755,000. [14]

Under client Identification, the appraisal provided the following "American Properties, Co., G.P., in addition to affiliates and-or assigns, including Food Assistance, Inc., and the Internal Revenue Service (IRS), may rely upon this report in evaluating the subject property's market value ("Fair Market Value") for financial decision making purposes in support of a bargain sale to a charitable organization. It is acknowledged that, ultimately, this appraisal will be utilized to develop a deduction for the seller's (owner's) federal income tax. No other user is intended or permitted."

The report defined FMV base as the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

The report refers to an "IRS 561 Appraisal" and stated that the IRS allows the Seller to obtain an IRS 561 appraisal for the purpose of a Bargain Sale transaction. The appraisal method is not like a typical bank quick-sale appraisal, nor an insurance appraisal. It's specifically for the purposes of estimating the value of donated property.

The report provides the following differences between a traditional appraisal and an IRS 561 Appraisal.

1. In real estate transactions, one of the biggest reasons that a 561 Appraisal may be higher than list price for large and hard to move properties with significant carrying costs is because the list price is often determined by a seller who is "under compulsion" to sell within certain time frames. The carrying costs and need to dispose of the property outweigh the need to wait and find the right buyer and user. The 561 Appraisal price is determined by using the IRS stipulation of "not under compulsion" to buy or sell regardless of the carrying cost and other factors.

* * * *

[14] Exhibit I-Bryant Appraisal

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

2. Another example of how this appraisal method is different is that Publication 561 allows for, and encourages, a weighted average of the market (sales) approach, income approach and replacement cost approach. The Bargain Sale 561 appraisal accounts for all approaches using a weighted average determined by the qualified appraiser. However, it remains the appraiser's discretion which approaches are applied.

3. A final example of how the 561 Bargain Sale Appraisal is often higher than what the seller is willing to sell it for, is because IRS Publication 561 makes it clear that the appraised value must be based on the property's highest and best use. And quite often the Seller is not patient enough to realize the highest and best use of the property, because of things like the high carrying costs of the property, the Seller's own business and investment focus, external factors influencing the seller's motivation and compulsion to sell, and so forth.

The report stated that the FMV determined in the report was predicated on several extraordinary assumptions being met or realized, based on the Internal Revenue Service (IRS). IRC §170, and Publication 561 guidelines.

These included.

1. The aggressive and creative marketing of the asset be handled by an independent professional, globally dominant, commercial investment & leasing brokerage team (Cushman & Wakefield, CBRE, NKF, HHF or similar) specializing in industrial real estate.

2. Marketing time of the asset be nearly open ended (24-36+ months) and void of any undue pressure or motivation on the part of the seller.

3. Exposure time is assumed to have been {24-36+ months) preceding the effective date of value:

4. Necessary capital investment be made to repair all items of deferred maintenance (as described herein).

5. Property being professionally maintained throughout the prescribed marketing period to exhibit pride of ownership; outreach be made to the local city, municipality, or county, to explore any public- private partnership opportunities that might benefit the marketing efforts or serve to enhance the appeal of the subject property.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

6. Historically low interest rates remain stable.

7. National economic conditions remain stable and continue on a positive trend; local market conditions remain stable to upwardly trending; development/redevelopment trends continue to take root and benefit more properties within the subject's regional trade area.

8. Given the current upward economic trends seen in the real estate sector, it is the opinion of the appraiser that the subject property will be an attractive investment for an investor or group of investors, seeking a well-located commercial property in the near future.
9. The final value conclusions and exposure/marketing time periods presented herein, explicitly assume the subject property to have been marketed at or near the price point of the final correlated value presented within this report. Any previous marketing, asset pricing or pricing representations for the subject have not been given considerable weight due to the fact they were likely established by a highly motivated owner/seller with differing motivations than those of a typical Seller under the definition of "Fair Market Value" as defined by the Internal Revenue Service (IRS), IRC §170, and Publication 561.

IRS Appraisal

On February 22, 2021 the IRS Senior Appraiser, Mark Bovee, MAI completed the IRS Appraisal and concluded that the highest and best use for the subject is as a neighborhood shopping center. Based on the highest and best use, the fair market value was $3,200,000. [15]

The IRS Appraisal rejected the Bryant Appraisal as a meaningful valuation of this property for a Treas., Reg. § 1.170 Non-Cash Charitable Donation and concluded the following.

1. The appraisal provides a prospective opinion of value and does not value the property "as is" but as of a date 2 to 3 years hence. (prospective value)
2. The appraisal fails to analyze the terms and conditions of the current leases.
3. The appraisal develops a cost approach for a property type that is exclusively valued by buyers and sellers on its income characteristics, fails to provide market support for depreciation, and fails to identify functional/external obsolescence
4. The report fails to address functional and external obsolescence with a 40- year old neighborhood shopping center.

* * * *

[15] Exhibit K-IRS Appraisal

5. The appraisal does not consider nor identify the impact of restrictive deed covenants on the property.
6. The appraisal excludes certain sale transactions and then reconciles to an unsupportable unit price in the sales comparison approach.
7. The appraisal does not support the expense projections per square foot, does not display historic accounting statements, nor provide adjustments thereto.
8. The direct capitalization of income is deficient in use of a 15.0% vacancy and credit loss rate which does not address the 60% to 70% tenant retention rate (by implication a 30% to 40% non-retention rate).
9. The appraisal includes unacceptable assignment conditions with the requirement that the client, who was never identified in the report, produce a protective order which would allow the appraiser to avoid answering questions concerning the work product.
10. The appraisal fails to comply with USPAP Standard Rule 2-2(a)(i) as to identification of the client.
11. In order to justify this type of valuation, the appraisal asserts that an IRS Pub 561 appraisal is different from other appraisals; but, offers no statutory, legal, logical, or industry standard that would recognize such a departure from generally accepted practices.
12. The appraisal contains a multiple number of minor boilerplate errors that individually do not have an impact on value but taken collectively affect credibility and quality of work.

Advice from Tax Advisor

IDR RA-9 asked the power of attorney and tax preparer if the taxpayer received written or oral tax advice or legal advice regarding the transaction.

The response provided that oral advice was given to the taxpayer regarding the CPA's firms research into whether a "bargain sale" in general was supported by the Internal Revenue Code and Regulations and what the tax impact of the bargain sale offer put forth by Welfont would be on the partners. The communication was provided to the taxpayer between December 2018 and July 2019. [16]

**LAW**

Internal Revenue Code

IRC § 6662 (a) provides that, if this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

* * * *

[16] See IDR response to RA-9

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

IRC § 6662(b) provides that, this section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

1. Negligence or disregard of rules or regulations.
2. Any substantial understatement of income tax.
3. Any substantial valuation misstatement under chapter 1.

IRC § 6662(e)(1) (A) provides that for purposes of this section, there is a substantial valuation misstatement under chapter 1 if the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).

Treas. Reg. § 1.6662–3(a) provides in part, that if any portion of an underpayment, as defined in section 6664(a) and § 1.6664–2, of any income tax imposed under subtitle A of the Internal Revenue Code that is required to be shown on a return is attributable to negligence or disregard of rules or regulations, there is added to the tax an amount equal to 20 percent of such portion.

The penalty for disregarding rules or regulations does not apply, however, if the requirements of paragraph (c)(1) of this section are satisfied and the position in question is adequately disclosed as provided in paragraph (c)(2) of this section (and, if the position relates to a reportable transaction as defined in § 1.6011–4(b) (or § 1.6011–4T(b), as applicable), the transaction is disclosed in accordance with § 1.6011–4 (or § 1.6011–4T, as applicable)), or to the extent that the reasonable cause and good faith exception to this penalty set forth in § 1.6664–4 applies.

Treas. Reg. § 1.6662–3(b)(1) provides in part, that the term negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. "Negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. A return position that has a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence. Negligence is strongly indicated where—

(i) A taxpayer fails to include on an income tax return an amount of income shown on an information return, as defined in section 6724(d)(1).

(ii) A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.

Treas. Reg. § 1.6662–3(b)(2) provides in part, that the term disregard includes any careless, reckless, or intentional disregard of rules or regulations. The term "rules or regulations" includes the provisions of the Internal Revenue Code, temporary or final Treasury regulations issued under the Code, and revenue rulings or notices (other than notices of proposed rulemaking) issued by the Internal Revenue Service and published in the Internal Revenue Bulletin.

A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe.

A disregard is "intentional" if the taxpayer knows of the rule or regulation that is disregarded. Nevertheless, a taxpayer who takes a position (other than with respect to a reportable transaction, as defined in § 1.6011–4(b) or § 1.6011–4T(b), as applicable) contrary to a revenue ruling or notice has not disregarded the ruling or notice if the contrary position has a realistic possibility of being sustained on its merits.

Treas. Reg. § 1.6662–3(b)(3) provides in part, that reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim.

If a return position is reasonably based on one or more of the authorities set forth in § 1.6662–4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662–4(d)(2). (See § 1.6662–4(d)(3)(ii) for rules with respect to relevance, persuasiveness, subsequent developments, and use of a well-reasoned construction of an applicable statutory provision for purposes of the substantial understatement penalty.) In addition, the reasonable cause and good faith exception in § 1.6664–4 may provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard.

Treas. Reg. § 1.6662–5(a) provides that, if any portion of an underpayment, as defined in section 6664(a) and § 1.6664–2, of any income tax imposed under chapter 1 of subtitle A of the Code that is required to be shown on a return is attributable to a substantial valuation misstatement under chapter 1 ("substantial valuation misstatement"), there is added to the tax an amount equal to 20 percent of such portion. Section 6662(h) increases the penalty to 40 percent in the case of a gross valuation misstatement under chapter 1 ("gross valuation misstatement"). No penalty under section 6662(b)(3) is imposed, however, on a portion of an underpayment that is attributable to a substantial or gross valuation misstatement unless the aggregate of all portions of the underpayment attributable to substantial or gross valuation misstatements exceeds the applicable dollar limitation ($5,000 or $10,000), as provided in section 6662(e)(2) and paragraphs (b) and (f)(2) of this section. This penalty also does not apply to the extent that the reasonable cause and good faith exception to this penalty set forth in § 1.6664–4 applies. There is no disclosure exception to this penalty.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Treas. Reg. § 1.6664–4(a) provides that no penalty may be imposed under section 6662 with respect to any portion of an underpayment upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to, such portion. Rules for determining whether the reasonable cause and good faith exception applies are set forth in paragraphs (b) through (h) of this section.

Treas. Reg. § 1.6664–4 (b)(1) provides in part, that the determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances

Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith.

Reliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith. Similarly, reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect. Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable, and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to reliance on the advice of others.)

For example, reliance on erroneous information (such as an error relating to the cost or adjusted basis of property, the date property was placed in service, or the amount of opening or closing inventory) inadvertently included in data compiled by the various divisions of a multidivisional corporation or in financial books and records prepared by those divisions generally indicates reasonable cause and good faith, provided the corporation employed internal controls and procedures, reasonable under the circumstances, that were designed to identify such factual errors.

Reasonable cause and good faith ordinarily are not indicated by the mere fact that there is an appraisal of the value of property. Other factors to consider include the methodology and assumptions underlying the appraisal, the appraised value, the relationship between appraised value and purchase price, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer or to the activity in which the property is used. (See paragraph (g) of this section for certain rules relating to appraisals for charitable deduction property.)

Treas. Reg. § 1.6664–4 (b)(2) Example 1. A, an individual calendar year taxpayer, engages B, a professional tax advisor, to give A advice concerning the deductibility of certain state and local taxes. A provides B with full details concerning the taxes at issue. B advises A that the taxes are fully deductible. A, in preparing his own tax return, claims a deduction for the taxes. Absent other facts, and assuming the facts and circumstances surrounding B's advice and A's reliance on

such advice satisfy the requirements of paragraph (c) of this section, A is considered to have demonstrated good faith by seeking the advice of a professional tax advisor, and to have shown reasonable cause for any underpayment attributable to the deduction claimed for the taxes. However, if A had sought advice from someone that A knew, or should have known, lacked knowledge in the relevant aspects of Federal tax law, or if other facts demonstrate that A failed to act reasonably or in good faith, A would not be considered to have shown reasonable cause or to have acted in good faith.

Treas. Reg. § 1.6664–4 (c)(1) provides that all facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice (including the opinion of a professional tax advisor) as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law. For example, the taxpayer's education, sophistication, and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith. In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied. The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith. For example, reliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.

Treas. Reg. § 1.6664–4 (c)(1)(i) provides that the advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.
Treas. Reg. § 1.6664–4 (c)(1)(ii) provides that, the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

Treas. Reg. § 1.6664–4 (h)(1) provides that there may be reasonable cause and good faith with respect to a portion of an underpayment that is attributable to a substantial (or gross) valuation misstatement of charitable deduction property (as defined in paragraph (h)(2) of this section) only if—

(i) The claimed value of the property was based on a qualified appraisal (as defined in paragraph (h)(2) of this section) by a qualified appraiser (as defined in paragraph (h)(2) of this section); and

(ii) In addition to obtaining a qualified appraisal, the taxpayer made a good faith investigation of the value of the contributed property.

(2) Definitions. For purposes of this paragraph (h):

I.R.C. § 6664(c)(4)(A) provides the term "charitable deduction property" means any property contributed by the taxpayer in a contribution for which a deduction was claimed under section 170. For purposes of paragraph (3), such term shall not include any securities for which (as of the date of the contribution) market quotations are readily available on an established securities market.

I.R.C. § 6664(c)(4)(B) provides the term "qualified appraisal" has the meaning given such term by section 170(f)(11)(E)(i).
I.R.C. § 6664(c)(4)(C) provides the term "qualified appraiser" has the meaning given such term by section 170(f)(11)(E)(ii).

Case Law

In Glade Creek Partners, LLC v. Commissioner of Internal Revenue, T.C. Memo. 2020-148, the court found that, with respect to adjustments to amounts reported by an LLC, reasonable cause is determined by examining the actions of the managing member. The court also found that, in general, reliance on a promoter is not reasonable or in good faith and is not a defense to an accuracy-related penalty.

In Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279, the court defined negligence as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Negligence is strongly indicated when a "taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."

In Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001), the court found that the taxpayer burden of proof for defenses to accuracy-related penalties and must introduce evidence regarding reasonable cause, substantial authority, or similar defenses.

In Neonatology Assocs., v. Comm'r, 115 T.C. 43, the court found that reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. The good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. Whether a taxpayer relies on advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. A professional may render advice that may be relied upon reasonably when he or she arrives at that advice independently, taking into account, among other things, the taxpayer's purposes for entering into the underlying transaction. Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

inherent conflict of interest that the taxpayer knew or should have known about. Reliance also is unreasonable when the taxpayer knew, or should have known, that the adviser lacked the requisite expertise to opine on the tax treatment of the disputed item.

**TAXPAYERS POSITION**

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

**DISCUSSION**

It's the Governments position that the concept of an IRS 561 Bargain Sale Appraisal used in the Bryant Appraisal is purely a tax strategy developed and facilitated by Welfont and disregards several of the fundamental aspects of what determines FMV. Mr. Underberg knew the FMV was overstated and did not act with reasonable cause or in good faith in choosing to use the Bryant Appraisal to value the charitable contribution. Therefore, the taxpayer would be subject to the negligence penalty.

A taxpayer may be liable for an accuracy-related penalty of 20 percent for negligence. However, the accuracy-related penalty does not apply if the taxpayer can prove they acted with reasonable cause and in good faith.

The mere fact that a taxpayer had a property appraised does not establish reasonable cause and good faith. In this case, the Government determined that the Bryant Appraisal was not a qualified appraisal in part due to the fact that Mr. Underberg knew that the FMV of the appraisal was overstated. See IRS 5701-1.

The facts show that Mr. Underberg knew the Bryant Appraisal was overstated based on information he had at the time. Prior to the Welfont initial offer and the Bryant Appraisal, Mr. Underberg had gathered the following relevant information.

1. Property Tax Appeals from 2015-2018 where the taxpayer had argued that the property's FMV was less than the assessed value. The taxpayer had argued the FMV was $2,182,000 as late as 2018.
2. The Valbridge Appraisal which stated the FMV was $3,390,000.
3. The property was held for sale and received five offers with the highest offer being $3,340,000.

At the time of the sale, Mr. Underberg had over 20 years of experience buying and selling commercial real estate. Mr. Underberg initially offered the property for sale at $4,288,000 and after receiving several low offers he obtained the Valbridge Appraisal which determined the FMV of the property as $3,390,000. Mr. Underberg then lowered the offering price to $3,600,000 acknowledging the fact that he understood the FMV was lower than the initial asking price.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

These are all relevant factors because they show Mr. Underberg's efforts to determine the FMV of the property. It also shows that he intentionally disregarded his own efforts and instead chose to use the Bryant Appraisal's FMV because it provided him with the most tax benefits. This was not an honest misunderstanding but instead a negligent disregard for the facts by an experienced and knowledgeable taxpayer.

The Welfont Offer and the Bryant Appraisal both use terms such as "IRS Section 170 Bargain Sale Opinion of Value" and "IRS 561 Appraisal" both of which are terms not commonly used in real estate. Both documents profess to provide a higher appraised FMV than a traditional appraisal. The Bryant appraisal even states that a Bargain Sale Appraisal, based on Publication 561, can be very different than what the "Seller is willing to sell it for".

A reasonable and prudent person, even one without Mr. Underberg's knowledge and experience should have questioned if the appraisal was "too good to be true". Simply relying on Welfont, their promotional material or an appraisal from an appraiser Welfont identified and the charity paid does not qualify as reasonable cause.

In an E-mail, the broker Micky Davis questioned the use of the bargain sale internally and was told it appeared to be "legit" but that they should make it clear that the buyer and seller are relying on their own legal and financial counsel to structure this transaction. Mickey Davis concluded the e-mail chain stating that "We told the seller to take it to his accountant to see if he thought it was a viable option for him."

On the same date, Mickey Davis responded to an e-mail from Welfont and provided in part, that Mr. Underberg was looking at other offers and that he was a seasoned owner who would likely include his CPA when considering the Welfont offer.

Based on IDR responses, Mr. Underberg did discuss the bargain sale with his tax preparer. However, the extent of the tax advice received consisted of oral advice regarding whether a "bargain sale" in general was supported and a written analysis of the net proceeds received and the tax impact each would have on the partners.

A taxpayer will not be considered to have reasonably relied in good faith on professional tax advice if the taxpayer fails to disclose a fact it knows, or should know, to be relevant to the proper tax treatment of an item. In this case, the taxpayer knew the FMV of the property and knew that the Welfont Offer was "too good to be true" based on his own knowledge and years of experience in commercial real estate.

Based on the factors discussed above, it is the Governments position that Mr. Underberg consciously and intentionally disregarded what he knew to be the properties correct FMV and instead used the Bryant Appraisal to value the charitable deduction. The taxpayer did not act with reasonable cause or in good faith and would be subject to the negligence penalty.

**CONCLUSION**

A 20% negligence penalty under IRC § 6662(b) will be imposed on any portion of an underpayment related to the bargain sale transaction and corresponding charitable contribution.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-4 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

The penalty would be calculated based on the Preliminary Imputed Underpayment (IU) of $1,088,344 * 20% which would be equal to $217,669.

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| | |
|---|---|
| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-5 |
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | $0.00 | BBA Procedures | 724 | 06221B.00-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items.).*

See attached 886A

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| | |
|---|---|
| Taxpayer's / Representative's Signature | Date |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| | |
|---|---|
| Team Manager<br>Digitally signed by Q2JDB<br>Date: 2021.09.30 14:22:01 -05'00' | Date |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-5 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Preliminary Imputed Underpayment (IU)

| | | |
|---|---|---|
| Total Netted Partnership Adjustment (TNPA) | | |
| - Sum of all net positive adjustments from Reallocation Grouping tab | | 0 |
| - Sum of all net positive adjustments from Residual Grouping tab | $ | 2,941,470 |
| TNPA | $ | 2,941,470 |
| Highest rate for the taxable year<br>(Higher of IRC §1 or §11 tax rates) | | 37% |
| IU before credit and creditable expenditure | $ | 1,088,344 |
| Sum of all net positive adjustment (from Creditable Expenditure tab) | $ | - |
| Sum of net positive adjustment (from Credit Grouping tab) | $ | - |
| **Preliminary Imputed Underpayment (IU)** | **$** | **1,088,344** |
| Reconcile to Form 14791 | | |
| Penalties | $ | 217,669 |

**ISSUES**

1. What is the taxpayer's Preliminary Imputed Underpayment (IU)?

**FACTS**

The following 5701 (Notice of Proposed Adjustments) were proposed as part of the 2019 audit.

1. 5701-1 Bargain Sale Charitable Contribution
2. 5071-2 Bargain Sale §1231 Gain Calculation
3. 5701-3 Primary Penalty Argument
4. 5701-4 Alternative Penalty Argument
5. 5701-5 §199A and Charitable Contribution
6. 5701-6 §199A and §1231 Gain

**LAW**

Internal Revenue Code

Treas. Reg. § 301.6225-1(a) (1) provides that, in the case of any partnership adjustments (as defined in § 301.6241-1(a)(6)) by the Internal Revenue Service (IRS), if the adjustments result in an imputed underpayment (as determined in accordance with paragraph (b) of this section), the partnership must pay an amount equal to such imputed underpayment in accordance with paragraph (a)(2) of this section. If the adjustments do not result in an imputed underpayment (as

described in paragraph (f) of this section), such adjustments must be taken into account by the partnership in the adjustment year (as defined in § 301.6241–1(a)(1)) in accordance with § 301.6225–3. Partnership adjustments may result in more than one imputed underpayment pursuant to paragraph (g) of this section. Each imputed underpayment determined under this section is based solely on partnership adjustments with respect to a single taxable year.

Treas. Reg. § 301.6225–1(a)(2) provides that, an imputed underpayment (determined in accordance with paragraph (b) of this section and included in a notice of final partnership adjustment (FPA) under section 6231(a)(3)) must be paid by the partnership in the same manner as if the imputed underpayment were a tax imposed for the adjustment year in accordance with § 301.6232–1. The FPA will include the amount of any imputed underpayment, as modified under § 301.6225–2 if applicable, unless the partnership waives its right to such FPA under section 6232(d)(2). See § 301.6232–1(d)(2). For the alternative to payment of the imputed underpayment by the partnership, see § 301.6226–1. If a partnership pays an imputed underpayment, the partnership's expenditure for the imputed underpayment is taken into account by the partnership in accordance with § 301.6241–4. For interest and penalties with respect to an imputed underpayment, see section 6233.

Treas. Reg. § 301.6225–1(a)(3) provide that, an imputed underpayment set forth in a notice of proposed partnership adjustment (NOPPA) under section 6231(a)(2) is determined in accordance with paragraph (b) of this section without regard to any modification under § 301.6225–2. Modifications under § 301.6225–2, if allowed by the IRS, may change the amount of an imputed underpayment set forth in the NOPPA and determined in accordance with paragraph (b) of this section. Only the partnership adjustments set forth in a NOPPA are taken into account for purposes of determining an imputed underpayment under this section and for any modification under § 301.6225–2.

Treas. Reg. § 301.6225–1(b)(1) provides that, in the case of any partnership adjustment by the IRS, an imputed underpayment is determined by

(i) Grouping the partnership adjustments in accordance with paragraph (c) of this section and, if appropriate, subgrouping such adjustments in accordance with paragraph (d) of this section.

(ii) Netting the adjustments in accordance with paragraph (e) of this section.

(iii) Calculating the total netted partnership adjustment in accordance with paragraph (b)(2) of this section.

(iv) Multiplying the total netted partnership adjustment by the highest rate of Federal income tax in effect for the reviewed year under section 1 or 11; and

(v) Increasing or decreasing the product that results under paragraph (b)(1)(iv) of this section by—

(A) Any amounts treated as net positive adjustments (as defined in paragraph (e)(4)(i) of this section) under paragraph (e)(3)(ii) of this section; and

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-5 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

(B) Except as provided in paragraph (e)(3)(ii) of this section, any amounts treated as net negative adjustments (as defined in paragraph (e)(4)(ii) of this section) under paragraph (e)(3)(ii) of this section.

Treas. Reg. § 301.6225–1(b)(2) provides that, for purposes of determining an imputed underpayment under paragraph (b)(1) of this section, the total netted partnership adjustment is the sum of all net positive adjustments in the reallocation grouping described in paragraph (c)(2) of this section and the residual grouping described in paragraph (c)(5) of this section.

Treas. Reg. § 301.6225–1(c)(1) provides that, to determine an imputed underpayment under paragraph (b) of this section, partnership adjustments are placed into one of four groupings. These groupings are the reallocation grouping described in paragraph (c)(2) of this section, the credit grouping described in paragraph (c)(3) of this section, the creditable expenditure grouping described in paragraph (c)(4) of this section, and the residual grouping described in paragraph (c)(5) of this section. Adjustments in groupings may be placed in subgroupings, as appropriate, in accordance with paragraph (d) of this section. The IRS may, in its discretion, group adjustments in a manner other than the manner described in this paragraph (c) when such grouping would appropriately reflect the facts and circumstances. For requests to modify the groupings, see § 301.6225–2(d)(6).

Treas. Reg. § 301.6225–1(c)(2)(i) provides that, any adjustment that allocates or reallocates a partnership-related item to and from a particular partner or partners is a reallocation adjustment. Except in the case of an adjustment to a credit (as described in paragraph (c)(3) of this section) or to a creditable expenditure (as described in paragraph (c)(4) of this section), reallocation adjustments are placed in the reallocation grouping. Adjustments that reallocate a credit to and from a particular partner or partners are placed in the credit grouping (see paragraph (c)(3) of this section), and adjustments that reallocate a creditable expenditure to and from a particular partner or partners are placed in the creditable expenditure grouping (see paragraph (c)(4) of this section).

Treas. Reg. § 301.6225–1(d)(1) provides that, if all partnership adjustments are positive adjustments, this paragraph (d) does not apply. If any partnership adjustment within any grouping described in paragraph (c) of this section is a negative adjustment, the adjustments within that grouping are subgrouped in accordance with this paragraph (d). The IRS may, in its discretion, subgroup adjustments in a manner other than the manner described in this paragraph (d) when such subgrouping would appropriately reflect the facts and circumstances. For requests to modify the subgroupings, see § 301.6225–2(d)(6).

Treas. Reg. § 301.6225–1(d)(2)(i) provides that, for purposes of this section, partnership adjustments made by the IRS are treated as follows:

(A) An increase in an item of gain is treated as an increase in an item of income.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-5 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

(B) A decrease in an item of gain is treated as a decrease in an item of income.

(C) An increase in an item of loss or deduction is treated as a decrease in an item of income; and

(D) A decrease in an item of loss or deduction is treated as an increase in an item of income.

(ii) Negative adjustment. A negative adjustment is any adjustment that is a decrease in an item of income, a partnership adjustment treated under paragraph (d)(2)(i) of this section as a decrease in an item of income, or an increase in an item of credit.

(iii) Positive adjustment—(A) In general. A positive adjustment is any adjustment that is not a negative adjustment as defined in paragraph (d)(2)(ii) of this section.

**TAXPAYERS POSITION**

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

**CONCLUSION**

The preliminary imputed underpayment is $1,088,344 and the calculated I.R.C Section 6662 accuracy related penalty amount is $217,669. See attached calculation for the tax and penalty amounts.

**Partnership Name: American Properties CO, GP**
**Tax Year: 201912**
**Attachment to Form 886A-5**

Preliminary Imputed Underpayment (IU)

| | |
|---|---|
| Total Netted Partnership Adjustment (TNPA) | |
| - Sum of all net positive adjustments from Reallocation Grouping tab | 0 |
| - Sum of all net positive adjustments from Residual Grouping tab | $ 2,941,470 |
| TNPA | $ 2,941,470 |
| Highest rate for the taxable year (Higher of IRC §1 or §11 tax rates) | 37% |
| IU before credit and creditable expenditure | $ 1,088,344 |
| Sum of all net positive adjustment (from Creditable Expenditure tab) | $ - |
| Sum of net positive adjustment (from Credit Grouping tab) | $ - |
| **Preliminary Imputed Underpayment (IU)** | **$ 1,088,344** |
| Reconcile to Form 14791 | |
| Penalties | $ 217,669 |

Partnership Name: American Properties CO, GP

Tax Year: 201912

Attachment to Form 886A-5

RESIDUAL GROUPING

| 5701# | Adjustment Description (from Adjustment Input Summary tab) | Total | Duplicative Adjustment: If box is checked, adjustment entry in appropriate subgrouping column will be less than proposed adjustment amount from Form 886-A/5701 | If box is checked, explain reason for duplication and identify related adjustment | Net section 1231 gain (loss) Schedule K. line 10 | Contributions Shedule K. Line 13a | Qualified Business Income (QBI) Deduction Schedule K, Line 20c, Code Z |
|---|---|---|---|---|---|---|---|
| 1 | Schedule K, Line 13a-Contribution | | | | | 2,105,000 | |
| 2 | Form 4797, Part 1, Line 7 (Sec. 1231 Gain) | | | | (836,470) | | |
| 5 | Increase to Sec 199A Qualified Business Income (Charitable Contributions) | | X | This adjustment is a increase to Section 199A Qualified Business Income in the amount of $2,105,000, and is already reflected in the imputed underpayment as an adjustment to Contributions.The adjustment would be considered as duplicative. | | | 0 |
| 6 | Decrease to Sec 199A Qualified Business Income (Sec. 1231 Gain) | | | This adjustment is a decrease to Section 199A Qualified Business Income in the amount of $836,470, and was not previously reflected in the imputed underpayment as an adjustment to Sec. 1231 Gain . The adjustment would not be consider as duplicative. | | | 836,470 |
| | Net Positive Adjustment Total (Sum of positive adjustment column totals only) | $ 2,941,470 | | | (836,470) | 2,105,000 | 836,470 |

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-6 |
|---|---|
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | $0.00 | 199A-Charitable Contribution Amount | 724 | 06221B.00-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items).*

See attached 886A

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| Taxpayer's / Representative's Signature | Date |
|---|---|
| | |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| Team Manager | Date |
|---|---|
| [signature] Digitally signed by Q2JDB Date: 2021.09.30 14:22:43 -05'00' | |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-6 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Form 1065, §199A (Charitable Contribution)
Increase or (Decrease) to Income

| | 201912 |
|---|---|
| Per Return | 2,595,000 |
| Per Exam | 490,000 |
| Adjustment | 2,105,000 |
| Duplicative Adjustment | -2,105,000 |
| IU Computation | 0 |

## ISSUES

1. What is the taxpayer's §199A charitable contribution amount?

## FACTS

The following 5701 (Notice of Proposed Adjustments) were proposed as part of the 2019 audit.

1. 5701-1 Bargain Sale Charitable Contribution
2. 5071-2 Bargain Sale Gain Calculation

§199A items

The taxpayer reported Schedule K §199A items as part of its 201912 return and included statements on pages 137-145. Each §199A amount was included as a separate statement titled "Other Items and Amounts Statement". The statements correspond to the specific Notice of Proposed Adjustment as follows:

| Return PDF Page Number | Other Items and Amounts Statement – Other Information Description | Amount |
|---|---|---|
| 138 | Section 199A – Section 1231 Gain (Loss) | 5,164,076 |
| 140 | Section 199A – Charitable contributions | 2,595,000 |

## LAW

Internal Revenue Code

Treas. Reg. § 301.6225–1(a) (1) provides that, in the case of any partnership adjustments (as defined in § 301.6241–1(a)(6)) by the Internal Revenue Service (IRS), if the adjustments result

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-6 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

in an imputed underpayment (as determined in accordance with paragraph (b) of this section), the partnership must pay an amount equal to such imputed underpayment in accordance with paragraph (a)(2) of this section. If the adjustments do not result in an imputed underpayment (as described in paragraph (f) of this section), such adjustments must be taken into account by the partnership in the adjustment year (as defined in § 301.6241–1(a)(1)) in accordance with § 301.6225–3. Partnership adjustments may result in more than one imputed underpayment pursuant to paragraph (g) of this section. Each imputed underpayment determined under this section is based solely on partnership adjustments with respect to a single taxable year.

Treas. Reg. § 301.6225–1(a)(2) provides that, an imputed underpayment (determined in accordance with paragraph (b) of this section and included in a notice of final partnership adjustment (FPA) under section 6231(a)(3)) must be paid by the partnership in the same manner as if the imputed underpayment were a tax imposed for the adjustment year in accordance with § 301.6232–1. The FPA will include the amount of any imputed underpayment, as modified under § 301.6225–2 if applicable, unless the partnership waives its right to such FPA under section 6232(d)(2). See § 301.6232–1(d)(2). For the alternative to payment of the imputed underpayment by the partnership, see § 301.6226–1. If a partnership pays an imputed underpayment, the partnership's expenditure for the imputed underpayment is taken into account by the partnership in accordance with § 301.6241–4. For interest and penalties with respect to an imputed underpayment, see section 6233.

Treas. Reg. § 301.6225–1(a)(3) provide that, an imputed underpayment set forth in a notice of proposed partnership adjustment (NOPPA) under section 6231(a)(2) is determined in accordance with paragraph (b) of this section without regard to any modification under § 301.6225–2. Modifications under § 301.6225–2, if allowed by the IRS, may change the amount of an imputed underpayment set forth in the NOPPA and determined in accordance with paragraph (b) of this section. Only the partnership adjustments set forth in a NOPPA are taken into account for purposes of determining an imputed underpayment under this section and for any modification under § 301.6225–2.

Treas. Reg. § 301.6225–1(b)(1) provides that, in the case of any partnership adjustment by the IRS, an imputed underpayment is determined by

(i) Grouping the partnership adjustments in accordance with paragraph (c) of this section and, if appropriate, subgrouping such adjustments in accordance with paragraph (d) of this section.

(ii) Netting the adjustments in accordance with paragraph (e) of this section.

(iii) Calculating the total netted partnership adjustment in accordance with paragraph (b)(2) of this section.

(iv) Multiplying the total netted partnership adjustment by the highest rate of Federal income tax in effect for the reviewed year under section 1 or 11; and

(v) Increasing or decreasing the product that results under paragraph (b)(1)(iv) of this section

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-6 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

by—

(A) Any amounts treated as net positive adjustments (as defined in paragraph (e)(4)(i) of this section) under paragraph (e)(3)(ii) of this section; and

(B) Except as provided in paragraph (e)(3)(ii) of this section, any amounts treated as net negative adjustments (as defined in paragraph (e)(4)(ii) of this section) under paragraph (e)(3)(ii) of this section.

Treas. Reg. § 301.6225–1(b)(2) provides that, for purposes of determining an imputed underpayment under paragraph (b)(1) of this section, the total netted partnership adjustment is the sum of all net positive adjustments in the reallocation grouping described in paragraph (c)(2) of this section and the residual grouping described in paragraph (c)(5) of this section.

Treas. Reg. § 301.6225–1(b)(4) provides that, treatment of adjustment as zero for purposes of calculating the imputed underpayment. If the effect of one partnership adjustment is reflected in one or more other partnership adjustments, the IRS may treat the one adjustment as zero solely for purposes of calculating the imputed underpayment.

Treas. Reg. § 301.6225–1(c)(1) provides that, to determine an imputed underpayment under paragraph (b) of this section, partnership adjustments are placed into one of four groupings. These groupings are the reallocation grouping described in paragraph (c)(2) of this section, the credit grouping described in paragraph (c)(3) of this section, the creditable expenditure grouping described in paragraph (c)(4) of this section, and the residual grouping described in paragraph (c)(5) of this section. Adjustments in groupings may be placed in subgroupings, as appropriate, in accordance with paragraph (d) of this section. The IRS may, in its discretion, group adjustments in a manner other than the manner described in this paragraph (c) when such grouping would appropriately reflect the facts and circumstances. For requests to modify the groupings, see § 301.6225–2(d)(6).

Treas. Reg. § 301.6225–1(c)(2)(i) provides that, any adjustment that allocates or reallocates a partnership-related item to and from a particular partner or partners is a reallocation adjustment. Except in the case of an adjustment to a credit (as described in paragraph (c)(3) of this section) or to a creditable expenditure (as described in paragraph (c)(4) of this section), reallocation adjustments are placed in the reallocation grouping. Adjustments that reallocate a credit to and from a particular partner or partners are placed in the credit grouping (see paragraph (c)(3) of this section), and adjustments that reallocate a creditable expenditure to and from a particular partner or partners are placed in the creditable expenditure grouping (see paragraph (c)(4) of this section).

Treas. Reg. § 301.6225–1(c)(5)(i) provides that, any adjustment to a partnership-related item not described in paragraph (c)(2), (3), or (4) of this section is placed in the residual grouping.

Treas. Reg. § 301.6225–1(d)(1) provides that, if all partnership adjustments are positive adjustments, this paragraph (d) does not apply. If any partnership adjustment within any

grouping described in paragraph (c) of this section is a negative adjustment, the adjustments within that grouping are subgrouped in accordance with this paragraph (d). The IRS may, in its discretion, subgroup adjustments in a manner other than the manner described in this paragraph (d) when such subgrouping would appropriately reflect the facts and circumstances. For requests to modify the subgroupings, see § 301.6225–2(d)(6).

Treas. Reg. § 301.6225–1(d)(2)(i) provides that, for purposes of this section, partnership adjustments made by the IRS are treated as follows:

(A) An increase in an item of gain is treated as an increase in an item of income.

(B) A decrease in an item of gain is treated as a decrease in an item of income.

(C) An increase in an item of loss or deduction is treated as a decrease in an item of income; and

(D) A decrease in an item of loss or deduction is treated as an increase in an item of income.

(ii) Negative adjustment. A negative adjustment is any adjustment that is a decrease in an item of income, a partnership adjustment treated under paragraph (d)(2)(i) of this section as a decrease in an item of income, or an increase in an item of credit.

(iii) Positive adjustment—(A) In general. A positive adjustment is any adjustment that is not a negative adjustment as defined in paragraph (d)(2)(ii) of this section.

Treas. Reg. § 301.6225–1(d)(3)(i) provides that, except as otherwise provided in this paragraph (d)(3), an adjustment is subgrouped according to how the adjustment would be required to be taken into account separately under section 702(a) or any other provision of the Code, regulations, forms, instructions, or other guidance prescribed by the IRS applicable to the adjusted partnership-related item. A negative adjustment must be placed in the same subgrouping as another adjustment if the negative adjustment and the other adjustment would have been properly netted at the partnership level and such netted amount would have been required to be allocated to the partners of the partnership as a single partnership-related item for purposes of section 702(a), other provision of the Code, regulations, forms, instructions, or other guidance prescribed by the IRS. For purposes of creating subgroupings under this section, if any adjustment could be subject to any preference, limitation, or restriction under the Code (or not allowed, in whole or in part, against ordinary income) if taken into account by any person, the adjustment is placed in a separate subgrouping from all other adjustments within the grouping.

## TAXPAYERS POSITION

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

## DISCUSSION

The taxpayer made a determination of which items were qualified items of income, gain, deduction, and loss (IRC §199A items) and reported those items on its 201912 Form 1065.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-6 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Since the items being adjusted in 5701-1 and 5701-2 are also §199A items, and §199A items are considered partnership-related items, then the adjustments to the §199A items must also be identified and each adjustment reflected in a 5701/886A and IU computation.

There would be two additional adjustments made to the Residual grouping in order to reflect adjustments pertaining to §199A items. The following is a summary of the adjustments, with Adjustment #6 and #7 being the adjustments to Sec 199A items:

| 5701 # | Exam Adjustment Description | Form 886- Amount | Include in IU | Include in Adj Yr. | Subgrouping | Duplicative |
|---|---|---|---|---|---|---|
| 1 | Decrease to Charitable contributions – Sch K, Ln 13a | 2,105,000 | 2,105,000 | | Contributions, Schedule K, Line 13a | |
| 6 | Increase in Sec 199A Qualified Business Income | 2,105,000 | 0 | 0 | Sch K- Qualified Business Income (QBI) Deduction – Sec 199A QBI (code Z)-Sch K, Line 20c | Yes |
| 2 | Reduction in bargain sale gain - F4797, Pt 1, Ln 7 | (836,470) | 0 | (836,470) | Net section 1231 gain (loss), Schedule K, line 10 | |
| 7 | Decrease in Sec 199A Qualified Business Income | 836,470 | 836,470 | 0 | Sch K- Qualified Business Income (QBI) Deduction – Sec 199A QBI (code Z)-Sch K, Line 20c | |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-6 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Adjustment #6 is not included in the IU computation as it is duplicative. The adjustment is treated as being zero, solely for purposes of computing the IU. The decrease to charitable contributions increases taxable income which causes the §199A to also increase. Therefore, Adjustment #6 is duplicative to Adjustment #1.

Adjustment #7 is included in the IU since it is not duplicative to Adjustment #2. Adjustment #7 reflects the indirect impact of Adjustment #2 on the QBI reported.

**CONCLUSION**

The §199A charitable contribution amount would be decreased by $2,105,000. However, it is not included in the IU computation as it is duplicative. The adjustment is treated as being zero, solely for purposes of computing the IU.

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| Name of taxpayer<br>AMERICAN PROPERTIES COMPANY G P | Issue Number<br>5701-7 |
|---|---|
| Name and title of person to whom delivered<br>Plass, Richard T CPA | Date<br>09/10/2021 |
| Entity for this proposed adjustment<br>AMERICAN PROPERTIES COMPANY G P | Response Due<br>09/29/2021 |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or return line | SAIN Number | UIL Code |
|---|---|---|---|---|
| 201912 | ($836,470.00) | 199A-Section 1231 Gain | 724 | 06221B.00-00 |

Reasons for Proposed Adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (Explanation of Items).)*

See attached 886A

Taxpayer's / Representative's Action:

☐ Agreed ☐ Agreed in Part ☑ Disagreed ☐ Have additional information; will submit by:

| Taxpayer's / Representative's Signature | Date |
|---|---|
| | |

If Disagreed in Part or in Full - Check here for consideration of Fast Track Settlement

☐ Taxpayer ☐ IRS

| Team Manager | Date |
|---|---|
| Digitally signed by Q2JDB<br>Date: 2021.09.30 14:23:11 -05'00' | |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Issue Number:<br>5701-7 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Form 1065, §199A (§1231 gain)
Increase or (Decrease) to Income

| | 201912 |
|---|---|
| Per Return | $5,164,076 |
| Per Exam | $4,327,606 |
| Adjustment | -$836,470 |
| Duplicative Adjustment | 0 |
| IU Computation | $ (836,470) |

## ISSUES

1. What is the taxpayer's §199A (§1231 gain) amount?

## FACTS

The following 5701 (Notice of Proposed Adjustments) were proposed as part of the 2019 audit.

1. 5701-1 Bargain Sale Charitable Contribution
2. 5071-2 Bargain Sale (§1231) Gain

§199A items

The taxpayer reported Schedule K §199A items as part of its 201912 return and included statements on pages 137-145. Each §199A amount was included as a separate statement titled "Other Items and Amounts Statement". The statements correspond to the specific Notice of Proposed Adjustment as follows:

| Return PDF Page Number | Other Items and Amounts Statement – Other Information Description | Amount |
|---|---|---|
| 138 | Section 199A – Section 1231 Gain (Loss) | 5,164,076 |
| 140 | Section 199A – Charitable contributions | 2,595,000 |

## LAW

Internal Revenue Code

Treas. Reg. § 301.6225–1(a) (1) provides that, in the case of any partnership adjustments (as defined in § 301.6241–1(a)(6)) by the Internal Revenue Service (IRS), if the adjustments result

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-7 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

in an imputed underpayment (as determined in accordance with paragraph (b) of this section), the partnership must pay an amount equal to such imputed underpayment in accordance with paragraph (a)(2) of this section. If the adjustments do not result in an imputed underpayment (as described in paragraph (f) of this section), such adjustments must be taken into account by the partnership in the adjustment year (as defined in § 301.6241–1(a)(1)) in accordance with § 301.6225–3. Partnership adjustments may result in more than one imputed underpayment pursuant to paragraph (g) of this section. Each imputed underpayment determined under this section is based solely on partnership adjustments with respect to a single taxable year.

Treas. Reg. § 301.6225–1(a)(2) provides that, an imputed underpayment (determined in accordance with paragraph (b) of this section and included in a notice of final partnership adjustment (FPA) under section 6231(a)(3)) must be paid by the partnership in the same manner as if the imputed underpayment were a tax imposed for the adjustment year in accordance with § 301.6232–1. The FPA will include the amount of any imputed underpayment, as modified under § 301.6225–2 if applicable, unless the partnership waives its right to such FPA under section 6232(d)(2). See § 301.6232–1(d)(2). For the alternative to payment of the imputed underpayment by the partnership, see § 301.6226–1. If a partnership pays an imputed underpayment, the partnership's expenditure for the imputed underpayment is taken into account by the partnership in accordance with § 301.6241–4. For interest and penalties with respect to an imputed underpayment, see section 6233.

Treas. Reg. § 301.6225–1(a)(3) provide that, an imputed underpayment set forth in a notice of proposed partnership adjustment (NOPPA) under section 6231(a)(2) is determined in accordance with paragraph (b) of this section without regard to any modification under § 301.6225–2. Modifications under § 301.6225–2, if allowed by the IRS, may change the amount of an imputed underpayment set forth in the NOPPA and determined in accordance with paragraph (b) of this section. Only the partnership adjustments set forth in a NOPPA are taken into account for purposes of determining an imputed underpayment under this section and for any modification under § 301.6225–2.

Treas. Reg. § 301.6225–1(b)(1) provides that, in the case of any partnership adjustment by the IRS, an imputed underpayment is determined by

(i) Grouping the partnership adjustments in accordance with paragraph (c) of this section and, if appropriate, subgrouping such adjustments in accordance with paragraph (d) of this section.

(ii) Netting the adjustments in accordance with paragraph (e) of this section.

(iii) Calculating the total netted partnership adjustment in accordance with paragraph (b)(2) of this section.

(iv) Multiplying the total netted partnership adjustment by the highest rate of Federal income tax in effect for the reviewed year under section 1 or 11; and

(v) Increasing or decreasing the product that results under paragraph (b)(1)(iv) of this section

by—

(A) Any amounts treated as net positive adjustments (as defined in paragraph (e)(4)(i) of this section) under paragraph (e)(3)(ii) of this section; and

(B) Except as provided in paragraph (e)(3)(ii) of this section, any amounts treated as net negative adjustments (as defined in paragraph (e)(4)(ii) of this section) under paragraph (e)(3)(ii) of this section.

Treas. Reg. § 301.6225–1(b)(2) provides that, for purposes of determining an imputed underpayment under paragraph (b)(1) of this section, the total netted partnership adjustment is the sum of all net positive adjustments in the reallocation grouping described in paragraph (c)(2) of this section and the residual grouping described in paragraph (c)(5) of this section.

Treas. Reg. § 301.6225–1(b)(4) provides that, treatment of adjustment as zero for purposes of calculating the imputed underpayment. If the effect of one partnership adjustment is reflected in one or more other partnership adjustments, the IRS may treat the one adjustment as zero solely for purposes of calculating the imputed underpayment.

Treas. Reg. § 301.6225–1(c)(1) provides that, to determine an imputed underpayment under paragraph (b) of this section, partnership adjustments are placed into one of four groupings. These groupings are the reallocation grouping described in paragraph (c)(2) of this section, the credit grouping described in paragraph (c)(3) of this section, the creditable expenditure grouping described in paragraph (c)(4) of this section, and the residual grouping described in paragraph (c)(5) of this section. Adjustments in groupings may be placed in subgroupings, as appropriate, in accordance with paragraph (d) of this section. The IRS may, in its discretion, group adjustments in a manner other than the manner described in this paragraph (c) when such grouping would appropriately reflect the facts and circumstances. For requests to modify the groupings, see § 301.6225–2(d)(6).

Treas. Reg. § 301.6225–1(c)(2)(i) provides that, any adjustment that allocates or reallocates a partnership-related item to and from a particular partner or partners is a reallocation adjustment. Except in the case of an adjustment to a credit (as described in paragraph (c)(3) of this section) or to a creditable expenditure (as described in paragraph (c)(4) of this section), reallocation adjustments are placed in the reallocation grouping. Adjustments that reallocate a credit to and from a particular partner or partners are placed in the credit grouping (see paragraph (c)(3) of this section), and adjustments that reallocate a creditable expenditure to and from a particular partner or partners are placed in the creditable expenditure grouping (see paragraph (c)(4) of this section).

Treas. Reg. § 301.6225–1(c)(5)(i) provides that, any adjustment to a partnership-related item not described in paragraph (c)(2), (3), or (4) of this section is placed in the residual grouping.

Treas. Reg. § 301.6225–1(d)(1) provides that, if all partnership adjustments are positive adjustments, this paragraph (d) does not apply. If any partnership adjustment within any

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-7 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

grouping described in paragraph (c) of this section is a negative adjustment, the adjustments within that grouping are subgrouped in accordance with this paragraph (d). The IRS may, in its discretion, subgroup adjustments in a manner other than the manner described in this paragraph (d) when such subgrouping would appropriately reflect the facts and circumstances. For requests to modify the subgroupings, see § 301.6225–2(d)(6).

Treas. Reg. § 301.6225–1(d)(2)(i) provides that, for purposes of this section, partnership adjustments made by the IRS are treated as follows:

(A) An increase in an item of gain is treated as an increase in an item of income.

(B) A decrease in an item of gain is treated as a decrease in an item of income.

(C) An increase in an item of loss or deduction is treated as a decrease in an item of income; and

(D) A decrease in an item of loss or deduction is treated as an increase in an item of income.

(ii) Negative adjustment. A negative adjustment is any adjustment that is a decrease in an item of income, a partnership adjustment treated under paragraph (d)(2)(i) of this section as a decrease in an item of income, or an increase in an item of credit.

(iii) Positive adjustment—(A) In general. A positive adjustment is any adjustment that is not a negative adjustment as defined in paragraph (d)(2)(ii) of this section.

Treas. Reg. § 301.6225–1(d)(3)(i) provides that, except as otherwise provided in this paragraph (d)(3), an adjustment is subgrouped according to how the adjustment would be required to be taken into account separately under section 702(a) or any other provision of the Code, regulations, forms, instructions, or other guidance prescribed by the IRS applicable to the adjusted partnership-related item. A negative adjustment must be placed in the same subgrouping as another adjustment if the negative adjustment and the other adjustment would have been properly netted at the partnership level and such netted amount would have been required to be allocated to the partners of the partnership as a single partnership-related item for purposes of section 702(a), other provision of the Code, regulations, forms, instructions, or other guidance prescribed by the IRS. For purposes of creating subgroupings under this section, if any adjustment could be subject to any preference, limitation, or restriction under the Code (or not allowed, in whole or in part, against ordinary income) if taken into account by any person, the adjustment is placed in a separate subgrouping from all other adjustments within the grouping.

## TAXPAYERS POSITION

The taxpayer has indicated that they do not agree with the proposed adjustments but have not yet provided a written position.

## DISCUSSION

The taxpayer made a determination of which items were qualified items of income, gain, deduction, and loss (IRC §199A items) and reported those items on its 201912 Form 1065.

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Issue Number:<br>5701-7 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Since the items being adjusted in 5701-1 and 5701-2 are also §199A items, and §199A items are considered partnership-related items, then the adjustments to the §199A items must also be identified and each adjustment reflected in a 5701/886A and in the IU Computation.

There would be two additional adjustments made to the Residual grouping in order to reflect adjustments pertaining to §199A items. The following is a summary of the adjustments, with 5701 #6 and #7 being the adjustments to Sec 199A items:

| 5701 # | Exam Adjustment Description | Form 886- Amount | Include in IU | Include in Adj Yr. | Subgrouping | Duplicative |
|---|---|---|---|---|---|---|
| 1 | Decrease to Charitable contributions – Sch K, Ln 13a | 2,105,000 | 2,105,000 | | Contributions, Schedule K, Line 13a | |
| 6 | Increase in Sec 199A Qualified Business Income | 2,105,000 | 0 | 0 | Sch K- Qualified Business Income (QBI) Deduction – Sec 199A QBI (code Z)-Sch K, Line 20c | Yes |
| 2 | Reduction in bargain sale gain - F4797, Pt 1, Ln 7 | (836,470) | 0 | (836,470) | Net section 1231 gain (loss), Schedule K, line 10 | |
| 7 | Decrease in Sec 199A Qualified Business Income | 836,470 | 836,470 | 0 | Sch K- Qualified Business Income (QBI) Deduction – Sec 199A QBI (code Z)-Sch K, Line 20c | |

| Form 886-A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Issue Number:<br>5701-7 |
|---|---|---|
| Name of Case: American Properties, CO GP<br>Entity: American Properties, CO GP | | Year/Period Ended:<br>201912 |

Adjustment #6 is not included in the IU computation as it is duplicative. The adjustment is treated as being zero, solely for purposes of computing the IU. The decrease to charitable contributions increases taxable income which causes the §199A to also increase. Therefore, Adjustment #6 is duplicative to Adjustment #1.

Adjustment #7 is included in the IU since it is not duplicative to Adjustment #2. Adjustment #7 reflects the indirect impact of Adjustment #2 on the QBI reported.

**CONCLUSION**

The §199A (§1231 gain) amount would be decreased by $836,470. The adjustment is included in the IU computation since it is not duplicative.